# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 05-61283-CIV-COHN/Magistrate Snow

WILLIAM SCOTT TANIS,

      Plaintiff,

vs.

CHROMATEK IMAGING, INC., INC.,
a Florida corporation; ALLEN EVANS
an individual; and KAREN HOULLI,
an individual,

      Defendants.

_____

## DEFENDANTS' MOTION FOR CASE DISPOSITIVE SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

### I.    MOTION

Pursuant to Fed. R. Civ. P. 56(b), Defendants Chromatek Imaging, Inc. ("Chromatek"),

Allen Evans ("Evans") and Karen Houlli ("Houlli") (collectively the "Defendants"), move this

court for Case-Dispositive Summary Judgment on all of Plaintiff William Scott Tanis' claims.

Because Tanis' Fair Credit Reporting Act and Driver's Privacy Protection Act claims present

novel issues of law in the Eleventh Circuit, Defendants submit that an oral argument would

better permit the Court to resolve the disputes between the Parties.  Therefore, Defendants

request an oral argument as to Counts I, II, and III of Tanis' Complaint.

### II.    MEMORANDUM OF LAW

### A.    INTRODUCTION

Plaintiff William Scott Tanis ("Tanis") brought this case under the Fair Credit Reporting

Act ("FCRA"), the Driver's Privacy Protection Act ("DPPA"), Florida's Private Whistleblower

Act ("FPWA"), and a tort claim for invasion of privacy, all centering around a number of reports ordered by Defendants from Federal Background Services,[1] without Tanis' written authorization, on April 18, 2005, as part of an investigation Defendants were conducting into suspected employee theft.  Tanis claims Defendants terminated his employment from Chromatek on June 20, 2005, as a result of his complaining that Defendants had ordered several reports on Tanis.[2] Through the undisputed facts, Defendants will show that each of Tanis' claims fails.

Tanis' FCRA claims fail because Defendants ordered the Reports in connection with their investigation into suspected misconduct related to Tanis' employment (employee theft).  This is exactly the type of situation that Congress was addressing when it enacted the FACT Act[3] exemption to the FCRA, wherein communications connected to investigations into suspected misconduct related to employment were exempted from the authorization and notice requirements of the FCRA.  *See* Section B.1.a., *supra*.

Tanis' DPPA claim fails because the DPPA was not enacted to prevent an individual's current employer from having a current employee's personal information,[4] and specifically, personal information voluntarily given to the employer by the employee.  Tanis' FPWA claim fails because Defendants did not engage in any illegal conduct about which Tanis could complain, and Tanis was terminated for reasons completely unrelated to any complaints he made concerning Defendants' conduct.  Tanis' invasion of privacy claim fails because Defendants did

---

[1] Federal Background Services was the company Chromatek had used on several occasions to conduct pre-employment background checks.

[2] The reports Houlli decided to order after being directed by Evans to order Tanis "background report" were: a Florida Criminal History, a 50 State Criminal Records History, an Individual Credit History, and a Florida Driver's License History (hereinafter, the "Reports"), as well as two reports ordered in error: a National Sexual Offender/Predator record and a Florida Workers' Compensation Report.

[3] Fair and Accurate Credit Transactions Act of 2003, Pub. L. No. 108-159 (Dec. 4, 2003).

[4] Under the DPPA, personal information is defined as information that "identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information." 18 U.S.C. §2725(3).

not engage in any improper or illegal conduct, nor conduct even remotely close to being considered highly offensive to a reasonable person.

**B.     ARGUMENT**

      **1.     Pursuant to the FACT Act, the Reports Ordered by Chromatek Were Exempt from the Notice and Authorization Requirements of the FCRA**

          **a.     The FACT Act Exemption to the FCRA.**

In 2004, Congress enacted the Fair and Accurate Credit Transactions Act, which amended the FCRA, and made certain communications, i.e. consumer reports, exempt from the protections of the FCRA.   Specifically, it excluded "certain communications for employee investigations" when the communication is made "in connection with an investigation of . . . suspected misconduct relating to employment; . . . is not made for the purpose of investigating a consumer's credit worthiness, credit standing, or credit capacity; and the communication is not provided to any person except . . . to the employer or an agent of the employer."   15 U.S.C. §1681a(x)(1)(a)-(d).

This exception was Congress' response to the problem that was caused by a Federal Trade Commission opinion letter issued on April 5, 1999 (the "Vail Letter"),[5] which stated that "if an employer used experienced outside organizations to investigate employee misconduct, the investigation must comply with the notice and disclosure requirements" of the FCRA.   149 Cong. Rec. H8122-02 (daily ed. Sept. 10, 2003) (statement of Rep. Jackson-Lee).[6]   Congress recognized that the FCRA, as interpreted by the FTC, "sometimes impedes investigations of workplace misconduct . . . [by] undermin[ing] the ability of employers to use experienced, outside organizations or individuals to investigate allegations of . . . job safety and health

---

[5] The FTC issued the Vail letter in response to a private attorney's inquiry as to whether the requirements of the FCRA would extend to a sexual harassment investigation being conducted by an outside organization.
[6] 2003 WL 22097591.

violations, as well as criminal activity, **including theft**, fraud, embezzlement . . . and other types of misconduct related to employment." *Id.* (emphasis added). [7] Congress never intended this to be the result of the FCRA, however, and through the FACT Act, responded to this concern by "excluding employment investigations **that are not for the purpose of investigating the employee's credit worthiness** from the FCRA requirements." *Id.* (emphasis added).

Accordingly, in light of the clear language and purpose of the FACT Act, employers **do not** need to notify, or receive written authorization from, an employee when a report is sought by an employer in connection with an investigation of suspected misconduct related to employment, where the employee in question is the subject of the investigation. *See* 15 U.S.C. §1681a(x)(1)(b)(i); *Millard v. Miller*, No. 05-C-103-S, 2005 WL 1899475, at *3 (W.D. Wis. Aug. 9, 2005) (employer was "not obligated to comply with the permission and notice requirements of the FCRA by virtue of the exclusion in 15 U.S.C. § 1681a(x)" where employer was investigating suspected workers' compensation fraud).[8]   An investigation into possible employee theft, which is precisely the situation here, clearly falls into this exception. *See* 149 Cong. Rec. H8122-02 (daily ed. Sept. 10, 2003) (statement of Rep. Jackson-Lee).

  **b.   Chromatek Ordered the Reports on Tanis in Connection with Its Investigation into Suspected Employee Theft**

It is undisputed that in March and April 2005, Defendants Evans and Houlli were conducting an investigation into employee theft as a possible cause for the extreme increase in Chromatek's cost of goods from January to February of 2005.  (Facts, ¶¶45-49)  On March 14, 2005, Rich Gruber, Chromatek's accountant, informed Evans of the possibility of employee theft

---

[7] Congress also recognized that while the Vail letter "impacts all businesses, it is particularly damaging to small and medium sized companies [such as Chromatek] that do not have the in-house resources to conduct their own investigations." 149 Cong. Rec. H8122-02 (daily ed. Sept. 10, 2003) (statement of Rep. Jackson-Lee).

[8] The defendants in *Millard* obtained the plaintiff's credit report "for the purpose of discovering her credit card issuers so [the defendants] could subpoena [the credit card issuers'] records." *Millard v. Miller*, No. 05-C-103-S, 2005 WL 1899475, at*1 (W.D. Wis. Aug. 9, 2005).

causing the cost of goods problem. (Facts, ¶43)   Tanis admitted that he spoke with Evans in March 2005 regarding Evans' concern over the increase in the cost of goods and whether Tanis thought someone might be stealing from the company.   (Facts, ¶49)   As part of their investigation into suspected employee theft, Evans directed Houlli to order a "background" report on Tanis. (Facts, ¶48)

Houlli ordered a number of different reports, including a Florida Criminal History, a 50 State Criminal Records History, an Individual Credit History, and a Florida Driver's License History. (Facts, ¶¶50-58) The type of reports ordered by Houlli indicate that neither she, Evans, nor Chromatek were making any inquiry into Tanis' credit worthiness, credit standing, or credit capacity.   Instead, Houlli ordered the reports, including the credit report, that she felt would provide information showing whether or not Tanis had a predilection, motive, or reason to steal from Chromatek, and perhaps even provide circumstantial evidence that Tanis was stealing from Chromatek. (Facts, ¶¶52-55)

The Reports generated by Federal Background Services were provided only to Evans and Houlli.  (Facts, ¶66)  Moreover, Evans and Houlli did not receive the Reports from Federal Background Services until well after Tanis' employment with Chromatek terminated. (Facts, ¶66)

Because the Reports were made in connection with Chromatek's investigation into suspected employee theft, and were not made for the purpose of investigating Tanis' credit worthiness, credit standing, or credit capacity, Defendants' conduct falls under the FACT Act exemption to the FCRA for investigations into suspected misconduct related to employment. Counts I and II of Tanis' Complaint, for violation of the FRCA, therefore fail as a matter of law.

CASE NO. 05-61283-CIV-COHN/Magistrate Snow

2.   **THE DPPA Does Not Prohibit an Employer from Having Personal Information Concerning Its Employees.**

a.   **Disclosure of Personal Information Under the DPPA.**

Congress enacted the DPPA in order to restrict the States' ability to disclose a driver's personal information without the driver's consent. *See Reno v. Condon*, 528 U.S. 141 (2000). Specifically, as the Act's original co-sponsor stated, the DPPA was introduced in reaction to private individuals using personal information garnered from a state department of motor vehicles to assist them in carrying out crimes, including stalkers tracking down their victims. 139 Cong. Rec. S15745-01 (daily ed. Nov. 16, 1993) (statement of Sen. Harkin)[9]; *Parus v. Kropelin*, 402 F. Supp.2d 999, 1005-06 (W.D. Wis. 2005). *See also Kehoe v. Fidelity Fed. Bank & Trust*, 421 F.3d 1209, 1210 (11th Cir. 2005) (noting that "Congress enacted the DPPA to limit the release of an individual's personal information contained in his driver's license record to those who had a legitimate and lawful need for the information").

The Act defines "personal information" as information that "identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information." 18 U.S.C. §2725(3). The DPPA also defines "highly restricted personal information" as "an individual's photograph or image, social security number, medical or disability information." 18 U.S.C. §2725(4).

The DPPA also "regulates the resale and redisclosure of drivers' personal information by private persons who have obtained that information from a state DMV." *Id.* at 146. While the DPPA looks to control the dissemination of information collected by the state DMVs, it **"does not regulate information freely given by consumers to private businesses**." *O'Brien v. Quad*

---

[9] 1993 WL 470986.

*Six, Inc.*, 219 F. Supp.2d 933, 934-35 (N.D. Ill. 2002) (emphasis added).   To be eligible to recover under the DPPA, a plaintiff must prove that "(1) the defendant knowingly obtained, disclosed, or used personal information from her motor vehicle records; and (2) the purpose of such obtaining, disclosure, or use was not permissible." *Pichler v. UNITE*, 228 F.R.D. 230, 242 (E.D. Pa. 2005); 18 U.S.C. § 2724(a).

> **b.      Defendants Obtained Tanis' Personal Information Freely from Tanis Himself, not from a Motor Vehicle Record.**

It is undisputed that any personal information contained in Tanis' seven year driver's license history was freely given to Defendants by Tanis in January 2005, to verify his employment eligibility.  (Facts, ¶17)  There was no personal information in Plaintiff's seven year driver's license history that was not included in the Form I-9 that Tanis filled out and gave to Houlli and Chromatek along with a copy of his driver's license in January 2005.  (Facts, ¶17) Moreover, Tanis also provided the same personal information to Chromatek in order to be placed on Chromatek's auto insurance in the event that he wanted to use the company van for deliveries. (Facts, ¶17)

The only information included in the driver's license report that was not on the Form I-9 and related documents was Tanis' driver status, accident record, and driving violations.  (Facts, ¶55)  That information, however, is not considered "personal information" under the DPPA.  *See* 18 U.S.C. §2725(3) ("'personal information' . . . does not include information on vehicular accidents, driving violations, and driver's status").   The DPPA simply does not apply to information that was freely given by an employee to his employer.  *See Quad Six, Inc.,* 219 F. Supp.2d at 934-35 (dismissing a DPPA claim and holding that the DPPA "does not regulate information freely given by consumers to private businesses, such as when plaintiff tendered his

CASE NO. 05-61283-CIV-COHN/Magistrate Snow

drivers' license to [the nightclub]").[10]   As a result, Defendants did not obtain any of Tanis' "personal information" from a motor vehicle record, but in fact, had received Tanis' personal information from Tanis himself in January 2005.

### c.   Defendants Had a Permissible Use for the Driver's License History.

Further, Houlli requested Tanis' seven year driver's license history in connection with Defendants' investigation into suspected employee theft.  (Facts, ¶¶51,54)  By its very nature, an investigation involves research.[11]   Houlli therefore had a permissible use for Tanis' driver's license history because she ordered it as part of her research into whether Tanis had the propensity to, or may have actually, stolen from Chromatek.  *See* U.S.C. § 2721(b)(5) (one permissible use under the DPPA is "[f]or use in research activities").

Because the DPPA would not apply to a situation where, as here, Defendants did not obtain any of Tanis' personal information from a motor vehicle record but freely from Tanis himself, and because Defendants had a permissible use for the driver's license history, Count III of Tanis' Complaint, for violation of the DPPA, fails as a matter of law.

### 3.   Defendants' Did Not Engage in Any Illegal Conduct to Which Tanis Objected and Tanis Was Terminated for Numerous Reasons, All Unrelated to His Complaints Over the Reports Chromatek Had Ordered on Him

Pursuant to the FWPA, an employer may not retaliate against an employee who has "[o]bjected to, or refused to participate in any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."  *See* Fla. Stat. § 448.102(3).  Florida state and federal courts apply the Title VII framework to retaliation claims brought under the FWPA.  *Rice-Lamar v. City of Fort Lauderdale*, 853 So.2d 1125, 1132 (Fla. 4th DCA 2003); *Sierminski v. Transouth*

---

[10] The defendant nightclub videotaped the plaintiff's driver's license, entered his name and address into a database, and shared the database with other nightclubs in order to distribute their promotional items.
[11] Merriam-Webster defines "research" as an "investigation or experimentation aimed at the discovery and interpretation of facts."  *Merriam-Webster Online Dictionary* (2006) <http://www.m-w.com/dictionary>

CASE NO. 05-61283-CIV-COHN/Magistrate Snow

*Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000).

In order to establish a *prima facie* case for whistleblower retaliation, Tanis must establish "(1) that there was a statutorily protected participation; (2) that an adverse employment action occurred; and (3) that there was a causal link between the participation and the adverse employment action."[12] *Padron v. Bellsouth Telecommunications, Inc.*, 196 F. Supp.2d 1250, 1255 (S. D. Fla. 2002) (King, J.); *see also Sierminski*, 216 F.3d at 950-51; *Rice-Lamar*, 853 So. 2d at 1132. Once the *prima facie* case is established, Chromatek and Evans must proffer a legitimate, non-retaliatory reason for the adverse employment action. Tanis, however, "bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct." *Rice-Lamar*, 853 So. 2d at 1133; *Sierminski*, 216 F.3d at 950.

    **a.**    **Tanis Cannot Establish a *Prima Facie* Case for Whistleblower Retaliation.**

In order to establish the first prong of the *prima facie* test, Tanis must show that the conduct he objected to was illegal. *See Taylor v. Memorial Health Sys., Inc.*, 770 So. 2d 752, 753-54 (Fla. 5th DCA 2000); *see also White v. Purdue Pharma, Inc.*, 369 F. Supp.2d 1335, 1337 (M.D. Fla. 2005) (employee "must prove that the activity, policy or practice objected to is, in fact, in violation of a law, rule or regulation").

The only alleged illegal conduct to which Tanis objected was Defendants' ordering the Reports from Federal Background Services on April 18, 2005. (Complaint, at ¶¶33,39, Dkt. #1) As discussed in detail in Sections 1 and 2, *infra*, neither Houlli, Evans, nor Chromatek engaged in any illegal conduct when Houlli ordered the Reports on Tanis. Moreover, it is undisputed Defendants did not receive the Reports until July 22, 2005, more than a month after Evans and

---

[12] For summary judgment purposes only, Defendants concede that Tanis suffered an adverse employment action, namely his termination on June 20, 2005.

CASE NO. 05-61285-CIV-COHN/Magistrate Snow

Randy Schneider terminated Tanis' employment.  (Facts, ¶¶41,66)  Therefore, when Tanis demanded that Evans turn over the Reports on June 8, 2005, there were no documents to turn over.  Further, in light of the delay to Chromatek receiving the Reports from Federal Background Services, Tanis' termination could not have been based on any information contained in the Reports.

> **b.**     **Plaintiff Was Terminated for Failing to Achieve His Sales Goals, Insubordination, and Due to Three Separate Complaints Brought by Female Employees.**

The undisputed evidence shows that Chromatek terminated Tanis for reasons completely unrelated to any complaints he may have made as to the ordering of the Reports.  Therefore, Tanis cannot prove that the proffered reasons for his termination were mere pretext for retaliation. *See Rice-Lamar*, 853 So. 2d at 1133; *Sierminski*, 216 F.3d at 950.  Indeed, pursuant to the very language of the FWPA, Tanis may not recover if the alleged retaliatory personnel action "was predicated upon a ground other than the employee's exercise of a right protected" by the FWPA.  Fla. Stat. § 448.103(1)(c); *see also Padron*, 196 F. Supp.2d at 1255.

The undisputed facts show that Tanis was terminated for reasons completely unrelated to any complaints he may have raised over Chromatek's ordering of the Reports.  For the nine months Tanis worked at Chromatek, he consistently failed to even come close to hitting the sales goals that he himself had proposed.  (Facts, ¶20)  Tanis averaged only $37,000 in sales per month, well below the $47,500 goal he had proposed, and upon which his annual salary of $57,000 was based.  (Facts, ¶20)  In fact, during his nine months at Chromatek, Tanis only achieved his monthly sales goal twice.  (Facts, ¶20)

Not only could Tanis not meet the sales goals of his sales manager position, but he also consistently failed to show he was capable of being an effective manager and team player.  On

CASE NO. 05-61285-CIV-COHN/Magistrate Snow

three different occasions, female employees, who represented the three different departments at Chromatek, complained to Evans about Tanis' behavior. (Facts, ¶¶21-28) On January 6, 2005, Houlli, the accounting manager, expressed her feeling harassed and disrespected by Tanis and followed up on her complaint by resigning on January 18, 2005. (Facts, ¶¶21-23) Barely three months later, on April 22, 2005, Laura Morales, the production department supervisor, resigned from her supervisory post due to the constant verbal harassment by Tanis and the overwhelming stress it caused her. (Facts, ¶¶24-25)

Finally, on June 7, 2005, just days after Tanis complained about Chromatek ordering the Reports, the third complaint against Tanis was brought to Evans by Karen Alper, a saleswoman who was hired in part based on a recommendation from Tanis. (Facts, ¶¶27-28) Alper made a formal complaint by email to Randy Schneider, Chromatek's Vice President of Sales, on June 8, 2005, claiming that she had received no direction, encouragement, or support from Tanis, who was her direct supervisor and responsible for her training. (Facts, ¶28)

The last straw came approximately one week later, with Tanis' continued insubordination and disdain he showed for Schneider. Tanis refused to take Schneider with him on sales calls as Schneider requested, and refused to cross sell the public relations services of Evans' other business, Full Spectrum Media. (Facts, ¶39) Moreover, Tanis disagreed with nearly every change Schneider tried to implement in order to improve Chromatek's sales. (Facts, ¶39) Specifically, on or around June 17, 2005, upon Schneider informing Tanis of Schneider's decision to change the pay structure for sales people to a 100% commission basis as of July 1, 2005, Tanis proceeded to hang up on Schneider. (Facts, ¶40) He then called back only to tell Schneider that he knew nothing about the business and was nothing but a puppet for Evans.

(Facts, ¶40)   Tanis then proceeded to speed dial and hang up on Schneider until 9:45 p.m. (Facts, ¶40)

At that point, it was obvious to Schneider that Tanis was not going to work out at Chromatek.   Schneider had been trying to work with Tanis to help him improve his sales rather than terminate Tanis as Evans had been considering prior to Schneider joining Chromatek. (Facts, ¶¶31,35)   All Schneider got for his efforts was blatant insubordination.  (Facts, ¶¶39-40) At that point, Schneider knew that Tanis would not be able to work with Schneider, leaving he and Evans with no choice but to terminate Tanis' employment on June 20, 2005.  (Facts, ¶41)

Because Tanis cannot show that the conduct he complained about was illegal, or that he even was terminated for making any such complaint, Count IV of Tanis' Complaint, for violation of the FWPA, fails as a matter of law.

### 4. Tanis' Tort Claim for Invasion of Privacy Does Not Fit Into Any of the Four Recognized Categories under Florida Common Law

Florida does recognize a claim for invasion of privacy; however, there are four distinct categories for common law invasion of privacy:

> (1) appropriation--the unauthorized use of a person's name or likeness to obtain some benefit; (2) intrusion--physically or electronically intruding into one's private quarters; (3) public disclosure of private facts--the dissemination of truthful private information which a reasonable person would find objectionable; and (4) false light in the public eye--publication of facts which place a person in a false light even though the facts themselves may not be defamatory.

*Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003) (citing *Agency for Healthcare Admin. v. Associated Indus. of Florida, Inc.*, 678 So. 2d 1239, 1252 n.20 (Fla. 1996)).  Tanis' entire claim for invasion of privacy is based upon his allegation that by "illegally, intentionally, and willfully obtaining Plaintiff's credit report, driver's license information, personal information, highly restricted personal information, motor vehicle record, and other confidential

background information under false pretenses, Defendants have intruded upon Plaintiff's private affairs and matters and have thus violated his individual rights under Florida law to seclusion, solitude, and privacy." (Complaint, ¶74)

Based on the allegations as pled, Tanis appears to be attempting to fit his invasion of privacy claim into category number two, for intrusion, by his allegation that Defendants "have intruded upon Plaintiff's private affairs and matters." (Complaint, ¶74). Florida courts generally look for an actual physical or electronic intrusion (such as by video or audio taping a person in their home) to support a claim of invasion of privacy based on intrusion upon seclusion. *See, e.g., Associated Indus.*, 678 So. 2d at 1252; *Goosen v. Walker*, 714 So. 2d 1149, 1150 (Fla. 4th DCA 1998); *Thompson v. City of Jacksonville*, 130 So. 2d 105 (1st DCA 1961). Under the Restatement 2d of Torts, for example, the invasion must be "of a kind that would be highly offensive to a reasonable [person]." Restatement 2d Torts, §652B. For example, such an intrusion "may be . . . by some other form of investigation or examination into [a person's] private concerns, as by opening his private and personal mail . . . or compelling him by a forged court order to permit an inspection of his personal documents." Restatement 2d Torts, §652B, cmt. b.

No such physical or electronic intrusion has occurred here, nor did Defendants engage in any conduct that would be "highly offensive to a reasonable man." Defendants simply conducted an investigation into suspected employee theft. In connection with that investigation, the Reports were ordered on Tanis in order to determine whether Tanis might have had some motive or incentive to steal from Chromatek, or even provide circumstantial evidence that Tanis was stealing from Chromatek. (Facts, ¶52) The Reports were never published to any third party, only to Chromatek in July 2005, and only Allen Evans ever reviewed the reports. (Facts, ¶66)

Under the FACT Act exemption to the FCRA, Defendants were well within their rights to order the Reports. *See* 15 U.S.C. §1681a(x)(1)(a)-(d).

Moreover, the majority of the personal information into which Defendants allegedly intruded already had been given freely to Defendants by Tanis, or was a matter of public record. For example, all of the "personal information" contained in Tanis' motor vehicle record had been given to Defendants by Tanis in January 2005, upon his completion of a Form I-9 for employment verification. (Facts, ¶¶17,55)  Further, any information contained in Tanis' criminal records is part of a state's public record, to which Tanis has no expectation of privacy. *See Aid for Women v. Foulston*, __ F.3d __, No. 04-3310, 2006 WL 723354, at *18 (10th Cir. Jan. 27, 2006); *see also Campbell v. Lyon*, 26 Fed.Appx. 183, 188 (4th Cir. Dec. 27, 2001) (finding that in an invasion of privacy, the plaintiff did "have a criminal record, and that criminal record is a matter of public record"); *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996) ("one's criminal history is arguably not a private 'personal matter' at all, since arrest and conviction information are matters of public record"); *Trade Waste Mgmt. Ass'n v. Hughey*, 780 F.2d 221, 234 (3d Cir.1985) (holding plaintiff's claim of a privacy right in records of a criminal conviction and pending criminal charges failed because such "matters are by definition public").

Because Tanis has failed to come forward with any evidence showing that Defendants' ordering of the Reports was illegal, or otherwise "highly offensive to a reasonable [person],"[13] Count V of Tanis' Complaint, for invasion of privacy, fails as a matter of law.

---

[13] Indeed, Tanis failed to even plead that Defendants' conduct was highly offensive, and instead simply alleged that the conduct was illegal.  (Complaint, ¶74)

CASE NO. 05-61283-CIV-COHN/Magistrate Snow

### III.    CONCLUSION

As discussed at length above, Tanis cannot establish that pursuant to the FACT Act, Defendants' conduct was not exempted from the notice and authorization requirements of the Fair Credit Reporting Act.  Moreover, Tanis cannot establish that the Driver's Privacy Protection Act would apply to an employer who obtained an employee's personal information freely by the employee himself, nor that Defendants did not have a permissible use for Tanis' driver's license report.  Tanis also cannot prove the elements for a *prima facie* case of whistleblower retaliation, or that he was terminated for any reason other than his own failure to achieve his sales goals, his insubordination, and the three independent complaints brought against him by female employees. Finally, Tanis cannot show that Defendants intruded on any right to privacy enjoyed by Tanis. Defendants Chromatek Imaging, Inc., Allen Evans, and Karen Houlli therefore respectfully request that all claims be dismissed as a matter of law and that the Court award Defendants their attorney's fees and costs, including under 15 U.S.C. §1681n(c), and Fla. Stat. § 448.104, for having to defend this litigation.

Dated this 7th day of April, 2006.

Samuel A. Terilli, Esq.
Fla. Bar #352535
Kevin D. Smith, Esq.
Fla. Bar #0528137
FORD & HARRISON LLP
100 S.E. 2nd Street
Suite 4500
Miami, Florida 33131
Telephone: (305) 808-2100
Facsimile:  (305) 808-2101

Kevin D. Smith, Esq.
Attorneys for Defendants

CASE NO. 05-61283-CIV-COHN/Magistrate Snow

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by

U.S. mail this 7th day of April, 2006 to:

Dion J. Cassata, Esq.
John J. Hanson, Esq.
CASSATA & HANSON, P.L.
1250 E. Hallandale Beach Blvd.
Suite 607
Hallandale Beach, Florida 33009
Tel: 954-364-7803
Fax: 954-251-4787
Attorneys for Plaintiff

By: _____
    Attorney

Miami:73717.1

-16-

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 05-61283-CIV-COHN/Magistrate Snow

WILLIAM SCOTT TANIS,                        :
                                             :
      Plaintiff,                      :
                                             :
vs.                                          :
                                             :
CHROMATEK IMAGING, INC.                      :
a Florida corporation; ALLEN EVANS           :
an individual; and KAREN HOULLI,             :
an individual,                               :
                                             :
      Defendants.                     :
_____     :

### APPENDIX TO
### DEFENDANTS' MOTION FOR CASE DISPOSITIVE SUMMARY JUDGMENT
### AND INCORPORATED MEMORANDUM OF LAW

1.     Excerpts from Deposition of Robert Allen Evans taken on March 3, 2006.

2.     Excerpts from Deposition of Karen Houlli taken on February 13, 2006.

3.     Excerpts from Deposition of William Scott Tanis taken on February 24, 2006.

4.     Excerpts from Deposition of Harvey Tucker taken on March 10, 2006.

5.     Declaration of Robert Allen Evans dated April 7, 2006.

6.     Declaration of Richard Gruber dated April 6, 2006.

7.     Declaration of Karen Houlli dated April 7, 2006.

8.     Declaration of Randy Schneider dated April 6, 2006.

Miami:73806.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE No.: 05-61283-CIV-COHN/SNOW

---------------------------------------

WILLIAM SCOTT TANIS,

       Plaintiff,

-vs-

CHROMATEK IMAGING, INC., a
Florida corporation; ALLEN
EVANS, an individual; and KAREN
HOULLI, an individual,

       Defendants.

---------------------------------------

            Fort Lauderdale, Florida
            March 3rd, 2006
            10:05 p.m.

        VOLUME I, PAGES 1 - 129
          DEPOSITION
            OF
       ROBERT ALLEN EVANS

Page 11

1    were all your duties with PriceSmart, what did you --

2    what were you hired to do, and what did you end up

3    doing?

4            A.    I was hired as, I believe, an operations

5    specialist, reporting to the chief operating officer;

6    and when I left, I was senior vice president of

7    logistics and international services.

8            Q.    Okay.  And so you left to take time off

9    to spend with your wife and family and to --

10           A.    Pretty much at the doctor's orders, yeah.

11           Q.    Okay.

12           A.    If she was going to get -- if she was

13   going to recover, it meant that she needed to be --

14   Basically, I guess, she couldn't lift, she couldn't do

15   anything like that, she couldn't lift more than a

16   gallon of milk, she couldn't exert herself, so she

17   couldn't take care of the kids.

18           Q.    How long did you spend at home?

19           A.    Till the time that I purchased the assets

20   of Chromatek.

21           Q.    Okay.  Which would have been when?

22           A.    September of 2004.

23           Q.    And how did you come to do that, how did

24   you hear about the opportunity to do that?

25           A.    Through a business broker.

Page 12

1    Q.    Okay.  Who's the business broker?

2    A.    I believe his name was Edwin Pena.

3    Q.    Okay.  Did he work with a firm or with --

4    A.    He worked with a firm.

5    Q.    Okay.  Where was he based out of?

6    A.    South Florida someplace, I'm not sure

7  exactly.

8    Q.    Okay.

9    A.    I believe his cell phone was a 954 number

10  or a 786 number.  I can't remember now.

11    Q.    Okay.  But you were looking to buy a

12  business?

13    A.    Uh-huh.

14    Q.    Why did you want to do that?

15    A.    Because I felt I wasn't in a situation to

16  travel anymore because of my wife's situation.

17    Q.    Okay.

18    A.    So I was looking for something that

19  didn't require me to travel, and that I could provide

20  for my family.

21    Q.    Okay.  And you looked at several

22  businesses, I assume, and --

23    A.    Uh-huh.

24    Q.    -- chose to buy the assets of Chromatek?

25    A.    Yes.

1      Q.    Did you know anything about what

2   Chromatek does or their business?  Had you had any

3   experience in that?

4      A.    Well, at PriceSmart, all of our stores

5   had photo processing and photo services in them, so I

6   was familiar with the business.  I hadn't had a

7   hands-on experience with the business, but I was

8   familiar with the business and the potential profits

9   in the business.

10     Q.    Okay.  So, you purchased --

11     A.    We had roughly, I think, 33 stores, so we

12  had 33 photo labs.

13     Q.    Okay.  What does Chromatek do?

14     A.    It's a photo lab.

15     Q.    Okay.  And beyond being a photo lab --

16           By "photo lab," I'm assuming that you

17  develop film, but you do a lot more than that, I would

18  guess.

19     A.    We develop film and we print everything

20  on photographic paper, for the most part.

21     Q.    Okay.  And, I mean, do you do this for

22  individuals or businesses or how does that --

23     A.    Whoever wants -- whoever wants --

24     Q.    Okay.

25     A.    -- our services.  We do it for

Page 14

1     individuals, we do it for professional photographers,

2     we do it for corporations, we do it for law firms, we

3     do it for --

4          Q.     Okay.  Do you do, I guess, point of sales

5     displays and that kind of stuff?

6          A.     Uh-huh.

7          Q.     Okay.  Who owns Chromatek?

8          A.     I do.

9          Q.     Solely?

10         A.     Yes.

11         Q.     Okay.  Is it an S corporation?

12         A.     Yes.

13         Q.     Is it affiliated with any other company?

14         A.     When you say "affiliated," what do you

15    mean?

16         Q.     Well, let me back up.

17                Are you a manager, director, or principal

18    of any other corporate entities?

19         A.     I am.

20         Q.     Okay.  What are those corporate entities?

21         A.     One called Evans Grouping.

22         Q.     Okay.

23         A.     One called Full Spectrum Media.

24         Q.     Okay.

25         A.     One called E-Bove.

Page 23

1         A.     Me and my wife.

2         Q.     Oh, okay.

3                3400 Powerline, are you the sole owner of

4    that?

5         A.     Uh-huh.

6                MR. SMITH:   Remember to use "yes" or

7         "no's," rather than --

8                THE WITNESS:   Uh-huh.   Yes.

9                MR. CASSATA:   Yeah.

10               MR. SMITH:   It just makes her job easier.

11        Q.     (By Mr. Cassata)   Okay.   And what is

12   your position with Chromatek?

13        A.     I'm the owner/president.

14        Q.     And do you have a --

15               Owner and president?

16        A.     Uh-huh.

17        Q.     And are there any other officers or

18   directors?

19        A.     Randy's vice president of sales.

20        Q.     Okay.   When did he become vice president

21   of sales?

22        A.     We talked about it February of 2005,

23   formalized it in June of 2000.

24        Q.     June of 2005?

25        A.     Yes.

1        So, to say how much exactly of my time do

2   I spend doing Chromatek, I mean --

3        Q.    No, I was just looking for a rough

4   estimate.

5        A.    Okay.

6        Q.    What percentage of the time would

7   Schneider -- would Randy Schneider devote to

8   Chromatek?

9        A.    I would say 50/50 between.

10       Q.    Okay.  Would you say up until early June,

11   he didn't do much of anything for Chromatek; is that

12   right?

13       A.    He -- he would advise me on sales issues,

14   but he was not -- Chromatek was certainly not his main

15   focus.

16       Q.    Did he have any position with Chromatek

17   up until June 2005?

18       A.    Not -- not in an official -- I mean, it

19   was very well known that Randy was part of everything

20   that I do; and so I relied heavily on him for anything

21   that -- we talked very often about business --

22   business opportunities, business --

23       Q.    Okay.

24       A.    -- strategies.  He was in the office a

25   lot.

Page 26

1          Q.     What do you mean by "well known"?  It's

2    well known that -- among who?

3          A.     Everybody at Chromatek or anybody that

4    knows me, I mean, knows that Randy and I do a lot of

5    things together, and --

6          Q.     Okay.

7          A.     -- business-wise we -- I mean, he's in

8    the office very regularly, so --

9          Q.     Okay.  I mean, was he --

10                Up until June 2005, what was his main

11   job, would you say?

12         A.     His main job was Full Spectrum.

13         Q.     And at that time, it was also located at

14   3400 --

15         A.     No, it was not.  It was located in Boca

16   Raton.

17         Q.     Okay.  When did Full Spectrum move to

18   3400 Powerline Road?

19         A.     When the lease in Boca expired, which I

20   believe was towards the end of 2005.

21         Q.     Okay.  So, relatively recently Full

22   Spectrum moved its operations into 3400 --

23         A.     Exactly.

24         Q.     -- Powerline?

25                So, Randy became the VP of sales in June

Page 27

1  2005, for Chromatek?

2         A.    I think -- I don't know if you actually

3  put a date on it.  I mean, Randy and I talked

4  specifically about him taking over those

5  responsibilities in February.

6         Q.    Okay.

7         A.    He said that June 1st would be when he

8  could actually -- felt that he would be able to be in

9  the office full time.

10        Q.    Okay.  And is that when he started full

11  time or --

12        A.    Yeah, right --

13        Q.    Early June?

14        A.    Early June, yeah.

15        Q.    Okay.  Up until that point, he did not

16  have any official position with Chromatek; is that

17  correct?

18        A.    Up until that point --

19              I guess I'm trying to define "official"

20  from -- again, a definition of "official" from you.

21        Q.    Okay.

22        A.    He -- he was very involved with

23  everything that I did.  So, did I ever talk to him

24  about Chromatek?  Absolutely, all the time.  Did I

25  rely on his opinions?  Absolutely.

1    Q.    Did --

2    A.    I mean, did I ever talk to him about

3    Chromatek sales?  Certainly.  Did I talk to him

4    about --

5            I don't know what you're trying to ask.

6    Q.    No, I'm just -- I'm just --

7    A.    I mean, so if that's "official," then he

8    was official probably long before June.

9    Q.    When he became VP of sales in early June

10   2005, what became his duties?

11   A.    You know, he stepped into my shoes in

12   everything related to sales.

13   Q.    He stepped into your shoes everything

14   related --

15           Okay.  Did he become a supervisor at that

16   point?  Did he have supervisory authority at that

17   point?

18   A.    Yes.

19   Q.    Who did he supervise?

20   A.    The sales organization.

21   Q.    And who would that include?

22   A.    At the time, I believe, Scott was sales

23   manager --

24   Q.    Uh-huh.

25   A.    And I believe Karen Alper was a sales --

Page 31

1         A.    I believe so.

2         Q.    Okay.  Did they have ten employees in

3    April, like April 18th, 2005?

4         A.    I believe so.

5         Q.    Okay.  When was Karen Houlli hired?

6         A.    Shortly after I purchased the assets.

7         Q.    Okay.  Roughly --

8         A.    I would say within the first month of

9    owning the --

10        Q.    So, would you say October or November of

11   2004?

12        A.    I would say it was probably late

13   September, early October.

14              She -- she was hired to replace the

15   owner's wife, who was doing the accounting and

16   bookkeeping --

17        Q.    Okay.

18        A.    -- and --

19        Q.    Okay.

20        A.    So, that was a priority when I got there,

21   too.

22        Q.    When you purchased the assets of

23   Chromatek, how many -- how many employees then existed

24   with Chromatek Photo?

25        A.    I believe twelve.

Page 32

1        Q.      Okay.

2        A.      Twelve or 13.

3        Q.      **Twelve or 13 full-time employees?**

4        A.      I believe that they were all full time.

5    I can't think of any part time off my -- the top of my

6    head.

7        Q.      Okay.  **Were there any employees that were**

8    **with Chromatek Photo, but you chose not to retain with**

9    **Chromatek Imaging?**

10       A.      No.

11       Q.      **You retained all of them?**

12       A.      There was one employee, Gelitza, who gave

13   her notice just prior to -- right around the time of

14   the -- that I purchased the assets.  I don't know if

15   it was prior to that or if it was right after I

16   purchased them.

17              But she gave her notice that she was

18   going to be leaving; and so she worked -- she did work

19   for Chromatek Imaging for a period of two weeks or so.

20   It may have been a little longer, actually, Dion.  I

21   don't know the exact date.  It may have been a month.

22   I can't remember what she had given.

23       Q.      Okay.  **And just to back up, so I was**

24   **clear on something, up until June 6th, 2005, Randy**

25   **Schneider had no supervisory role with respect to**

Page 33

1    Chromatek; is that correct?

2         A.    No.

3         Q.    He did not supervise employees, did he?

4         A.    That would be correct.

5         Q.    Okay.

6         A.    You know what?  That let me clarify that.

7    That was the date that I announced to the other

8    employees that he was assuming that role.

9         Q.    On June 6th?

10        A.    On June 6th.

11              On June 1st, Scott and Randy and I had a

12   lunch meeting at Champs, and at that point we had told

13   Scott that he was coming on and taking responsibility

14   for sales for all of the organizations that -- that

15   Randy -- that I owned as far as -- I'm sorry, for Full

16   Spectrum and for Chromatek Imaging.

17        Q.    Okay.  So --

18        A.    And at that time we had talked to Scott.

19        Q.    Okay.  I wasn't wanting to get into that

20   yet, but --

21        A.    But you --

22        Q.    No, I was just --

23        A.    Well, you just asked when did he have

24   supervisory, when did we talk about that --

25        Q.    Yeah.

Page 34

1          A.     -- I mean, that's the first time that it

2    was made known to anyone that he was going to be

3    having supervisory experience.  The actual employee

4    announcement came on the 6th.

5          Q.     So, you're saying on June 1st, Scott was

6    made aware that Randy was his new boss?

7          A.     Uh-huh.

8          Q.     Okay.  Effective immediately?

9          A.     Exactly.  And that we would be -- we

10   wanted to work on the sales between Chromatek Imaging

11   and Full Spectrum --

12         Q.     Uh-huh.

13         A.     -- and that Randy was taking

14   responsibility for all of that.

15         Q.     Okay.  So, it's your position that on

16   June 1st, Scott would have been under the impression

17   that Randy was his boss?

18         A.     Yes.

19         Q.     Okay.  As you know, one of the issues in

20   this case is whether there's an investigation into

21   suspected employee theft or misconduct.

22               When did you first suspect -- Hold on,

23   scratch that, actually.

24               Before we go any further, you were -- I'd

25   like to enter Plaintiff's Exhibit A -- or 1, rather.

1     MR. SMITH:  Object to form.

2   Q. (By Mr. Cassata)  Okay.  Do you have any

3 objections to appearing as the corporate

4 spokesperson as to these subjects for Chromatek

5 Imaging?

6   A. No.

7   Q. Okay.  Going forward with the deposition,

8 I'm going to be asking you questions in your capacity

9 as Chromatek.

10   A. Okay.

11   Q. And I'll be clear when I'm -- if I change

12 gears and ask you a question as Allen Evans, I'll ask

13 you to take your Chromatek hat off and answer as

14 Evans.

15   A. Okay.

16   Q. And I'm sure your lawyer will remind me

17 if I ask a question that --

18     You were going to say something?

19   A. No.  I just --

20   Q. Okay.  All right.  Okay.  I'll ask you

21 Chromatek from this point forward unless I say

22 differently.

23   A. By the way, Chromatek didn't go to

24 college.

25   Q. When did Chromatek first suspect employee

1  theft or misconduct?

2         A.    The first time that I was -- became

3  extremely concerned about it was in a meeting with my

4  accountant sometime in March regarding the February

5  financials.

6         Q.    Okay.  And --

7         A.    Typically, we -- I received the

8  financials from the previous month sometime during the

9  first week or two of the following month --

10        Q.    Uh-huh.

11        A.    -- and then I usually meet with the

12 accountant, either I stop by or I --

13        Q.    Okay.  And who's the accountant?

14        A.    Gruber & Associates.

15        Q.    And where are they located?

16        A.    Fort Lauderdale.

17        Q.    So, in early March 2005, you got the

18 February financials, and that would reflect the sales

19 information and accounts receivable and expenditures

20 and that kind of thing?

21        A.    Uh-huh.

22        Q.    Okay.

23        A.    Income statement.

24        Q.    Okay.  And what about the February

25 financials caused you concern?

Page 38

1      A.      There had been a big swing in the cost of

2   goods, percentage of cost of goods as a percentage of

3   sales.

4      Q.      Okay.  And why wasn't that readily

5   discernible as to where that increase came from?

6      A.      I'm sorry, what?

7      Q.      What I'm asking is, you said there was a

8   big swing in the cost of goods or the percentage.

9      A.      Right.

10     Q.      Okay.  Wouldn't it be apparent from the

11  financial numbers or apparent from, you know, your

12  order forms possibly where this increase came from?

13          MR. SMITH:  Object to the form.

14     A.      I still am not following you.  I mean, I

15  was looking at the financial statement, and that's

16  when I could see that -- what the numbers were for

17  January versus what the numbers were for February --

18     Q.      Okay.

19     A.      -- and there -- there was a big

20  percentage difference.

21     Q.      Okay.  What I'm -- I guess what I'm

22  getting at is --

23     A.      It would be --

24     Q.      -- what sort of goods are we talking

25  about?

Page 39

1        A.    The materials used to produce the stuff

2   that we sell.

3        Q.    Okay.  And what are those materials,

4   generally?

5        A.    Paper.  Any --

6        Q.    Developer, chemicals?

7        A.    Yeah, exactly.  Paper, chemicals,

8   laminating film.

9        Q.    Okay.

10       A.    Those types of things.

11       Q.    Okay.  What I'm getting is, if there was

12   a big increase in the cost of these items in February,

13   wouldn't it be readily discernible that, hey, I

14   ordered more film this particular month, or, oh, we --

15   you know, we had to order more laminating solution at

16   this --

17            MR. SMITH:  Object to form.

18       Q.    (By Mr. Cassata)  -- this given time?

19       A.    I think the -- I think what you're

20   confused in is that we -- we calculate cost of goods

21   based on what's used, not what we purchase.

22            So, if we have ten to start the month

23   with --

24       Q.    Uh-huh.

25       A.    -- and I order 20, and I end up with

1   five --

2          Q.     Uh-huh.

3          A.     -- I've used 25, not 20 that I purchased.

4          Q.     Okay.

5          A.     Do you see what I'm saying?  Because --

6          Q.     So, you're saying that when you got the

7   February financials, you noticed that more goods had

8   been used up?

9          A.     As a percentage of sales --

10         Q.     Okay.

11         A.     -- versus January --

12         Q.     Okay.

13         A.     -- as a percentage of sales.

14         Q.     Okay.  So, the February financial

15  statements --

16         A.     You can't -- it's hard to tell exactly

17  throughout the month how much is --

18         Q.     Okay.

19         A.     -- is -- was existing inventory and how

20  much is being used of inventory you purchased that

21  month until you reconcile at the end of the month --

22         Q.     Okay.

23         A.     -- with your physical inventory.

24         Q.     So, to put it simply, though, the

25  February financial statement indicated that you had

Page 41

1   gone through a lot more inventory than normal?

2          A.     Than we'd gone through in January;

3   absolutely.

4          Q.     In the month of January; okay.

5          A.     When you compare those two, it was a

6   big --

7          Q.     Okay.  And you couldn't figure out why

8   you went through that level of inventory?

9          A.     It was a big concern when we were looking

10  at the financial statements, and the accountant said

11  there's a big -- big shift here in your cost of

12  goods --

13         Q.     Uh-huh.

14         A.      -- and then we started to talk about the

15  things that would cause a shift in that.

16         Q.     Okay.  And what were those things that

17  might cause a shift?

18         A.     It could be a timing in the receiving.

19  If something was received after the previous month

20  closed, but it really had been -- should have been

21  received in the month before.

22                So, say, at the end of January, if

23  something came in at the end of January, and it didn't

24  get received in in January's --

25         Q.     Uh-huh.

Page 42

1      A.     -- it would -- it would appear to
2  understate January's and overstate February's numbers
3  if it had gotten booked as receiving in February
4  instead of January.  So, a cutoff issue was a big
5  thing, so the timing.
6      Q.     Okay.  The timing in the -- the
7  receivables.
8      A.     Receiving.
9      Q.     What other --
10      A.     Timing and invoicing.
11      Q.     Okay.
12      A.     If something shipped out in January, but
13  didn't get invoiced until February, your sales numbers
14  would be inflated or --
15      Q.     Uh-huh.
16      A.     I guess that wouldn't really cause the --
17  the percentage to go up, that would cause it to go
18  down; but timing issues, basically.
19      Q.     Okay.  And what other causes were
20  discussed with the accountant?
21      A.     Inventory control, making sure that
22  inventory was accurate.
23      Q.     Okay.  And what is meant by -- what do
24  you mean by "inventory control"?
25      A.     Well, if you went and you counted rolls

Page 43

1    of paper, and there were five and you accidentally

2    counted -- you accidentally wrote down 15, you're

3    going to show -- you know, inventory is not going to

4    be accurate, and that can affect cost of goods.

5          Q.    Okay.  So, to put it simply, miscounting?

6          A.    Yeah.

7                Accurate inventory would be --

8          Q.    Okay.

9          A.    An accurate inventory.

10         Q.    Okay.  What else?

11         A.    Employee theft.

12         Q.    Okay.  Anything else?

13         A.    We talked about a whole lot of things.

14    I'm trying --

15         Q.    And, again, this was a meeting with

16    Gruber & Associates?

17         A.    Uh-huh.

18         Q.    What accountant?

19         A.    Rich Gruber and --

20         Q.    Okay.

21         A.    -- Jeff.

22         Q.    Okay.

23         A.    I don't know Jeff's last name.

24         Q.    Okay.  So, you met with them in early

25    March.

1          So, the timing of receiving, invoicing,

2    inventory control, employee theft.  Anything else that

3    would cause it?

4          A.   He had quite the speech on it.  I mean,

5    he had -- here's the things you've got to -- that it

6    could be, and --

7          Q.   Okay.

8          A.   -- the one that stuck out to me is not

9    obvious was employee theft.

10         Q.   Okay.

11         A.   The others were things that I knew could

12   cause issues.

13         Q.   Okay.  And what did you decide to do

14   about -- what was the next step you decided to take?

15         A.   Well -- well, first, I was shocked

16   about -- that the swing was so dramatic, and so I know

17   I --

18         Q.   How -- can you quantify how dramatic it

19   was, like in terms of dollars or --

20         A.   I can't remember the exact percentages

21   now at this point.

22         Q.   I mean, was it tens of thousands of

23   dollars?

24         A.   It's a percentage versus a -- that's the

25   key thing.  If you sell -- you know, if your -- if you

Page 45

1   sell $100,000, and your cost of goods is

2   ten percent --

3        Q.    Uh-huh.

4        A.     -- and then you sell a million dollars

5   and your cost of goods is still ten percent, that's --

6   that's not -- the dollars is less relevant than the

7   percentage.

8        Q.    Okay.  I'm just asking if -- if you can

9   attach -- and I understand -- a real rough ballpark

10  dollar amount to this swing and the cost of goods.

11            MR. SMITH:  Object to form.

12       A.    I'd be speculating at this point.  I --

13       Q.    Well, would you say, is it thousands or

14  tens of thousands?

15       A.    I don't know.  If we had the financials,

16  I could tell you, but I don't know off the top of my

17  head.

18       Q.    Well, you said it would cause you a lot

19  of concern, and you were shocked, so, I mean, I'm

20  assuming it's not $200.

21       A.    Yes, but, I mean, an example would be,

22  you know, if your real estate taxes were normally

23  two percent, and you got a bill that represented your

24  real estate taxes now to be 20 percent, it's -- you

25  would be concerned; right?

1    Q.    Well, right; but --

2    A.    That's all I was --

3    Q.    -- in that example, that would mean that

4  my taxes increased tenfold, you would be paying ten

5  times as much money; and I'm just asking if you can

6  attach a dollar amount.

7         Like -- and I understand you're -- it's a

8  guess, but can you venture a range, let's say, of what

9  the swing and the cost of goods -- how did January

10 differ from February in terms of the cost of goods?

11        MR. SMITH:  Object to form.

12   A.    I would say it could be tens of

13 thousands.

14   Q.    Okay.  For some reason, the number

15 $30,000 sticks in my head.  Maybe I saw that somewhere

16 else in this case.  Do you recall ever asserting --

17        MR. SMITH:  Object to form.

18   Q.    (By Mr. Cassata) -- in discovery or

19 elsewhere that --

20   A.    I don't recall.

21   Q.    -- the swing was $30,000?

22   A.    I don't recall.

23   Q.    Okay.  All right.  So, you suspected

24 em -- one of the causes suspected was employee theft.

25 What was the next step you took?

Page 47

1      A.    Well, I started looking at the financials

2  for January and February.

3      Q.    Uh-huh.

4      A.    And -- and doing some of the things that

5  would potentially -- I don't -- I don't know exactly,

6  Dion, the full next step that I took and when I took

7  them, actually.

8      Q.    Okay.  Well --

9      A.    I don't recall the exact date of the

10  meeting either with the accountant, so --

11      Q.    Understood.  But it was just the three of

12  you, Rich, Jeff and you?

13      A.    Uh-huh.

14      Q.    Okay.

15      A.    And it was sometime, I would say, mid --

16  mid --

17      Q.    Okay.

18      A.    -- mid-March or --

19      Q.    Okay.  You've taken the position in this

20  case that you were investigating suspected employee

21  misconduct.  What other sorts of misconduct were you

22  investigating beyond suspected employee theft?

23      A.    Employee theft was the main --

24      Q.    Okay.

25      A.    -- type of --

Page 48

1          Q.     Maybe this will refresh your memory.

2                 I'd like to enter Plaintiff's Exhibit

3     Number 2.

4                 (Thereupon, Plaintiff's Exhibit No. 2 was

5          marked for identification.)

6                 THE WITNESS:  Thank you.

7          Q.   (By Mr. Cassata) Okay.  Do you recognize

8     this document?

9          A.     I do.

10         Q.     Okay.  What is it?

11         A.     It's meeting notes regarding possible

12    employee theft.

13         Q.     Okay.  And it's dated March 30th, 2005?

14         A.     Yes.

15         Q.     Okay.  When was this documented typed up?

16         A.     I would say sometime following March

17    30th.  I don't know if it was done that day or the

18    following week, but it would have been sometime around

19    that time.

20         Q.     You would say within a week of March

21    30th?

22         A.     Within a week or two, yeah.

23         Q.     Okay.  So, at the outside, it would be --

24    this was typed up within two weeks after --

25         A.     Sometime after the meeting.

Page 49

1          Q.     Okay.  But it was definitely typed up

2    before this litigation?

3          A.     Yes.

4          Q.     It was typed up before Scott was fired?

5          A.     Yes.

6          Q.     Okay.  It says here, Attendees: Karen --

7          A.     Uh-huh.

8          Q.     -- and Allen.

9          A.     Uh-huh.

10         Q.     Does "Karen" refer to Karen Houlli?

11         A.     Yes.

12         Q.     Okay.  So, I assume Karen Houlli was

13   aware of this issue of possible employee theft?

14         A.     You know what, prior to this meeting,

15   Karen had brought up a concern with the cash register

16   being short, also --

17         Q.     Okay.

18         A.     -- which prompted this meeting.  I had my

19   accountant, who had indicated that possible employee

20   theft was a problem with my cost of goods --

21         Q.     Right.

22         A.     -- and then all of a sudden now I have

23   cash missing, and the building being left not secure,

24   and the words of my accountant --

25         Q.     Tell me about the building not being left

1    secure, what -- how did that come to your attention?

2          A.    Karen, Karen brought that to my

3    attention.  Karen opened the building typically each

4    morning.

5          Q.    Okay.

6          A.    She was usually the first employee there.

7          Q.    Okay.

8          A.    And so she said she would come in and

9    notice that the shutters were not locked --

10         Q.    Uh-huh.

11         A.    -- and that -- several times, and also

12   that the alarm code, I believe, was her --

13         Q.    Okay.

14         A.    -- concern, and then cash was short --

15         Q.    Okay.

16         A.    -- so --

17         Q.    When did she inform you of this issue

18   with the shutters and the alarm code?

19         A.    Prior to this meeting.

20         Q.    Would you say in March?

21         A.    Yes.

22         Q.    Okay.  Mid-March probably?

23         A.    It was between -- it was between -- I

24   believe it was the day before.

25         Q.    Okay.  Oh, the day -- March 29th she may

Page 51

1    have brought the shutter issue to your attention?

2         A.    I believe she brought all of it to my

3    attention.  She left me a memo --

4         Q.    Okay.

5         A.    -- on my chair, which is where she

6    usually left everything for me because we shared an

7    office --

8         Q.    Okay.

9         A.    -- and when I read that, I was very

10   concerned because the accountant had told me that --

11   or brought up the issue of potential employee theft,

12   now I've got cash shortages and -- and security issues

13   that my accounting manager is bringing up, and it

14   became -- it became concerning to me, and so I said,

15   Karen, we need to talk about this.

16        Q.    Okay.  So, March -- on or about

17   March 29th, she informs you of this issue with the

18   shutters?

19        A.    Uh-huh.

20        Q.    Whose responsibility was it for making

21   sure the shutters were locked?

22        A.    Scott was the closing manager most of the

23   time, so he was typically the last one to leave.

24        Q.    Okay.

25        A.    So, whoever had the key who was leaving

Page 54

1    Q.    Uh-huh.

2    A.    And I assume that she would have told me

3  if she got there and the shutters were not locked.

4    Q.    Okay.  And she probably would have told

5  you about the alarm not being set?

6    A.    Absolutely.

7    Q.    Okay.  So, sometime after this meeting

8  the problem resolved itself?

9    A.    It hasn't seemed to be a problem since.

10   Q.    Since the time of this meeting?

11   A.    Uh-huh.

12   Q.    Okay.  Tell me about the missing cash

13 from the register.  What did she bring to your

14 attention?

15   A.    That the cash register had been short

16 multiple times.

17   Q.    And she told you about this again in late

18 March 2005?

19   A.    Uh-huh.

20   Q.    You need to say "yes" or "no" for the --

21   A.    Yes.

22   Q.    -- court reporter.  Sorry.

23         So, what was your reaction to her

24 informing you of the cash register being short?

25   A.    Meeting.

Page 55

1          Q.     Okay.  And how long did the meeting last?

2          A.     Thirty minutes maybe.

3          Q.     Okay.  Where was it held?

4          A.     In my office.  Our office.

5          Q.     Okay.  Why -- why did you decide to take

6     meeting notes regarding this meeting?

7          A.     I took -- take notes on everything.  I

8     got books of notes.

9          Q.     You take notes in every meeting that you

10    attend or call?

11         A.     Pretty -- I wouldn't say every one,

12    but --

13         Q.     Uh-huh.

14         A.     -- you know, I do -- if it's something of

15    importance, I usually always take notes.  I mean --

16         Q.     Okay.

17         A.     -- this is certainly --

18         Q.     You took handwritten notes during this

19    meeting?

20         A.     I did.

21         Q.     Okay.  And those were drafted -- or those

22    were written down during the meeting?

23         A.     Uh-huh.

24         Q.     You gotta say "yes."

25         A.     Yes.

Page 56

1    Q.    And from those notes you typed up this

2  document a week or two later?

3    A.    Exactly.

4    Q.    Okay.  And do you know what computer you

5  typed this up on?

6    A.    I don't know exactly which computer it

7  would have been typed up on.  I kind of bounce

8  between.

9    Q.    Home computer or work computer?

10    A.    It would have been at the office.

11    Q.    Okay.  Would it be your computer that you

12  use at the office or --

13    A.    You know what, I don't know because at

14  the time I was kind of bouncing between computers

15  because I was trying to switch over to Macintosh

16  versus --

17    Q.    Okay.

18    A.    -- PC, and when I came there, they had

19  computers already, but then we were shuffling

20  computers around, so I, you know --

21    Q.    What -- would this exist as a Word file

22  somewhere?

23        Let me back up.  Was this typed up using

24  Microsoft Word?

25    A.    That's typically what I use.

Page 57

1          Q.    Okay.  Does this -- would this document

2     exist as a Word file somewhere?

3          A.    I don't know.

4          Q.    Well, I mean, would it be -- would you

5     have saved it or --

6          A.    I doubt I would have saved it.  Usually

7     if I print something up for file for hard copy, I

8     usually don't save it.  Kind of probably from my --

9     Kevin has told me that's --

10         Q.    Kevin has told you what?

11         A.    Well --

12               MR. SMITH:  You don't need to disclose

13          any conversations that we had.

14         A.    That's all right.

15         Q.    No, I don't want to know anything

16    privileged, if it was something that --

17         A.    No, I --

18               It probably came from my days of small

19    hardrives where I didn't save everything if I actually

20    printed something.  If it was something I was going to

21    go back and edit or alter or do, then I would save it.

22         Q.    Okay.

23         A.    That's typically been my practice all

24    along.

25         Q.    All right.  So, it says here, "issues" on

Page 58

1  this memo, and there's four issues there.  And then

2  under that it says, "possible employee," and I assume

3  that means these are suspects as to the cause of those

4  four issues?

5       A.    People that I felt would have access --

6  exactly.

7       Q.    Okay.  Okay.  Let's just go through them

8  in turn.

9       A.    Okay.

10      Q.    Laura, who's that, Laura --

11      A.    Morales.

12      Q.    Morales.  You suspected that she may have

13 been involved in all four of those issues or just --

14      A.    Well, she had keys and the alarm code, so

15 certainly the shutters remaining unlocked or the alarm

16 not set, she could have -- she would have access to

17 the building.

18      Q.    Uh-huh.

19      A.    She conducted the inventory, so, you

20 know, back to our discussion earlier, if there was

21 going to be --

22            She -- she would be able to -- I mean,

23 she conducted the inventory, she had access --

24      Q.    Okay.

25      A.    -- to the accounts to know.  She placed

Page 59

1    the orders.

2         Q.    Uh-huh.

3         A.    And the thing here that I had was, during

4    the course of the meeting, we just talked about if

5    somebody were to take rolls of paper from us --

6         Q.    Yeah.

7         A.    -- what would they do with them.  You

8    know, it's not the kind of thing that you stand on the

9    street corner and say, want a role of photographic

10   paper.

11        Q.    Uh-huh.

12        A.    So, they would have to have a way to get

13   rid of them to sell the merchandise.  To make it of

14   any value to the employee, was my thought on it.

15        Q.    Okay.  And what did you mean by saying,

16   "no outlet to sell materials."

17        A.    I didn't believe Laura knew or had

18   contact with anywhere to really sell those -- the

19   materials to.

20        Q.    And why did you believe that?

21        A.    Because she -- she hadn't worked for any

22   other photo lab.

23        Q.    Okay.

24        A.    She didn't --

25        Q.    Doesn't everybody have access to a pawn

Page 60

1   shop or to eBay or to outlets to sell things?

2       A.   Certainly I'm not a big eBay user, so I

3   wouldn't know if those are available on eBay, but I

4   can't imagine that a pawn shop would have much use for

5   it.

6           So, I didn't see her as having a

7   readily -- a readily available way to sell those.

8   Just as I wouldn't see you as having a readily

9   available way to do it.

10          I'm not saying you couldn't, I guess, but

11  I -- you know, I mean, I don't see you as having --

12      Q.   From what I heard, you can sell anything

13  on eBay, so -- maybe, I don't know.

14          But, anyway, let's move on to Liz there.

15  "Access to cash register."  So, this indicates that --

16  I'm just guessing here -- that you suspected Liz with

17  regards to the cash register shortages, but not the

18  other issues?

19          MR. SMITH:  Object to the form.

20      A.   Just as I was looking at that time period

21  that, you know, we were talking about --

22      Q.   Uh-huh.

23      A.    -- she did have access to the cash

24  register; exactly.  She didn't have keys, she didn't

25  have the alarm code.  So, the big thing was that I

Page 61

1     felt that she had access to the cash register, so --

2          Q.     Okay.  And would that be true of Kristine

3     also?

4          A.     Exactly.

5          Q.     Okay.  Now we get down to Scott, and you

6     list here:  Manager responsible for closing, keys and

7     alarm code, access to cash register.  And it goes on,

8     too.

9                 What is the purpose of this list here?

10    What are you indicating?

11                MR. SMITH:  Object to the form.

12         Q.     (By Mr. Cassata) Tell me why, you know,

13    One -- Numbers 1 through 7 that you list here --

14         A.     Uh-huh.

15         Q.     What was the purpose of listing those

16    comments?  What are they indicative of to you?

17                Are these reasons to suspect him of the

18    four issues?

19         A.     I would say they -- yeah.

20         Q.     Okay.  Let's get down to 4 there.  It

21    says, "Previously admitted that he took samples from

22    customers and sold them on eBay."  When did he admit

23    that to you?

24         A.     It would have been -- it was when we were

25    sharing an office, so it would have been in 2004.

Page 66

1      Q.    Okay.  I mean, it's fair to say that

2   Chromatek disapproved of Scott selling stuff on e--

3   selling customer samples on eBay; is that correct?

4      A.    Fair to say that Chromatek disapproves of

5   anyone receiving a customer sample and using it for

6   personal use or financial gain, yes.

7      Q.    Okay.  And is it your testimony you can't

8   recall whether you told him not to do that?

9      A.    I don't recall the exact conversation.  I

10   just know --

11      Q.    Do you ever recall telling him to stop

12   selling customer samples on eBay?

13      A.    I'd be speculating to the exact -- exact

14   words of the conversation at this point, Dion.

15      Q.    No, I'm just asking, do you recall

16   telling him to stop selling customer samples on eBay?

17   If you don't recall it, you don't recall it.

18      A.    I don't recall.

19      Q.    You don't recall ever telling him to stop

20   selling customer samples on eBay; is that correct?

21      A.    We had a conversation about it.

22           Let me just think here.  I don't recall.

23      Q.    Take a look at Number 5 on Plaintiff's

24   Exhibit Number 2 under "Scott."  It says there,

25   "Admitted to other employees that he stole items from

Page 67

1    previous employer's dumpster and sold them on eBay.

2    What -- what did he tell you with regard to that?

3         A.    He didn't tell me anything with regard to

4    that, that was something that came up in the

5    conversation that Karen and I had had --

6         Q.    Uh-huh.

7         A.    -- that she had been told by other

8    employees that he had told them of that --

9         Q.    Uh-huh.

10        A.    -- previous -- previous to me purchasing

11   the assets of Chromatek.

12        Q.    So, she told you that he had told her?

13        A.    No.  She told me that other employees had

14   told her that that had happened.

15        Q.    Okay.

16        A.    As we were going through this, we were

17   just -- I mean --

18        Q.    I'm just -- why did you phrase it, he

19   stole items from a dumpster?

20        A.    That's what was told to me.

21        Q.    Well, to my mind -- my way of thinking,

22   you don't really steal things from a dumpster, would

23   you --

24             MR. SMITH:  Object to form.

25        Q.    (By Mr. Cassata) I mean, if he took them

Page 71

1   a red flag.

2          Q.    Okay.  Well, no, that's not what I'm

3   asking.  I mean, in your mind, if he did take

4   something out of a dumpster, that's stealing, in your

5   opinion?

6          A.    If it didn't belong to him and he took

7   something that didn't belong, then I would say that

8   that is theft, yes.

9          Q.    And taking out of a dumpster in this case

10  would be theft?

11         A.    I would see it as such.

12         Q.    Okay.  Did Karen tell you what items he

13  supposedly took out of a dumpster?

14         A.    No.

15         Q.    She never told you what he took out of a

16  dumpster?

17         A.    Not that I recall.

18         Q.    Okay.  What does Number 6 mean?

19         A.    That he had told other employees that he

20  returned to his previous employer and obtained

21  customer documents.

22         Q.    Okay.  What is meant by "customer

23  documents"?

24         A.    I would presume them sales numbers or

25  documents that would have been company property.

1     Q.    Now, did you write this down from your

2   own knowledge, or is this what Karen told you?

3     A.    These things were things that Karen said

4   other employees had told her at some point.

5     Q.    Okay.  She -- so, she told you that other

6   employees had admitted to her that Scott had returned

7   to his previous employer and obtained customer

8   documents?

9     A.    At this point, at this meeting, we were

10  talking about specific employees, and we were saying

11  what would be -- if there's something surrounding our

12  losses and things that have happened, what would be --

13  potentially be causes --

14    Q.    Okay.

15    A.    -- or things that happened.

16    Q.    But when you wrote this down, what was

17  your understanding of what he had done?  Had he gone

18  to his previous employer in the middle of the night

19  and taken customer documents?

20        MR. SMITH:  Object --

21    A.    I don't know when this --

22        MR. SMITH:  -- to form.

23    Q.    (By Mr. Cassata)  Okay.  When you wrote

24  this down, what was your understanding of what he

25  had done exactly?

Page 73

1          A.     That he returned to a previous

2  employer --

3          Q.     Okay.

4          A.     -- and obtained customer documents.

5          Q.     But how would he have done that, just

6  walked in the front door of the employer?

7          A.     I don't know.

8                 MR. SMITH:  Object to form.

9          Q.     (By Mr. Cassata) Would he have

10  burglarized them?  I mean, what was your

11  understanding of how he went on the employer's

12  premises and took these old customer documents?

13                MR. SMITH:  Object to form.

14         A.     I'd be speculating, Dion.  I don't know.

15         Q.     So, you really had no understanding of

16  how he went on the employer's premises and took old

17  documents?

18         A.     I was just writing down in my notes --

19         Q.     Okay.

20         A.     -- things that were coming up.

21         Q.     Okay.  And you write Number 7, "Would

22  know where to sell materials."  Why did you write

23  that?

24         A.     Well, he certainly knew photo -- photo

25  labs in the area, and had worked at several, and --

Page 74

1    and would have the ability to sell rolls of paper.

2         Q.    Okay.  Following that, we have "Action

3    Items."

4         A.    Uh-huh.

5         Q.    So --

6         A.    It's quiet.

7         Q.    You can --

8               You see that section there marked "Action

9    Items"?

10        A.    Uh-huh.

11        Q.    And let's take those one by one.  Audit

12   month-end inventory --

13        A.    Uh-huh.

14        Q.    -- that was something you determined to

15   do after having conducted this meeting?

16        A.    Uh-huh.

17              MR. SMITH:  Again, Allen, "yes" or "no."

18        A.    Yes.

19        Q.    Did this meeting that you had with your

20   accountant in early March, they probably suggested

21   that, as well?

22        A.    Uh-huh.  At this point -- Sorry.  Yes.

23   At this point, we were trying to come up with things

24   that we could do to explain the cost of goods, and

25   really determine if there was employee theft.

Page 75

1          Q.    Okay.  And then it says, "Review all

2    receivings against purchase orders."

3          A.    Uh-huh.

4          Q.    "Balance cash register daily."

5          A.    Uh-huh.

6          Q.    It says, "Background check on Scott."

7          A.    Uh-huh.

8                MR. SMITH:  "Yes" or "no," Allen?

9          A.    Yes.

10         Q.    Why would you write "background" --

11               Well, first of all, what did you mean by

12   "background check on Scott"?

13         A.    A background check.

14         Q.    What sort of background check?

15         A.    What I would call background check.  I

16   mean --

17         Q.    Okay.  I mean, you had this meeting with

18   Karen, and so I assume somewhere in this meeting

19   either you or her suggested doing a background check

20   on Scott; is that fair to say?

21         A.    Yes.

22         Q.    Do you recall, was it you that -- is it

23   you, Allen Evans, who suggested it or was it Karen

24   Houlli?

25         A.    I recall that it was me that suggested

1    it.

2         Q.    Okay.  Why, why did you suggest doing a

3    background check on Scott and not these other

4    employees?

5         A.    Well, I felt like with Laura, if we -- if

6    we did these other things --

7         Q.    Uh-huh.

8         A.    -- and --

9         Q.    What other things, the other three

10   actions?

11        A.    Yes, the action items.

12        Q.    Okay.

13        A.    A couple of things.  Let's just talk

14   about Liz specifically first.

15        Q.    Uh-huh.

16        A.    I felt that she had access to the cash

17   register to determine that if she was actually taking

18   money from the cash register, and by balancing the

19   cash register daily would -- would give us an

20   indication, if that was the case, and it would create

21   an awareness that it was not easy to take money.

22        Q.    Okay.  By the way, was there any employee

23   that did not have access to the cash -- cash register?

24        A.    Sure, certainly.

25        Q.    Okay.  Like why --

Page 77

1          Was Scott a cashier?  Did he work the
2    register sometimes?
3          A.    No, he didn't work the register.
4          Q.    Okay.  Well, why -- why would you say
5    that here that he has access to the cash register more
6    so than anybody else?
7          A.    Well, because he was supervising the
8    front counter.
9          Q.    He was the supervisor of Kristine and
10   Liz?
11         A.    Uh-huh.
12         Q.    You need to say "yes" or "no."
13         A.    Yes.
14         Q.    What were Liz and Kristine's job titles?
15         A.    Customer service or sales associate.  I
16   can't remember exactly what we had --
17         Q.    Okay.
18         A.    -- decided to call them.
19         Q.    What is Liz's last name?
20         A.    Starts with an "M."  It's Menconi or --
21         Q.    Menconi?
22         A.    Something like that.
23         Q.    Menconi?
24         A.    Something Italian.
25         Q.    Okay.

Page 78

1          THE WITNESS:  Actually, could we take a

2     break for just a second?

3          MR. CASSATA:  Sure, sure.

4          THE WITNESS:  I need to return this phone

5     call.

6          (Whereupon, a recess was had.)

7     Q.    (By Mr. Cassata) Okay.  Okay.  We were

8 discussing action items at the bottom of Plaintiff's

9 Exhibit Number 2?

10     A.    Huh-uh.

11     Q.    And let me also -- I'm wondering, why

12 didn't you have any action here related to the alarm

13 code and the shutters?

14     A.    I don't recall.

15     Q.    Okay.  And before I forget, which

16 employees had the alarm code?

17     A.    Scott --

18     Q.    Uh-huh.

19     A.    -- Karen, Laura.  There were some people

20 with keys, but I'm not sure if they had the alarm code

21 because --

22     Q.    And just so I'm clear, the alarm code is

23 something that you punch in when you leave for the

24 night?

25     A.    Exactly.

Page 79

1      Q.    And do you have to punch it again when

2   you arrive in the morning?

3      A.    Yes.

4      Q.    Okay.  So, whoever has this code --

5            Only the employees that have the code can

6   close up or open up?

7      A.    Exactly.

8      Q.    Okay.  So, you said Scott, Karen, Laura

9   had this alarm code?

10     A.    I had the code.

11     Q.    Karen Houlli?

12     A.    Uh-huh.  That's the Karen I meant.

13     Q.    Oh, I'm sorry.  I thought it was -- yeah,

14   Karen Alper.

15     A.    No, not Karen Alper.

16     Q.    Okay.  Karen -- Scott, Karen Houlli,

17   Laura Morales --

18     A.    Jairo Blandon.

19     Q.    Say that again.

20     A.    Blandon.

21     Q.    Blandon?

22           Anyone else?

23     A.    Not that I recall.

24     Q.    And what is meant by "keys and alarm

25   code"?  What do you mean by "keys," the key to open

Page 80

1    the front door?

2          A.    The employee access door, yes.

3          Q.    Okay.  And the shutters that you speak

4    of, I assume that's a metal shutter that goes over the

5    front door?

6          A.    Exactly.

7          Q.    Okay.

8          A.    With a key.

9          Q.    Okay.  This alarm code, is it actually

10   hooked up to an alarm?

11         A.    Yes.

12         Q.    Okay.  Some are not.

13               And do you subscribe to an alarm company

14   for that?

15         A.    I believe so.

16         Q.    Okay.  If the alarm goes off in the

17   middle of the night --

18         A.    I get a phone call.

19         Q.    Okay.  Do --

20               At the time that we're talking about,

21   would other employees get a phone call?

22         A.    I don't believe so.

23         Q.    Okay.  You don't recall that Scott was

24   the person -- the contact person for the alarm code

25   for the alarm company?

Page 83

1        Q.    (By Mr. Cassata) Let me rephrase that.

2   Why would he be the primary contact person for the

3   alarm company if you suspect him of stealing from

4   the company?

5              MR. SMITH:   Object to form.

6        A.    I'm not certain he was the primary

7   contact.

8        Q.    Uh-huh.

9        A.    I was doing an investigation, I was

10  trying to do as little -- I was trying to do -- make

11  as few changes as possible that might alert somebody

12  that I was doing an investigation.

13       Q.    Okay.  In the action items, why -- why

14  didn't you put there, tell everyone to lock up when

15  they leave?

16       A.    I don't recall why.

17       Q.    I mean, if you had problems with the

18  alarm code and the shutters, why not take some action

19  with respect to those issues?

20             MR. SMITH:   Object to form.

21       A.    I don't recall.

22       Q.    Moving -- going back to that last action

23  item, "Background check on Scott" --

24       A.    Uh-huh.

25       Q.    -- you had said that it was you at

Page 84

1    your -- Allen Evans' idea to do this, to do a

2    background check?

3          A.    Yes.

4          Q.    Okay.  And did you suggest or share that

5    idea with Karen during this March 30th meeting?

6          A.    Yeah.

7          Q.    And what was her reaction?

8          A.    Okay.

9          Q.    Okay.  And what kind of background check

10   did you have in mind?

11         A.    A background check.  I don't know, I

12   would call it a background check.

13         Q.    I mean, did you plan on hiring a

14   detective and staking out his house, or did you -- I

15   mean, there's different kinds of background checks.

16   What did you have in mind?

17               MR. SMITH:  Object to form.

18         A.    I was unaware of different levels of

19   background checks, so when I was thinking of

20   background check, I was thinking a background check,

21   you know.

22         Q.    Okay.

23         A.    Whatever we could find out that would

24   either substantiate the concern or negate it.

25         Q.    And what would be the purpose of doing

Page 85

1    the background check?

2         A.    I don't follow you.

3         Q.    I mean, were you trying to determine if

4    he had been arrested in his past, or what were you

5    trying to determine?  When you just say generally

6    "background check," what -- what are you looking for

7    at this point?

8              MR. SMITH:  Object to form.

9         A.    Anything that might indicate a motivation

10   for --

11        Q.    Okay.

12        A.    -- or history, or anything, you know,

13   something.

14        Q.    Did you discuss with Karen at this

15   meeting what this background check would consist of?

16        A.    A background check, I've never run a

17   background check --

18        Q.    Okay.

19        A.    -- so I don't know what's involved, so --

20        Q.    So, you just left it as generally, quote,

21   background check?

22        A.    Yes.

23        Q.    Okay.

24        A.    When I worked at PriceSmart, we would

25   just say, run a background check --

Page 86

1      Q.      Okay.

2      A.      -- to our HR people, and that was all I

3  know.

4      Q.      Okay.  Was it determined at this meeting

5  who would go about conducting the background check?

6      A.      I asked Karen to get a background check.

7      Q.      Okay.  You asked her to get a background

8  check at this meeting?

9      A.      Yes.

10     Q.      Okay.  And what did she say?

11     A.      Okay.

12     Q.      Okay.  Did -- did you have any concerns

13  about whether doing a general background check would

14  violate the law?

15     A.      No.

16     Q.      Did Karen express any concerns to you

17  about whether doing a background check would violate

18  the law?

19     A.      Not that I recall.

20     Q.      Did she discuss with you at this meeting

21  or later how she would go about getting the background

22  check?

23     A.      No.

24     Q.      Okay.  Did Chromatek just leave it up to

25  her to figure out how to go get a background check?

Page 87

1          A.     Yes.

2          Q.     Okay.  All right.  So, following this --

3   this March 30th meeting, Karen was to go get a

4   background check and --

5          A.     Karen helped with almost all of these

6   issues on the action items.  I mean, she was working

7   on balancing the cash register daily, she helped do

8   the review of all the receivables against the purchase

9   orders.

10         Q.     By the way, these issues that you mention

11  in this memo or Plaintiff's Exhibit Number 2, how did

12  these all resolve?  Did you ever resolve the issue --

13                You had testified that the shutters --

14  locking the shutters at night and the -- having the

15  alarm set, that sort of resolved itself after this

16  meeting for whatever reason?

17         A.     Uh-huh.

18                MR. SMITH:  Object to form.

19         Q.     (By Mr. Cassata) Did you ever figure out

20  why there was a large swing in cost of goods for

21  February 2005?

22         A.     No.

23         Q.     Did you ever figure out why there was

24  cash missing from the register?

25         A.     No, we never --

Page 89

1   2005; is that correct?

2              MR. SMITH:  Object to form.

3        A.    I think you'd have to ask Karen to know

4   for sure.

5        Q.    Okay.

6        A.    I wasn't there, I didn't witness -- see

7   her do it.  I --

8        Q.    Whatever she did in regard to ordering

9   this background check --

10       A.    Uh-huh.

11       Q.    -- is it Chromatek's position that she

12  was acting as an agent of the company?

13       A.    I requested her to get a background

14  check, so --

15       Q.    At any time up and through till today,

16  does Chromatek feel that she did something wrong in

17  regard to ordering background checks on Scott Tanis?

18       A.    No.

19       Q.    So, that it's fair to say that when she

20  ordered all of this information, she was acting on

21  Chromatek's behalf?

22       A.    She was following my directive to do a

23  background check.

24       Q.    Okay.  So, did Chromatek order Scott

25  Tanis' Florida criminal history on April 18th, 2005?

Page 90

1      A.     I don't know exactly what was ordered at

2   the time the order was placed.

3      Q.     Well, I mean, you've been produced today

4   as a -- as the corporate representative with knowledge

5   of these matters, so let me -- let me ask it again.

6   Did Chrom --

7             And you know what, let me enter an

8   exhibit that might help.

9      A.     I guess, Dion, I'm just confused at what

10  you're asking, so --

11     Q.     Plaintiff's Exhibit 4.

12            (Thereupon, Plaintiff's Exhibit No. 4 was

13            marked for identification.)

14            MR. SMITH:  Dion, for the record, I don't

15            believe in your notice of taking deposition for

16            the Chromatek representative does it state the

17            person with the most knowledge on exactly what

18            items were ordered as part of the background

19            check.

20            MR. CASSATA:  I --

21            MR. SMITH:  You have the reasons and

22            purposes behind conducting the background

23            check.

24            MR. CASSATA:  I believe it says the

25            person with the most knowledge of the reasons

Page 95

1  a Florida workers' compensation background check on

2  Scott Tanis?

3       A.    Yes.

4       Q.    Okay.  When did Chromatek receive the

5  Florida criminal history background?

6       A.    Sometime in July.

7       Q.    When did Chromatek --

8             Do you recall when in July or --

9       A.    I don't remember the exact date.

10      Q.    When did Chromatek receive the 50-state

11 criminal record background check on Scott Tanis?

12      A.    The same time as we received the other in

13 July.  It was a packet with everything, including --

14      Q.    Okay.

15      A.    -- an invoice.

16      Q.    Perhaps let me rephrase it this way.

17 These six types of background reports listed here --

18      A.    Uh-huh.

19      Q.    -- including the credit report and the

20 Florida worker's compensation background check, did

21 you receive all six in July?

22      A.    Yes.

23      Q.    Okay.

24      A.    Part of packet, including an invoice.

25      Q.    Okay.  So, why -- why was there a delay

Page 96

1    from ordering these six items on April 18th?  Or you

2    know what?  Scratch that.

3              Were there certain of these six items

4    that you received in April rather than July?

5         A.    I didn't receive anything in April.

6         Q.    You received -- am I to understand you

7    received all six of these reports in July?

8         A.    Yes.  As part of a single packet that

9    came in the mail with an invoice and --

10        Q.    Okay.  Do you know why it took so long

11   for these six background reports to get to you if you

12   ordered them on April 18th?

13             MR. SMITH:  Object to form.

14        A.    I think that's something you'd have to

15   ask Federal Background Services.  I don't know how

16   long it takes to conduct a background report.

17        Q.    Okay.  This handwriting that's on there,

18   do you recognize that handwriting?

19        A.    No.

20        Q.    You don't know who wrote that?

21        A.    I don't.

22        Q.    At the time that you ordered -- that

23   Chromatek ordered these six background checks, what

24   was Chromatek's understanding of the legality of doing

25   that?

Page 116

1    reporting agency bearing on a consumer's

2    creditworthiness, credit standing, credit capacity,

3    character, general reputation, personal

4    characteristics, or mode of living.  Do you see that?

5         A.    Uh-huh.

6         Q.    Okay.  What -- what did Chromatek hope to

7    learn by ordering Scott's workers' compensation

8    history?

9         A.    Dion, when I requested a background

10   check, I wasn't certain what was in there.  I -- so, I

11   don't know --

12        Q.    Okay.  In ordering --

13        A.    I -- I mean, is that a standard report in

14   a background?

15        Q.    Let me ask you this:  In ordering Scott's

16   credit report --

17        A.    Uh-huh.

18        Q.    -- what did Chromatek hope to learn by

19   that?

20        A.    I was ordering a background report, I

21   wanted to know if there was anything in his background

22   that might suggest a motive or a reason for employee

23   theft.

24        Q.    But what would a -- what would show up in

25   a credit report that would indicate that?

1          A.    I don't know.  I'm not real familiar with

2     credit reports, so I don't know.

3          Q.    Well, I mean, you've -- Karen Houlli

4     ordered this, and Chromatek approved of her actions,

5     we've made that clear in the case; Chromatek has

6     ratified her actions.  What did Chromatek hope to

7     uncover by getting his -- by getting Scott's credit

8     report?

9          A.    Well, in a background report, I was

10    hoping to find out if there was a reason for -- for

11    employee theft or a history of employee theft.

12         Q.    Okay.  What -- give me an example of what

13    would be on a credit report that would be indicative

14    of theft to Chromatek.

15         A.    Well, in a background report, you can --

16    I was certain there was plenty of things that -- that

17    show up in a background report.

18         Q.    Okay.

19         A.    When I --

20         Q.    Do you --

21               Let me ask you this.

22         A.    I don't know everything that's contained

23    in --

24         Q.    Okay.

25         A.    -- in -- different portions of it.

Page 118

1    Q.    Do you know one of -- one of the

2    discovery disputes in this case is that you and your

3    attorneys are seeking Scott's credit card statements

4    and bank statements?  Do you know what --

5              How -- how would credit card statements

6    be indicative of whether Scott was engaged in employee

7    theft or misconduct?

8    A.    I mean --

9    Q.    Okay.  Let me ask you again.  In ordering

10   a credit -- Scott's credit report --

11   A.    Right.

12   Q.    -- like what -- what plausible thing

13   could be in there that would help you uncover the --

14   all these suspected issues of employee misconduct?

15             Did you want to see if he had run up a

16   bunch of credit card bills, or if he had paid any big

17   payments on credit cards, or what were you looking

18   for?

19   A.    Well --

20             MR. SMITH:  Object to form.

21   A.    I think I stated in requesting a

22   background check, I was looking for anything that

23   would potentially indicate --

24   Q.    Okay.

25   A.    -- that there was a cause or a reason for

Page 119

1  employee theft.

2       Q.    I understand, and I'm asking with regards

3  to the credit report specifically, what -- what

4  information in there would shed light on whether Scott

5  was engaged in employee theft or not?

6       A.    Again, I'm not overly familiar with

7  credit reports, so I don't know.  I don't know.

8       Q.    Okay.  Why -- why did Karen Houlli -- I

9  mean, she checked this separate box for a credit

10  report, why did she order the credit report?

11            MR. SMITH:  Object to form.

12       A.    I think you have to ask her.

13       Q.    Well, she was acting as an agent of

14  Chromatek.  I mean, why did Chromatek order the credit

15  report?

16       A.    I requested her to order a background

17  report.  I don't know what's standard in a background

18  report, and if that's a standard report in the

19  background report, then it's a standard report.  If

20  it's -- I mean, I --

21       Q.    Is it fair to say in seeking Scott's

22  credit report, you wanted information regarding his

23  credit cards and debts and obligations; right?

24       A.    I'm telling you when I requested a

25  background report, I was looking for anything that

Page 120

1  might indicate whether or not there was cause for

2  employee theft.

3      Q.    And you would agree, though, that when

4  you order someone's credit report, you're seeking

5  information regarding their credit card statements,

6  their debts; would you agree with that?

7           MR. SMITH:  Object to form.

8      Q.    (By Mr. Cassata) I mean, isn't that

9  what's in a credit report?

10     A.    I believe that's what's in a credit

11 report.  I --

12     Q.    Okay.  So, if you seek a credit report,

13 you're seeking information on someone's credit; isn't

14 that true?

15     A.    I was seeking information in the

16 background report, anything that might indicate that

17 there was a cause or reason for employee theft.  I was

18 doing an investigation.  That's what I was trying to

19 determine if there was a cause or a reason for

20 employee theft.

21     Q.    You were -- you were --

22     A.    So --

23     Q.    You were doing an investigation; right?

24           Were you doing an investigation --

25     A.    Yes.

Page 121

1       Q.    -- into all sorts of things?

2       A.    Into our large cost of goods swing.

3       Q.    Okay.  But you were doing an

4  investigation into his background; right?

5       A.    I'd requested a background report as one

6  of the action items before that.

7       Q.    Okay.

8       A.    And the reason for --

9       Q.    You --

10      A.    -- requesting that was --

11      Q.    Wait, hold on.

12          It's fair to say, though, that when you

13  ordered his credit report, you're investigating his

14  credit; isn't that fair to say?

15      A.    I -- I guess -- I think we're getting

16  here on a semantic thing.  I requested a background

17  report.

18      Q.    No, all I'm asking --

19      A.    And you're asking me --

20      Q.    When --

21      A.    -- about something I didn't request

22  personally.  I requested a background report --

23      Q.    No, we're asking you as Chromatek --

24      A.    -- and I wanted to know whether or not

25  there was anything that would give reason or cause for

Page 122

1    employee theft.

2         Q.    Okay.  All I'm asking is, when

3    Chromatek -- or let's say anybody -- well, no, let me

4    think about this.  Hold on.

5              In -- in ordering Scott's credit report,

6    wasn't -- isn't it fair to say Chromatek was

7    investigating his credit?

8         A.    We were investigating employee theft.

9         Q.    Okay.  Were you -- no, I know that,

10   but --

11        A.    Well, you -- now you're asking me if we

12   were investigating his credit.

13        Q.    No, you were investigating --

14        A.    No, I wasn't investigating his credit, I

15   was investigating any reason that might indicate,

16   confirm or --

17        Q.    Right.  I know you were investigating,

18   broadly, employee theft, but in ordering a credit

19   report, I mean, isn't that an inquiry or investigation

20   into someone's credit history, isn't it?  I mean,

21   that's -- is that fair to say?

22        A.    I wasn't looking for -- in requesting a

23   background report, I was looking for anything that

24   might come up that would show --

25        Q.    Okay.

Page 123

1        A.    -- that there was a cause or a reason for

2   employee theft.

3        Q.    And I understand that.

4        A.    I mean --

5        Q.    But what I'm asking is, credit report

6   specifically --

7        A.    Okay.

8        Q.    -- when you order a credit report, aren't

9   you investigating someone's credit?

10       A.    I don't know.

11       Q.    Well, what else would you be looking --

12             When you order someone's credit report,

13   isn't that their credit history; isn't it?

14       A.    I presume it's their credit history.

15   I --

16       Q.    Okay.

17       A.    I just am confused why -- why -- because

18   part of the standard background report, why were -- I

19   don't know.

20       Q.    What was the purpose of ordering his

21   driver's license history, his seven-year driver's

22   license history?

23       A.    Again, we were conducting an employee

24   theft investigation.

25       Q.    No, but what would be on a driver's

Page 124

1    license history that would help you in your

2    investigation?

3        A.    I'm not overly familiar with what's on a

4    driver's license history, so I don't know.  I would --

5    I don't know.

6        Q.    Okay.  All right.  Anyway, taking a look

7    at Plaintiff's Exhibit 5 again.  Okay, you looked at

8    (d)(1) there.

9        A.    This is the first time I've seen this, so

10   go ahead, (D)(1).

11       Q.    Yeah, I was reading what a consumer

12   report means.

13       A.    Uh-huh.

14       Q.    Okay.  And it basically says, you know,

15   it means any communication that -- that bears on

16   creditworthiness, credit standing, character, general

17   reputation, et cetera; okay.

18           Are you familiar -- and it also qualifies

19   that, you know, this information is used for the

20   purpose of, and then it lists several purposes, and

21   one of them is employment purposes; but are you

22   familiar with any difference between a consumer report

23   and a credit report?

24       A.    No.

25       Q.    Okay.  Did you have any knowledge of the

Page 134

1    Whistleblower Act, the Florida Whistleblower Act, that

2    there's a fee-shifting provision?

3            What that is, is a prevailing party might

4    be entitled to their attorney's fees and costs from

5    the other side.  Are you aware of that?

6        A.    I heard it in Scott's deposition.

7        Q.    Okay.  Was that the first time you had

8    heard of that?

9        A.    Yes.

10       Q.    What's that?

11       A.    Yes.

12       Q.    That was the first time you'd ever heard

13   of that?

14       A.    Yes.

15       Q.    Okay.  Why was Scott fired?

16       A.    A variety of reasons.

17       Q.    Okay.

18       A.    Failure to hit sales numbers,

19   insubordination, teamwork.

20       Q.    Okay.  Who made the --

21            Are there others?  You said -- Well, I

22   mean, let me make sure.  You said it's a variety of

23   factors.

24       A.    Uh-huh.

25       Q.    It's the sales numbers?

Page 135

1          A.     Uh-huh.

2               MR. SMITH:  You've got to answer "no,"

3      Allen.

4               THE WITNESS:  Yes.

5          Q.   (By Mr. Cassata)  Insubordination.

6          A.     Yes.

7          Q.   What else?

8          A.     Teamwork.

9          Q.   Okay.

10         A.     And inappropriate behavior evidenced

11     through the employee complaints.

12         Q.     Well, let's start with the sales numbers.

13     You were at Scott's deposition where we discussed an

14     employment agreement between him and Chromatek --

15         A.     Imaging.

16         Q.     Was it Photo or Imaging that agreement

17     was originally with?

18               Was there a new agreement between you and

19     Chromatek -- between Chromatek Imaging and Scott in

20     September 2004?

21         A.     There was one that was drafted up, yes --

22         Q.     Okay.

23         A.     -- and, I believe, given to Scott in

24     October.

25         Q.     And that was the one that was never

Page 136

1    signed?

2         A.    Exactly.

3         Q.    Okay.  And there was sales numbers laid

4    out there.  Did Scott have a monthly selling

5    requirement?

6         A.    Yeah, we talked about it a lot, and that

7    was basically to cover the cost of the position.

8         Q.    Okay.  What would he have to sell per

9    month to cover the cost of the position?

10        A.    $47,500 -- $57,000 a year, I think that's

11   $47,500, which would equate to $570,000 in sales.

12        Q.    And --

13        A.    And that was based on conversations that

14   Scott and I had --

15        Q.    Uh-huh.

16        A.    -- after I got there, and so --

17        Q.    Okay.  And weren't the sales goals

18   staggered over time, weren't they supposed to increase

19   like a year out?

20        A.    $570,000 for the year, I know that, so --

21        Q.    Okay.  But if I recall -- and I'll get

22   the paper out in a minute --

23        A.    That was quarterly numbers, I believe.

24        Q.    It made -- was increments, so that they

25   increased over time; right?

Page 137

1       A.    I don't exact -- I don't exactly recall

2  the numbers.

3       Q.    Okay.  But the $570,000 --

4       A.    For the year.

5       Q.    -- for the year --

6       A.    A ten percent commission would equate to

7  $57,000 --

8       Q.    Okay.

9       A.    -- in base salary.

10      Q.    Okay.

11      A.    Draw against commission.

12      Q.    But was it expected when you hired him

13 that he would sell 47,500 every month for the first

14 year, or was it expected that the numbers would

15 gradually increase over time?

16      A.    Well, 57,000 was the minimum, and the

17 whole idea was hopefully to be up much higher than

18 that.

19      Q.    Okay.  When did you become dissatisfied

20 with Scott's sales numbers?

21      A.    Sales were always a concern of mine

22 because that's what drives a business and its

23 profitability.  So, I mean, Scott and I talked about

24 sales often.

25      Q.    Okay.

Page 138

1      A.     And he knew that I was very interested to

2  get sales, and $100,000 per month was pretty much the

3  target of sales for the company --

4      Q.     Okay.

5      A.     -- with 47,500 of that coming from

6  commercial at least, and then with growth

7  opportunities above that.  The other was the walk-in

8  business from the professional photographers that was

9  established.

10     Q.     When you first purchased the assets of

11 Chromatek and formed Chromatek Imaging, was Scott the

12 only salesperson you had?

13     A.     Yes.

14     Q.     Okay.  When did you get another

15 salesperson?

16     A.     I don't recall the exact date when that

17 was.  Scott and I talked about it, and I believe it

18 was -- Terry was the first person that was hired in a

19 sales capacity.

20     Q.     Do you remember when he was hired?

21     A.     I don't remember the date exactly.

22     Q.     Month or --

23     A.     I know we produced something that had

24 that date on there, and I don't --

25     Q.     Yeah, I'll get that out in a minute.

Page 139

1      A.    Okay.

2      Q.    So, until you hired Terry, Scott was the

3  entire sales department for the company; is that

4  correct?

5      A.    Uh-huh.

6      Q.    Okay.  Was he supposed to sell --

7            How much was he supposed to sell while he

8  was sole sales department?

9      A.    I mean, 47,500 was what was needed to

10  cover the monthly draw, so that would be the intent

11  of -- you know, at least that and hopefully more.

12      Q.    And --

13      A.    Obviously, from my standpoint, growing

14  sales is important.  I don't --

15      Q.    Okay.

16      A.    I mean, that's what you want to do, each

17  year more than the year before, and the year before

18  and each month the same.

19      Q.    Okay.  When did you first become

20  dissatisfied with his sales efforts?  Or, I mean, I

21  don't want to have the question assume an answer.  Did

22  you ever become dissatisfied with Scott's sales

23  efforts?

24      A.    Yes.

25      Q.    Okay.  When?

Page 140

1     A.    Oh, when he wasn't consistently hitting

2   the 47,500.

3     Q.    Okay.  When -- when would that have been?

4     A.    I believe in the period of time from when

5   I owned to the period of -- until Scott was

6   terminated, I believe he hit his sales numbers two

7   times, so 20 -- less than 25 percent of the time.

8     Q.    Okay.  But I'm asking -- I mean, were you

9   dissatisfied the first month that he worked there?

10    A.    I don't know that I was dissatisfied, I

11   was trying to get my arms around a lot of things that

12   first month.

13    Q.    Uh-huh.

14    A.    I was spending a lot of time -- I mean,

15   it was a new business, I --

16    Q.    Okay.

17    A.    Do I wish the sales were more?  I always

18   wish the sales are more, and, you know, but can I tell

19   you that that first month I sat down and said, you

20   know -- I don't know.

21    Q.    Okay.  Well, when you first started

22   owning and running Chromatek --

23    A.    Uh-huh.

24    Q.    -- would you say that Scott had more

25   knowledge of the business than you did?

Page 141

1        A.    I would say he had more knowledge of the

2   customers than I did, yes.

3        Q.    Okay.  Would you say that he had more

4   knowledge of the industry?

5        A.    Yes.

6        Q.    Okay.  Would you say that for the first

7   few months he was almost in a -- almost teaching you

8   the ropes in a sense?

9        A.    Well, the first few months, I don't think

10  so, because the owners, Joe Castro and his wife Rosa,

11  by contract stayed on for the first several months,

12  and so that's where the bulk of my learning came from

13  during that time.

14       Q.    Okay.

15       A.    So, you know, they -- and they've been

16  available for consulting and to help out ongoing as

17  part of our agreement going forward.

18       Q.    Were Joe and Rosa --

19       A.    Rosa.

20       Q.    -- were they on site a lot of times?

21       A.    Every day.

22       Q.    Every day for the first few months?

23       A.    Uh-huh.

24             They worked at least 40 hours a week, if

25  not more.  I mean, they were there --

Page 142

1    Q.    Were they drawing a salary for that?

2    A.    No.

3    Q.    Were they drawing any sort of

4    compensation?

5    A.    Well, it was part of the agreement when I

6    purchased that I was -- in order to do that, there

7    needed to be that period of time --

8    Q.    Okay.

9    A.    -- for a transition because I -- I did

10   want to learn from them.

11   Q.    Okay.  Did they -- did Joe and Rosa ever

12   express to you dissatisfaction with Scott's sales

13   numbers?

14   A.    I don't recall.

15   Q.    To your knowledge, they did not?

16   A.    I don't recall any conversation with them

17   about -- about that.

18   Q.    Okay.  Did they ever discuss with you who

19   the employees were and what were the employees like?

20   A.    You know, during the contract

21   negotiation, I mean, we talked a lot about the

22   employees and whether or not they would stay, and if

23   they -- you know, that was a key point, but we didn't

24   go through each one and do like a performance

25   evaluation on them or anything.

Page 143

1      Q.    Did they ever express dissatisfaction

2   with Scott as an employee to you?

3      A.    I don't recall.

4      Q.    Well, is that something that you would

5   recall if -- if it had happened?

6      A.    I don't recall talking about any employee

7   in that regard.

8      Q.    Okay.  So, the first month or two you're

9   getting used to running a new business.  When did --

10  and I don't know, were you aware of what a reasonable

11  amount of sales for Scott would be in the first month

12  or two?

13          MR. SMITH:  Object to form.

14     A.    Well, Scott had told me with previous

15  employers he had done $80,000 a month or more, and so

16  certainly that's what I was looking to get.

17     Q.    Okay.

18     A.    I mean, that would seem reasonable.

19     Q.    Okay.

20     A.    That was being done at a previous

21  employer.

22     Q.    When did you -- Okay.  When did you

23  express your dissatisfaction with Scott's sales

24  numbers to Scott?

25     A.    We talked about it very often as far as

Page 144

1   his sales were not where they needed to be.

2          Q.    Okay.  Was it --

3          A.    I mean --

4          Q.    Were you talking about sales numbers, or

5   did you ever express dissatisfaction with his sales

6   numbers?

7          A.    He was responsible for sales, so I don't

8   know that there's a big distinction there.

9          Q.    Well, there is.  Did you ever express to

10  him that his sales --

11         A.    His sales weren't coming in the way they

12  needed to, absolutely.

13         Q.    Okay.

14         A.    I mean, that was -- yes.

15         Q.    I mean, did you -- did you express

16  dissatisfaction with his efforts, or was it more, your

17  sales weren't coming in the way they're supposed to,

18  that could be a whole host of factors, maybe you need

19  a different business strategy?

20         A.    For a portion of that time, he was the

21  only salesperson, so --

22         Q.    Okay.

23         A.    -- it wasn't as if -- you know, you could

24  say Karen didn't bring in or she needs to be bringing

25  in or something -- I mean, we were talking about one

Page 145

1    person and one --

2         Q.    Okay.  And did you ever put anything in

3    writing saying that you were dissatisfied with his

4    sales numbers?

5         A.    No.

6         Q.    Did you ever make it clear to him that

7    his sales efforts were unacceptable?

8         A.    I think it was clear to him and even in

9    his deposition that $100,000 was the goal and anything

10   less than that was unacceptable.

11              I'm not sure what you're looking for

12   there.  I mean, are you --

13        Q.    Well, was it unacceptable or --

14        A.    Unacceptable.  I mean, if you're not

15   making your -- the money that you need to be making,

16   that's unacceptable from sales.  I mean, that's what

17   sales is about; right?

18        Q.    There's a difference between the term

19   "goal" and "requirement."  Goal is aspirational, and

20   goal is a requirement.

21        A.    We talked about sales goals.  I mean,

22   there's --

23        Q.    Okay.

24        A.    And I -- every organization I've been in,

25   it's always been referred to as a sales goal or

Page 147

1   month, but I know that they were below the -- they

2   were below the -- where he would go from draw to

3   commission.

4        Q.    Okay.  Before Scott was terminated, who

5   else joined the sales team?

6        A.    I believe Terry Davis, Karen Alper, Randy

7   Schneider.

8        Q.    J.J. Walker?

9        A.    J.J. Walker, Jason Weeks.  And at one

10  point, the people at the front counter reported to

11  Scott, so they would have been part of the sales

12  organization.

13       Q.    Were the people at the front counter

14  engaged in outside sales, though?

15       A.    No.

16       Q.    Okay.  So, they just --

17       A.    The thought was that they have the

18  opportunity to upsell to customers, and, therefore,

19  could benefit from being part of the --

20       Q.    Okay.  But the sales team that was

21  responsible for outside sales would have been Terry

22  Davis, Karen Alper, Randy, J.J., Jason Weeks and

23  Scott?

24       A.    Yeah.

25       Q.    Okay.

Page 148

1      A.    Terry, I can't remember the date, but he

2  moved eventually out of sales and into another role in

3  the company, and then -- and he's now part time.  And

4  then --

5            And Jason Weeks was an independent

6  contractor --

7      Q.    Okay.

8      A.    -- so, commission only.

9      Q.    How did you meet Jason Weeks?

10      A.    I'm trying to think.  We had talked to --

11  Randy and I had talked to him previously about an

12  opportunity that he saw with an Internet company, an

13  idea to go on the Internet, and so we talked to him

14  about that.

15      Q.    He was a friend of Randy's?  Or how did

16  you first meet him?

17      A.    I think I first met him at Chromatek.

18  I'm not sure where I first met him, I'm trying to

19  think where I first met him.  We became friends, and

20  then he had this idea for an Internet thing, so Randy

21  and I met with him; and then Jason and I became --

22  because of that, later -- we never did anything

23  together as far as business-wise, and then we became

24  friends after that.

25      Q.    Is Jason Weeks still there?

Page 149

```
 1        A.    No.

 2        Q.    Okay.  When did he leave?

 3        A.    I think -- I don't know exactly the date,

 4   no.

 5        Q.    I mean, is this a month or so --

 6        A.    I'll tell you the situation.  He took a

 7   full-time job doing something else, so --

 8        Q.    With another company?

 9        A.    With another company.

10        Q.    Do you know what company it was?

11        A.    It's in Miami, downtown Miami.

12        Q.    Okay.

13        A.    It's not in the industry --

14        Q.    Okay.

15        A.    -- so --

16        Q.    He left voluntarily?

17        A.    Yeah.

18        Q.    Okay.  What were his sales numbers like

19   before he left?

20        A.    He never really materialized into sales

21   at all.

22        Q.    Did he ever have any sales numbers?

23        A.    I think he took Randy on a few sales

24   calls, and then got another job and moved on that way.

25        Q.    So, he was there for two months maybe?
```

Page 150

1      A.    I don't know exactly how long he was

2   there.  I mean, potentially, I mean, yeah.

3      Q.    Okay.  What about J.J. --

4      A.    He certainly came in after that because,

5   you know, we were friends and he stopped by and that

6   type of thing, but --

7      Q.    How was J.J. Walker compensated?

8      A.    He was a -- he was a draw against

9   commission.

10     Q.    Do you recall what that was?

11     A.    What do you mean?

12     Q.    The dollar amount?

13     A.    I believe it was $2,000 a month, or sales

14   would be equal to $20,000 per month.

15     Q.    Is he still there?

16     A.    No, he's not.

17     Q.    When did he leave?

18     A.    November, I believe.

19           That's the chart.

20     Q.    Yeah.

21           J.J. is John Walker?

22     A.    Yes.

23     Q.    And he left on November 1st, 2005?

24     A.    Okay.

25     Q.    Does that sound right?

Page 163

1      A.    No, no.

2      Q.    I want to move ahead to late May.  Was

3 there a meeting held between you, Randy and Scott at a

4 Champs in late May?

5      A.    I think it was --

6            MR. CASSATA:  Sorry.

7      A.    -- late May or -- or June 1st.

8      Q.    Okay.  Were there two meetings or one?

9      A.    I don't recall.  I only recall one

10 meeting.

11     Q.    And that would have been on or about June

12 1st?

13     A.    Yeah.

14     Q.    Okay.  And what was the purpose of that

15 meeting?

16     A.    To let Scott know that Randy was going to

17 be assuming sales responsibility for sales of Full

18 Spectrum and sales of Chromatek Imaging, and that that

19 was going to be our -- the way we would be combining

20 sales going forward.

21     Q.    Was Scott approached at that meeting

22 about the idea of doing work for Full Spectrum?

23     A.    About selling the services from both

24 companies?

25     Q.    Uh-huh.

Page 164

1        A.     Uh-huh.

2        Q.     **What were those proposals or what was**

3   **discussed?**

4        A.     It was an opportunity for him to sell

5   these services, as well, to the people that he was

6   contacting.

7        Q.     **And what services would those be?**

8        A.     Full Spectrum Media was a public

9   relations firm or is a public relations --

10       Q.     **So, let me see if I have this correct.**

11  **You and Randy both were suggesting to Scott the idea**

12  **of Scott selling services for -- for Full Spectrum, as**

13  **well as Chromatek?**

14       A.     We talked about that from -- that Randy

15  was coming on board to take ahold of all -- take

16  responsibility for the sales efforts of both

17  companies, and that there was an opportunity there

18  with customers that he was calling on to be able to

19  help bring Randy in to help see if there was an

20  opportunity for Full Spectrum to do business with them

21  also.

22       Q.     **Okay.**

23       A.     If you're meeting with the marketing

24  department, there might be an opportunity for --

25       Q.     **Yeah.**

Page 165

1            **Were you ordering Scott to do this, or**

2    **were you making it available to him as an opportunity,**

3    **or what was the nature of the offer?**

4            A.    Well, I would say "ordering" is a very

5    strong word.  I mean, that -- to me that is -- we were

6    saying, this is the direction we were going.

7            Q.    Uh-huh.

8            **Why is "ordering" a strong word for an**

9    **employee?  I mean, why not just tell an employee, this**

10   **is what we're doing or this is what you're going to**

11   **do?**

12           A.    I think that that is -- that's different

13   than ordering.  You know, I mean, I think of ordering

14   military, you know, slam the fist and jump up and

15   down.

16           Q.    Well --

17           A.    But saying, this our new strategy going

18   forward, to me, is a direction.

19           Q.    **Would Scott, in your opinion, have been**

20   **under the assumption that this was optional or that**

21   **this was something he was being ordered to do?**

22           MR. SMITH:  Object to form.

23           A.    Scott would have to answer for himself.

24   I don't know what he -- how he interpreted that.

25           Q.    **Okay.  But your impression was he was**

Page 166

1  being --

2          A.    Being asked.

3          Q.    Okay.  And it wasn't optional, in your

4  opinion?

5          A.    To my mind, if an employer asked me to do

6  something, then I do what I can do to -- to do that.

7          Q.    Well --

8          A.    I mean --

9          Q.    And sometimes options are presented to an

10  employee as truly being options.

11              I mean, were you presenting this

12  opportunity to Scott, and saying, hey, you know, if

13  you want to do this, here's an opportunity you can,

14  but you don't have to, or was it more --

15          A.    My recollection --

16              MR. SMITH:  Object to form.

17          A.    -- of the meeting was, this is the

18  direction we're going with the company, and we want to

19  be able to cross some services for both companies.

20          Q.    Okay.  On June 3rd, 2005, Scott came to

21  you and let you know about his -- about the issue with

22  his background check; is that correct?

23              MR. SMITH:  Object to form.

24          A.    Yes.

25          Q.    Okay.  What did he say to you?

Page 167

1      A.    It was a very brief meeting.  He came in

2  to --

3      Q.    **Did he call a meeting, first of all?  I**

4  **mean --**

5      A.    Karen and I were in the office that we

6  jointly shared --

7      Q.    **Uh-huh.**

8      A.    -- and he came in, and said, can I talk

9  to you for a minute?

10     Q.    **Uh-huh.**

11     A.    We said, yes.  I was on my way out the

12 door.  Karen was on her way out the door.  And -- and

13 he asked if he could talk to us for a second.

14     Q.    **Okay.  What did he say to you?**

15     A.    That he -- something to the effect that

16 his credit -- he had been looking at his credit report

17 online, and that there was an inquiry from Federal

18 Background Services.

19     Q.    **Did he say anything else?**

20     A.    I think he said that he had contacted

21 them and they said that it was at the request of

22 Chromatek.

23     Q.    **Okay.  And --**

24     A.    I think that was --

25     Q.    **Okay.**

Page 168

1      A.    Just about at that point, I said, I'll

2   look into it, and we left.

3      Q.    Okay.  Did you --

4            I mean, that was all that was said?  Did

5   he make -- did he make it clear that he was upset

6   about it?

7      A.    I don't know that it was clear that he

8   was upset about it.

9      Q.    Okay.

10     A.    I mean, it was a very -- it was a very

11  short meeting.

12     Q.    Okay.  But didn't he say, hey, I need to

13  talk with the two of you?

14     A.    Can I talk to you for a second?  And --

15     Q.    Was it a closed-door meeting?

16     A.    I believe so.  I mean, we were standing

17  right there, and I imagine he closed the door.  I

18  don't recall exactly.

19     Q.    Okay.  And what was your reaction?

20     A.    I --

21     Q.    Did you admit that Chromatek had pulled

22  his background -- had done a background check?

23            MR. SMITH:  Object to form.

24     A.    I don't recall exactly the verbiage of

25  what actually was said in there except that I told him

Page 169

1    that I'd look into it.

2           Q.    Okay.  But you do recall that --

3           A.    I recall him coming in.

4           Q.    Okay.  And you recall him --

5           A.    I recall that I was late, and I was in a

6    hurry, and -- at the same time.

7           Q.    Do you recall saying something to the

8    effect that Chromatek does background checks on its

9    employees?

10          A.    I don't recall.

11          Q.    Okay.  So, you said you would look into

12   it?

13          A.    Uh-huh.

14                MR. SMITH:  You need to answer "yes"

15   or --

16          A.    Yes.

17          Q.    Sorry.

18                What did you intend -- How did you intend

19   to go about looking into it?

20          A.    I don't know.  I don't -- I don't know

21   exactly.  I mean --

22          Q.    Well, I mean, were you just sort of

23   brushing him off, so to speak, or did you really

24   intend to look into it?

25                MR. SMITH:  Object to form.

Page 170

1           A.     I mean, at the time I was --

2                  Well -- I mean, we had ordered a

3      background report as part of an investigation.  I

4      didn't want to at that point to say here's the

5      situation, we're investigating employee theft.  I

6      didn't feel that was prudent at the time.

7           Q.     **But didn't you testify earlier that you**

8      **weren't even aware of this exception to the Fair**

9      **Credit Reporting Act regarding employee**

10     **investigations --**

11                 MR. SMITH:  Object to form.

12          Q.     **(By Mr. Cassata) -- at that time?**

13          A.     Yeah, I wasn't aware of that.

14          Q.     **Okay.  So, why would -- so, that would**

15     **not be in the back of your mind, the -- the idea that**

16     **we're doing this investigation, and, therefore, I**

17     **better not --**

18                 MR. SMITH:  Object to form.

19          A.     I knew why we had ordered the background

20     report, and so when somebody comes and asks about a

21     background report -- I mean, the reason it was ordered

22     was part of an employee investigation --

23          Q.     **Okay.**

24          A.     -- and theft.  So, I mean --

25          Q.     **Okay.  So, back to you saying, I'll look**

Page 171

1  into it, what did you mean that you -- what steps did

2  you plan to take to look into it?

3       A.   I -- I don't know exactly specifically.

4  I didn't have anything in my mind, saying these are

5  the steps I'm going to do.

6       Q.   So, you had no --

7       A.   No.

8       Q.   -- immediate plan to look into it?

9       A.   I hadn't given it some -- any thought

10  specifically in that --

11           I mean, the meeting couldn't have lasted

12  more than two minutes, it was a very short meeting, so

13  it was --

14       Q.   Okay.

15       A.   I didn't quick, quick, quick, and go, oh,

16  here are the things I'm going to do.

17       Q.   Do you remember, did Ms. Houlli ever say

18  something to the effect of, well, we may have ordered

19  it as a -- in a mistake?

20       A.   I don't recall.

21       Q.   Did she ever suggest to Scott that it was

22  a mistake in ordering?

23       A.   I don't recall.  I remember Karen

24  testifying something of that, but I don't recall from

25  the meeting.

Page 172

1    Q.    Okay.  I mean, did you plan on looking

2  into it that Monday or next week?  I mean, I'm just --

3  I just am curious what your intent was at that point.

4              MR. SMITH:  Object to form.

5    A.    It would be the next week.  I believe the

6  3rd was a Friday.

7    Q.    Okay.

8    A.    And I was leaving, and it was -- I don't

9  recall what time of day it was.

10   Q.    You were in a hurry to get out the door

11 on a Friday; is that fair to say?

12   A.    Exactly.  I don't remember if I was going

13 someplace and coming back, or if it was the end of the

14 day.  I don't remember the situation.  I just remember

15 being all packed up and ready to go with my briefcase

16 and -- and standing there as he was walking in.

17   Q.    Okay.  Was it an uncomfortable meeting?

18   A.    No.

19   Q.    Did you have in the back of your mind

20 that you were going to fire him at that point?

21   A.    I certainly was not happy with sales

22 performance --

23   Q.    Uh-huh.

24   A.    -- so --

25   Q.    I mean, was it uncomfortable because you

1  knew you were going to fire him, or no?

2        A.    It wasn't -- it wasn't an uncomfortable

3  meeting.

4        Q.    Okay.  I mean, did you know you were

5  going to fire him at that point?

6        A.    I knew that I was not happy with the

7  sales numbers, and I knew that I wasn't happy with

8  some of the employees' complaints that I received; but

9  to say that I'd actually made a firm decision on that,

10  you know, I -- if -- if it were up to me, I would have

11  fired him sooner; however, because Randy was coming

12  in, I felt like that it was reasonable to let Randy

13  make his decision of the situation and -- and see

14  where -- where we could take Chromatek.

15              Randy and I had multiple conversations

16  about -- about the sales numbers and -- and Scott's

17  abilities to bring those sales numbers in.

18        Q.    Okay.

19        A.    I was aware of the -- of several employee

20  complaints at that point, too, I believe, employee

21  complaints --

22        Q.    Well, weren't those employee complaints

23  like six months prior?

24        A.    No, I --

25        Q.    I mean, I think there was like a

Page 174

1   resignation letter from --

2        A.    Karen.

3        Q.    -- Karen, and a resignation letter

4   from --

5        A.    Laura.

6        Q.    Laura.  I can't remember the dates.

7        A.    Laura's was the end -- towards the latter

8   part of April.  So, from April to June is a month and

9   a couple of weeks, a month and a week.  So, yeah,

10  that's still fairly fresh.  I mean --

11       Q.    I mean, were you planning on firing him

12  at that -- you know, did you have -- were you planning

13  on firing him on June 3rd?

14       A.    On June 3rd, was I planning on firing

15  him?

16       Q.    Did you know you were going to fire him

17  at that point?

18       A.    I think what I had just said a minute ago

19  is that I had felt that -- that we would fire -- that

20  I would fire him sooner had Randy not been coming in

21  to help take on --

22       Q.    Okay.  Are you saying that you decided to

23  let Randy make the decision whether he wanted to fire

24  Scott?

25       A.    I felt that Randy was in a good position

Page 175

1   to come in and evaluate the situation with the sales

2   of Chromatek, and the ability for Scott to go hit his

3   numbers, and -- and, you know --

4        Q.    Well, I mean --

5        A.    I --

6        Q.    -- you say it was up to you that you

7   would have fired Scott sooner, and, I mean, in a way

8   it was up to you, but what -- I think what you're

9   saying -- and please correct me if I don't have this

10  right -- is that you decided to let Randy make the

11  decision of whether he wanted to fire Scott or not; is

12  that right?

13              MR. SMITH:  Object to form.

14        A.    I wanted Randy to -- yeah, I mean,

15  that's --

16        Q.    You wanted Randy to -- it would be his

17  call whether to fire Scott or not; is that correct?

18        A.    It would be a -- a joint decision, but I

19  didn't want to sway Randy's decision before Randy had

20  been in there and worked with him and --

21        Q.    So, you're saying you didn't want to make

22  a -- make a unilateral decision to fire Scott; is that

23  right?

24        A.    Unilateral, I mean --

25        Q.    You wanted to -- well, you tell me.  I

Page 176

1   mean, why were you waiting for Randy to come in?  Why

2   were you going to let Randy decide whether to fire

3   Scott?

4           MR. SMITH:  Object to form.

5       A.    Well, Randy and I had been talking for

6   several months that he was coming in and going to be

7   taking -- stepping into my shoes to take

8   responsibility for sales.

9       Q.    Uh-huh.

10      A.    And so I was not happy with the sales as

11  they were.  I felt that I had had two legitimate

12  employee complaints from two key people at the

13  company --

14      Q.    Yeah.

15      A.    -- females, who are a protected category,

16  and, of course, for me that's, you know, something you

17  have to take seriously, and Randy was coming in and I

18  felt that --

19      Q.    Okay, but I'm just trying to pin down --

20           You're saying that you decided to let

21  Randy come in and somehow share in the decision or

22  make the decision to fire Scott.

23           Let me start at the beginning.

24      A.    Yeah, I'm --

25      Q.    All right.  On June 3rd, 2005 --

1        A.      Yeah.

2        Q.      -- did you have a plan in your mind to

3    let Randy come in to the sales department and you

4    would leave it up to Randy whether he wanted to keep

5    Scott on as an employee or fire Scott?

6        A.      It was up to Randy at that point.  He was

7    stepping into my shoes to build the sales of

8    Chromatek.

9        Q.      Okay.

10        A.      And -- and at that point that was

11    decisions I would -- ultimately I would be involved in

12    them, but it certainly would be at his

13    recommendation --

14        Q.      Okay.

15        A.      -- you know.

16        Q.      So, you decided that --

17        A.      Just when Scott hired employees or those

18    type of things, he would come to me and he would --

19        Q.      Right.

20        A.      -- suggest them, and unless there was

21    reason not to, I -- I mean, I would go with his

22    recommendations.

23        Q.      But you were the owner of the company,

24    and Randy wasn't even there yet until, I guess --

25        A.      June 1st we met with Scott about moving

1    forward.

2        Q.     Okay.

3        A.     And then June 3rd is when you're asking

4    me about, so two days later.

5        Q.     Okay.  I mean, you were the owner of the

6    company, you could just fire Scott.  Why -- why didn't

7    you?

8        A.     Well, I knew that -- I knew that we --

9    that Randy was coming in, it was going to be a new day

10   for sales in the company, and I -- you know, that's --

11   I felt like that would be his prerogative on how to

12   grow sales, and if the team in place was one that he

13   could work with or not.

14       Q.     Okay.  So, you were going to give Randy

15   the leeway to decide whether he wanted to fire Scott

16   or not; is that fair to say?

17       A.     Certainly some input, yes.

18       Q.     Okay.  And if Randy had wanted to keep

19   Scott on, then that would have happened?

20       A.     Yes.  I mean, yeah --

21       Q.     Okay.

22       A.     Provided that the sales were there.

23       Q.     So, at the time you had this meeting on

24   June 3rd, you had no plan to fire Scott?

25       A.     Me specifically, certainly --

Page 179

1      Q.    Well, let me ask you this:  As of June

2    3rd, Chromatek had no plan to fire Scott, did they?

3      A.    Randy was coming in, and we were going to

4    be --

5      Q.    And you said it would be Randy's

6    decision?

7      A.    Okay.

8      Q.    Do you recall on the weekend --

9            June 3rd is a Friday.  So, that weekend,

10   did Scott try to call you?

11     A.    I don't recall if it was that weekend or

12   when it was, but I know that he did try to call me.

13     Q.    Okay.  And do you know what he called you

14   in regard to?

15     A.    I don't know.

16     Q.    Did you talk to him or --

17     A.    I don't recall.

18     Q.    Do you recall talking --

19     A.    I think there was a message on either my

20   home number or my --

21     Q.    Do you remember what the message said,

22   generally?

23     A.    No, I don't.

24     Q.    I'd like to enter Plaintiff's Exhibit

25   Number --

1             MR. SMITH:  Seven.

2             MR. CASSATA:  Seven.  Thank you.

3             (Thereupon, Plaintiff's Exhibit No. 7 was

4        marked for identification.)

5        Q.   (By Mr. Cassata) Okay.  Do you recognize

6   this?

7        A.   I do.

8        Q.   Okay.  You agree this is a memo that

9   Scott gave you on June 6th?

10       A.   Yes.

11       Q.   Where did Scott give you this?

12       A.   I don't recall the exact place.

13       Q.   Was it at Chromatek's office?

14       A.   Yes.  I believe so.

15       Q.   Do you recall the time?

16       A.   No, I don't.

17       Q.   Did he give it to you in a private

18   meeting or --

19       A.   I don't remember if he gave it to me in

20   an envelope or handed it to me open.  I don't recall.

21       Q.   Okay.

22       A.   You know what, I don't believe it was a

23   meeting, though.  I believe it was just, here it is;

24   and I can't remember if it was sealed or if it was --

25       Q.   Okay.  So, he may have given it to you in

Page 181

1  an envelope; and did you open it right there, or what

2  did you do?

3       A.   I -- I don't recall exactly where I

4  opened it.

5       Q.   Okay.  Did you --

6       A.   I mean, but I opened it at Chromatek.  I

7  don't know if it was in the hallway or in my office

8  or --

9       Q.   Did you open it a few minutes after he

10 gave it to you, within a few minutes after he gave it

11 to you?

12      A.   I don't even remember what time of day he

13 gave it to me, so I don't know when I --

14      Q.   I mean, did it sit around for hours or

15 did it --

16      A.   I don't know.  I don't believe so, but I

17 don't know.

18      Q.   You read it that day?

19      A.   Yes.

20      Q.   Okay.  And probably within an hour or two

21 of him giving you it?

22      A.   I don't know the time frame.

23      Q.   Okay.  What was your reaction to this

24 memo?

25      A.   I read it, and I thought that Scott was

Page 182

1   on a witch hunt to have Karen fired.

2           Q.      You thought that was what -- you think he

3   was using the background checks as an excuse to try to

4   have Karen fired?

5           A.      When I read it, I felt that that's what

6   he was asking for in this letter, was to terminate

7   Karen Houlli.

8           Q.      Okay.

9           A.      I think if you read that last sentence,

10  "Your knowledge of these activities obligates you to

11  immediately terminate Karen Houlli..."

12          Q.      Okay.  And how did you -- how did you

13  feel about that?

14          A.      I didn't think that that was his

15  decision.

16          Q.      Okay.  Where it says here, "These

17  background checks were done without my consent or

18  authorization as required by law," what was your

19  reaction to -- to that, to the substance of the

20  complaint?

21          A.      I didn't -- I wasn't aware that we had

22  done anything wrong by requesting a background check,

23  so --

24                  I knew that we had ordered a

25  background -- or that I had requested that we order a

Page 183

1   background check, I didn't know -- this was the first

2   I knew anything about the specifics of what he was

3   claiming was ordered --

4        Q.    Okay.

5        A.    -- and --

6        Q.    But so, I mean, he's saying here -- he's

7   expressing to Chromatek that he feels that Chromatek

8   violated the law by obtaining or ordering his

9   background checks.  Did you have any concern that the

10  law had been broken?

11       A.    I don't recall exactly what my concern

12  was on that.

13       Q.    Okay.  What did you determine to do about

14  this memo?

15       A.    Well, I think I responded with a memo to

16  him, saying that I would look into it and --

17       Q.    Okay.  Let me introduce Plaintiff's

18  Exhibit Number 8.

19            (Thereupon, Plaintiff's Exhibit No. 8 was

20       marked for identification.)

21       Q.    (By Mr. Cassata) Do you recognize this?

22       A.    Yes.

23       Q.    Okay.  You gave this memo to Scott on

24  June 6th?

25       A.    I believe so.

Page 184

1      Q.    You typed this up?

2      A.    Yes.

3      Q.    Okay.  It says here, "I am reviewing all

4  the circumstances surrounding what occurred."  What

5  were you doing to review the circumstances?

6      A.    That's when I felt that I needed to

7  consult an attorney.

8      Q.    Okay.  And when did you consult an

9  attorney?

10      A.    Sometime after June 6th.

11      Q.    Okay.

12      A.    I don't know exactly the date.

13      Q.    Did you discuss this matter with Karen

14  Houlli?

15      A.    I don't recall at this particular point

16  if I discussed it with her or not.

17      Q.    Did you ever talk with her about what

18  was --

19            First of all, let me make -- Hold on a

20  second.  Prior to June 3rd, did you ever follow up

21  with Karen regarding the outcome of the background

22  check?

23      A.    No.

24      Q.    So, you had that March 30th meeting where

25  one of the items is get a background check on Scott

Page 185

1    Tanis; right?

2          A.    Right.

3          Q.    And you're saying that you never followed

4    up with her on this background check, you never

5    determined what happened?

6          A.    I believe somewhere around the 18th, I --

7    of April, I asked if she'd ordered it, and she hadn't

8    and said that she would.

9                And then -- and then I don't know how

10   long it takes from that point on to get a background

11   check.

12         Q.    Okay.  From April 18th till June 3rd, had

13   you heard anything else about the background check?

14         A.    No.

15         Q.    You never followed up with Karen on what

16   the results were or whether the background papers had

17   come in?

18         A.    Not that I recall.

19         Q.    Did you know on June 6th whether the

20   background checks had arrived or not?

21         A.    To my knowledge, they hadn't.

22         Q.    Well, you said you never really followed

23   up with her, so you didn't know whether they had or

24   hadn't?

25               MR. SMITH:  Object to form.

1      A.    Well, I figured that if they had, she

2   would have said something.  I mean --

3      Q.    Okay.  At that June 3rd meeting, did you

4   or Karen ever say to Scott, hey, we never received any

5   background information?

6      A.    I don't -- I don't recall exactly what

7   was said on that.

8      Q.    Well, wouldn't you have said that if --

9            I mean, do you not recall or was it not

10   said?

11      A.    I don't recall.  The meeting was so

12   hurried, it was very quick, it wasn't -- it was not

13   a --

14      Q.    Well, you said -- I think you said

15   earlier that you really don't have -- you never

16   followed up with her, so you would have no knowledge

17   whether the documents arrived or not; right?

18            MR. SMITH:  Object to form.

19      A.    Yes.

20      Q.    So, you probably wouldn't have said, we

21   never got the documents, because you had no knowledge

22   of it; right?

23            MR. SMITH:  Object to form.

24      A.    I had no knowledge whether the doc --

25   that we had received the documents, so --

1    Q.    Okay.  After Scott gave you this memo on

2  June 6th, do you recall saying, I want to change the

3  subject or talk about something else now?

4    A.    Change the subject and talk about

5  something else --

6    Q.    Yeah.

7    A.    No, I don't recall that.

8    Q.    Do you recall after he handed you this

9  memo informing Scott that Randy was going to be named

10  VP of sales or was becoming VP of sales?

11    A.    He had already been informed, so I don't

12  think I ever told him specifically that day, no.

13    Q.    When -- when did Randy officially become

14  VP of sales?

15    A.    I mean, we talked about it back in

16  February, so, I mean, I don't know that -- when you

17  want to say "officially," I mean, he -- I think his

18  first day in the office was probably the first part of

19  June sometime.  I don't know exactly what day was the

20  first day.  I know the first meeting he and I had with

21  Scott was either -- I believe June 1st.

22    Q.    Well, what was Randy's first day of work?

23    A.    I don't recall.  I'm not certain.

24    Q.    Was it -- was it June 7th?

25    A.    I don't know.

Page 188

1          Is -- is going -- his going to lunch with

2     Scott a first day of work?  I mean, that might be

3     considered the first day of work, June 1st.

4          Q.     I mean, when --

5          A.     I mean, that would be the logical --

6          Q.     -- was his official first day of work

7     when he came into the office and spent a workday doing

8     whatever it is the VP position entails?

9          A.     I would say, then, June 1st is probably

10    his first official day of VP of sales.  We had a

11    meeting with Scott, who was the sales manager.  Randy

12    then was -- I don't know his schedule exactly, but to

13    what date he actually started being in the office

14    eight hours a day or whatever, I'm not sure.  He

15    was -- still had an office up in Boca, so he was kind

16    of commuting back and forth.

17         Q.     When was the staff informed that Randy

18    was the VP?

19         A.     I -- I don't know off the top of my head.

20    I know there's a memo to that effect that I'm sure

21    you've been produced.

22         Q.     What would you say to the idea that Scott

23    first found out that Randy was going to be his boss on

24    June 6th?

25              MR. SMITH:  Object to form; assumes facts

Page 189

1    not in evidence.

2        A.    I would say that that's wrong.

3        Q.    So, what was the -- what was the next

4    step you took after you typed up this response memo of

5    June 5th and gave it to Scott?

6        A.    Probably the next step I took was to

7    contact legal counsel, but I don't know exactly what

8    day that was.  So, it was June 6th, 7th, or 8th, or

9    9th.

10        Q.    And that was Ford & Harrison?

11        A.    Uh-huh.

12        Q.    Plaintiff's Exhibit Number 9, I'd like to

13    enter.

14            (Thereupon, Plaintiff's Exhibit No. 9 was

15        marked for identification.)

16        Q.    (By Mr. Cassata) Do you recognize this

17    memo?

18        A.    Uh-huh.

19            MR. SMITH:  "Yes" or "no."

20        A.    Yes.

21        Q.    It says here -- you know, it's a letter

22    to you, it says, "The purpose of this memo is to ask

23    you to surrender to me the illegally obtained

24    documents that were ordered from Federal Background

25    Services on 4/18/05."  Do you recall the circumstances

Page 190

1    surrounding when Scott gave this to you?

2        A.    I don't recall, no.

3        Q.    It's dated June 8th.  Do you remember him

4    giving it to you on June 8th?

5        A.    I don't recall the date, but I don't

6    disagree with the date either.

7        Q.    Okay.  Do you remember where you were

8    when you got this?

9        A.    I don't.

10       Q.    What was your reaction to this memo?

11       A.    I don't really recall what my reaction

12   was at that particular point.

13       Q.    Well, did it concern you?

14       A.    I don't remember exactly what my reaction

15   was.

16       Q.    It says in the second sentence, "I have

17   asked you several times to give me these documents and

18   to date you have refused to give them to me..."  Is

19   that true?

20       A.    I don't believe so.

21       Q.    You don't think he asked you several

22   times for those documents?

23       A.    I don't believe that he asked several

24   times, no.

25       Q.    Well, he asked at least once in the

Page 191

1    June 6th memo; right?

2          A.    Yes.

3          Q.    Did you ever say to Scott on either

4    June 6th, 7th or 8th, that you had not received any

5    documents?

6          A.    I don't recall if I told him that or not.

7          Q.    Well, wouldn't you have --

8          A.    It seems likely that I would, but I don't

9    know that -- I don't recall exactly saying that.

10         Q.    Okay.   At this point, on June 8th, had

11   you contacted an attorney?

12         A.    I don't know when I first contacted an

13   attorney.   I believe when I first contacted -- I don't

14   recall exactly.

15               I remember that when I first contacted

16   Ford & Harrison, that Sam was out of town, and I was

17   waiting for him to call me back from being out of town

18   or something or --

19         Q.    Did you show this memo to Randy?

20         A.    No.

21         Q.    You never have?

22         A.    Not to my knowledge; no.

23         Q.    At the time that you got this memo on

24   June 8th, had -- had you -- I'm talking about

25   Chromatek -- had you made up your mind that you were

Page 192

1    going to fire Scott?

2         A.    I wouldn't say that I'd made up my mind

3    100 percent, but, you know, I believe the day before

4    this I received another complaint from one of Scott's

5    direct reports regarding her lack of direction and

6    poor -- poor management from Scott, and her feeling

7    like she was floundering because of that.

8              So, I certainly was --

9         Q.    Okay.

10        A.    I mean, again, from another female

11   employee.

12        Q.    Who was that complaint from?

13        A.    Karen Alper.

14        Q.    Did you give that complaint to Randy?

15        A.    I -- she came to me and talked to me, and

16   I told her that she should talk to Randy.

17        Q.    Okay.  And did you give her written

18   complaint to Randy?

19        A.    She didn't give me a written complaint,

20   she complained in person.

21        Q.    Oh, there is no written complaint from

22   June 7th?

23        A.    I think she wrote it to Randy, the

24   complaint.

25        Q.    Okay.  But she went to you first?

Page 193

1      A.    She came to me, yes.

2      Q.    And you told her to go to Randy.  Did you

3  tell her to go to Randy because it was Randy's

4  decision whether to -- of what to do about it?

5      A.    I mean, he was responsible, he stepped

6  into my shoes for the sales organization --

7      Q.    Okay.

8      A.    -- and so it seems logically that --

9  logical that she would voice that concern to Randy.

10     Q.    Okay.  And you -- so, you were going to

11 let Randy deal with it?

12     A.    Address it, yes.

13     Q.    And make whatever decisions that he -- or

14 recommendations that he wished to make?

15     A.    Uh-huh.

16           MR. SMITH:  "Yes" or "no"?

17     A.    Yes.

18     Q.    Thank you.

19           Do you know, had Randy made up his mind

20 to fire Scott at this point?

21           MR. SMITH:  Object to form.

22     A.    That is a question you'd have to ask

23 Randy.  I don't know.

24     Q.    Well, did he -- did Randy ever tell you

25 before June 8th that he was going to fire Scott?

Page 195

1   Was there a sales meeting perhaps?

2          A.    I don't recall exactly.  I don't know.

3          Q.    So, following the June 6th memo from

4   Scott to you, and your June 6th memo to Scott

5   regarding -- you were saying you were reviewing all

6   circumstances, what -- what was the next step you took

7   in terms of determining what to do about these

8   complaints?

9          A.    I spoke with an attorney.

10         Q.    Do you recall when?

11         A.    I don't recall the date.

12         Q.    Was it that week?

13         A.    I believe so.

14         Q.    Did you talk with an attorney before

15   June 20th?

16         A.    I presume, yeah.  I don't know the --

17         Q.    Did you address --

18               Did you consult with an attorney

19   regarding Scott's complaint regarding the background

20   check before he was terminated?

21               MR. SMITH:  Object to the extent it calls

22         for communications covered by the

23         attorney-client privilege.

24         A.    Again, I'd -- I'd have to go back and

25   look at records.  I don't know the exact date I

1    contacted Sam because, like I said, he was out of

2    town --

3         Q.    Okay.

4         A.    -- and then I was waiting for him to

5    return the phone call, so I'm not sure the exact date.

6    It could have been.

7         Q.    What could have been?

8         A.    The first time I had a phone conversation

9    with him, but I don't know the exact date.

10        Q.    Did you consult with an attorney

11   regarding these background -- this background check

12   issue prior to getting a settlement demand letter from

13   me?

14        A.    What date did we get a settlement demand

15   letter?  I mean --

16             MR. SMITH:  I think it was July 1st, the

17        date.

18             MR. CASSATA:  I think so, too.

19        Q.    (By Mr. Cassata) Yes, July 1st.  Had you

20   consulted with an attorney regarding the background

21   check issue prior to July 1st?

22        A.    I guess, but I couldn't be 100 percent

23   certain on that.  I don't know the exact date that I

24   talked with him.

25        Q.    To me it seems like something you would

Page 202

```
 1                MR. SMITH:  Sure.

 2                MR. CASSATA:  I'm asking if he

 3          consulted --

 4                MR. SMITH:  You can ask when, and he

 5          doesn't recall.

 6          Q.   (By Mr. Cassata) Let me ask this again.

 7                MR. SMITH:  Can we go off the record for

 8          a minute, please?

 9                MR. CASSATA:  Sure.

10                (Discussion off the record.)

11                MR. CASSATA:  I'm going to enter

12          Plaintiff's Exhibit Number 11.

13                (Thereupon, Plaintiff's Exhibit No. 11

14          was marked for identification.)

15          Q.   (By Mr. Cassata) Okay.  I'm asking

16    Chromatek here.  You recognize this document?

17          A.   I do.

18          Q.   Okay.  Do you recall receiving this

19    document?

20          A.   I recall -- I believe this was in the

21    packet of stuff that I received from Federal

22    Background Services in July with the invoice.

23          Q.   You don't recall receiving this June 9th?

24          A.   I don't recall receiving this June 9th,

25    no.
```

1    Q.    Okay.  It's dated June 9th.  Who -- who

2  would have opened this correspondence or saw this

3  correspondence at Chromatek?

4    A.    It depends on how it came in.  If it came

5  in in the mail, the mail all goes to Karen --

6    Q.    Okay.

7    A.    -- initially; and then if it came via

8  fax, then it would have gone the fax machine.  I don't

9  know how it came.

10    Q.    Well, did you -- did you see this on or

11  shortly after June 9th?

12    A.    I saw this for the first time on -- when

13  it came in the packet in July with the other --

14    Q.    That was the first time you saw this

15  document?

16    A.    Yes.

17    Q.    Do you see that second sentence, "As part

18  of our audit, we are requiring your company to send us

19  the mandatory authorization form signed by the

20  applicant in question."

21    A.    Okay.

22    Q.    To your knowledge, did Chromatek -- and.

23          It says here -- I'm sorry, let me back

24  up.  "Failure to provide the necessary documentation

25  of authorization will result in the immediate

Page 206

1      A.    No.

2      Q.    You never did?

3      A.    No.

4      Q.    So, whatever -- following June 3rd

5  onward, whatever telephone calls or correspondence

6  Chromatek had with Federal Background would have been

7  Karen Houlli acting on her own -- her own

8  decision-making; and what I mean by that is, deciding

9  of her own volition whether to send a letter or not

10 send a letter?

11          MR. SMITH:   Object to form.

12     A.    Exactly.

13     Q.    Is that correct?

14     A.    Yes.

15          The first document that I had received

16 from Federal Background Services was that -- the

17 packet that I received in July, which, again, I

18 believe this letter was included in that packet.

19          MR. CASSATA:   Okay.   I'd like to enter

20      Plaintiff's Exhibit Number 11.

21          MR. SMITH:   Twelve.

22     Q.    (By Mr. Cassata)   Twelve.

23          (Thereupon, Plaintiff's Exhibit No. 12

24      was marked for identification.)

25          MR. SMITH:   Do you have a copy of 11?   If

1    MR. CASSATA:  -- be able to figure out

2    when he first contacted the firm.

3    MR. SMITH:  Sure.  And the exact date

4    when Mr. Tanis first contacted an attorney.

5    MR. CASSATA:  Sure.

6    MR. SMITH:  Okay.

7    MR. CASSATA:  The date he entered into a

8    retainer agreement?

9    MR. SMITH:  That, and -- and if you

10   can -- the same thing we're doing.

11   MR. CASSATA:  Okay.

12   MR. SMITH:  The first time you had a

13   communication, the best you can determine, and

14   then the first time he actually entered into

15   the retainer agreement.

16   MR. CASSATA:  Okay.  Thirteen.

17   (Thereupon, Plaintiff's Exhibit No. 13

18   was marked for identification.)

19   Q.   (By Mr. Cassata) Do you recognize this

20   document?

21   A.   I do.

22   Q.   You typed it up?

23   A.   I did.

24   Q.   Was this to Randy or to the whole

25   company, the whole staff?

1       A.    It was to Randy to be able to be used by

2   the whole staff.

3       Q.    Okay.

4       A.    I mean, we certainly had spoken about it;

5   and Randy is very adamant that salespeople should be

6   paid on commission because that's what keeps them

7   motivated to go out and continue to get new business

8   and to grow the business.

9       Q.    Okay.  So, he suggested to you that the

10  pay structure should be changed to commission?

11      A.    Yes, he talked about that.

12      Q.    To be more heavily based on commission or

13  commission only?

14      A.    He talked about that.

15      Q.    Okay.

16      A.    But as far back as I can remember, that's

17  the way he felt about sales.

18      Q.    Okay.  So, it says here, "The company

19  will continue to pay new sales personnel the draw

20  against commission for the first six months of

21  employment."

22            Other than Scott Tanis, everybody was a

23  new salesperson; is that correct?

24      A.    Yes.

25      Q.    Okay.  So, the effect of this going in --

Page 212

1    it says here that this is going to be effective July

2    1st, 2005.  The practical impact of this was that only

3    Scott Tanis was going straight commission?

4              MR. SMITH:  Object to form.

5         A.   I mean, everybody was going to that

6    straight commission after they had been there six

7    months, so, I mean, it was --

8         Q.   But it's fair to say that he was the only

9    one that this policy --

10        A.   That had been there six months or more.

11        Q.   Well, he was the only one that was going

12   to be immediately impacted by this change in policy?

13        A.   I don't believe he would have been

14   immediately impacted if he hit his sales numbers, then

15   there would have been no impact to him at all.

16        Q.   Well, what do you mean -- it says July

17   1st he's going to straight commission.  He's --

18        A.   Well, if he hit -- if he hit the $570,000

19   of sales that he had committed to or the $47,500 month

20   of sales, there would have been no impact to him

21   whatsoever financially.

22        Q.   Oh, I'm not talking about whether his --

23   I'm not talking --

24        A.   You're just asking --

25        Q.   I'm not talking whether his pay would be

1      Q.     -- was that only Scott Tanis' pay would

2  be immediately changed, everyone else's might be

3  changed six months down the road?

4      A.    I don't believe it was six months because

5  some of them had been there long -- more than -- none

6  of them were --

7      Q.    Okay.

8      A.    -- were ultimately new hires, but --

9      Q.    I see.

10      A.    But Scott was the only one that had been

11 there six months at the time of this, yes.

12      Q.    Okay.  Number 14, please.

13            (Thereupon, Plaintiff's Exhibit No. 14

14       was marked for identification.)

15      Q.    (By Mr. Cassata) Do you recognize this?

16      A.    Yes.

17      Q.    It looks like a termination letter.

18      A.    Yes.

19      Q.    Who made the decision to terminate Scott?

20      A.    Randy and I.

21      Q.    Okay.  Do you recall the meeting at which

22 you informed Scott that he was being fired?

23      A.    I remember sitting down, yes.

24      Q.    Was it on this date, June 20th?

25      A.    I believe so.

Page 215

```
 1        Q.    Okay.  Do you recall the reason that

 2   either you or Randy gave for the decision?

 3        A.    I don't recall exactly what was said, no.

 4        Q.    Well, do you recall -- do --

 5              You recall the meeting --

 6        A.    Uh-huh.

 7        Q.    -- right?

 8              MR. SMITH:  "Yes" or "no"?

 9        A.    Yes.

10        Q.    Do you recall informing Scott that he was

11   being fired?

12        A.    Yes.

13        Q.    Okay.  Did you say that or did Randy?

14        A.    I believe Randy did.

15        Q.    Okay.  And was any reason for your

16   decision given to Scott?

17        A.    I don't believe so.

18        Q.    No reason at all?

19        A.    Not that I -- not that I recall.

20        Q.    Okay.  When did -- when was this letter

21   given to Scott?

22        A.    At the time of that meeting.

23        Q.    Okay.  Other than informing -- other than

24   Randy informing Scott that he was being fired, was

25   anything else said?
```

Page 220

1    it was a general release or confidentiality, you can't

2    remember whether one or all of those provisions were

3    in there; is that right?

4         A.    Exactly.

5         Q.    Okay.  Plaintiff's Exhibit Number 15.

6               (Thereupon, Plaintiff's Exhibit No. 15

7         was marked for identification.)

8         Q.   (By Mr. Cassata) This is an invoice from

9    Federal Background Services, it's made out to

10   Chromatek Imaging.  Do you see that middle box

11   there, it says, "Due date"?

12        A.    Middle box --

13              Up here, the invoice date, June -- or

14   April 1st?

15        Q.    No, towards the middle of the page is a

16   box that says, "Due Date," and it says, "5/15/2005."

17        A.    Okay.  Yes.

18        Q.    Okay.  It appears to be a bill to

19   Chromatek, and it's due on -- on May 15th, 2005,

20   and --

21        A.    It seems to have been invoiced on April

22   1st, 2005, prior to us even receiving -- or making a

23   request, I mean, for a background check.

24        Q.    Yeah.  I'm just asking, did Chromatek

25   receive this invoice prior to 5/15/2005?

Page 221

1      A.     Not that I'm aware of.

2             Right here, 7/22, mailed with invoice.

3  "Mailed this invoice with results."

4      Q.     Okay.  You testified earlier that you,

5  Chromatek, had not received this background

6  information until July 24th, I think, is that --

7      A.     I don't know.

8      Q.     In July, is that fair?

9      A.     I remember receiving this packet with

10 this invoice and some of these other documents that

11 you showed me in July.

12     Q.     Okay.  To your knowledge, did Federal

13 Background have to pull those background checks twice?

14     A.     I have no idea.

15            MR. CASSATA:  Plaintiff's Exhibit 16.

16            (Thereupon, Plaintiff's Exhibit No. 16

17     was marked for identification.)

18     Q.     (By Mr. Cassata) Have you seen this

19 document?

20     A.     It came with that same packet in July.

21     Q.     Okay.  You never saw this --

22            Well, it came, okay, with the cover

23 package -- it's dated here July 22nd, 2005.  Did you

24 ever discuss this letter with Karen Houlli?

25     A.     I don't recall.  Let me just read it

Page 222

1   quickly.

2           Okay.

3       Q.    That fax number, the middle -- (954)

4   566-6928, is that your fax number?

5       A.    It was.

6       Q.    Okay.  Was it your personal fax number

7   rather than Chromatek's number?

8       A.    Yes.

9       Q.    Personal as in your home fax number or --

10      A.    No, it's a separate fax in my office at

11  Chromatek.

12      Q.    Okay.  After you received this on

13  July 22nd, did you talk with Karen Houlli about this

14  letter?

15      A.    I don't recall.

16      Q.    In regard to the meeting you had on June

17  1st with Scott and Randy --

18      A.    Yes.

19      Q.    -- and you had asked Scott to start

20  selling the products of Full Spectrum, why did you ask

21  Scott to do that?

22      A.    He already had a relationship with --

23      Q.    Okay.

24      A.    -- certain customers, and it made sense

25  that if he had a relationship that he would be able to

Page 223

1   introduce other products for a company that I was also

2   a principal in.

3       Q.   Well, I mean, if you were dissatisfied

4   with his sales numbers, why would you ask him to begin

5   selling for some other company?

6       A.   It was the direction of where the company

7   was headed.  I mean, we talked to him about where we

8   were going with the sales structure, and it made sense

9   where we were going with the sales structure, and just

10  basically confirmed our new direction.

11      Q.   Just checking on some things.  Have you

12  ever gone by any other names?

13      A.   Allen is what I go by.

14      Q.   Okay.  Who else was privy to this

15  employee investigation besides you and Karen, anybody?

16      A.   That would have been it.

17      Q.   Generally when did the investigation end?

18      A.   I don't know that there was ever an exact

19  stop date of it.  Everything seemed to be under

20  control as far as this shift in cost of goods, and,

21  you know, having cash shortages, so --

22      Q.   Okay.  Did the investigation end before

23  or after Scott was fired?

24      A.   Again, I'm not certain there was ever a

25  formal date the investigation ends, so I don't know

1       Q.    Did it end before or after Scott left?

2       A.    Again, there was really no formal date

3    that I -- that we said the investigation is over.  So,

4    I don't know -- to be able to put an end date on to it

5    is possible.

6             MR. SMITH:  Are you asking -- are you

7         asking investigation on the cost of goods, or

8         investigation into the cash -- the cash

9         shortages, or all together?

10      Q.    (By Mr. Cassata)  I'm asking the -- the

11   investigation into suspected employee misconduct.  I

12   just want a general start date and end date, if it's

13   possible to give.

14      A.    I would say the general start date was

15   March 30th, the date of that memo would be probably

16   the --

17      Q.    Okay.

18      A.    It was certainly within my mind, you

19   know, since the meeting with the accountant, so I

20   guess that would be the tentative start date, and then

21   formalized on March 30th, when the other issues were

22   brought to my attention; but as far as a date

23   specifically saying, we no longer have to worry about

24   employee theft, I don't know that we've -- that's ever

25   been a statement that I've made.

Page 226

1        Q.    No, no, no, that's not -- that's not what

2    I'm getting at, but --

3             I notice absent from that memo regarding

4    the issues to be addressed in terms of employee

5    misconduct was the issue of the eBay selling or

6    salespeople selling product samples from customers.

7    Why -- were you investigating that or not?

8        A.    Investigating --

9        Q.    Well, I mean, was it the idea that

10   salespeople should not sell product samples given to

11   them on eBay?  Do you consider that a serious problem

12   that you were investigating?

13       A.    The things I was really investigating

14   were the issues that had come up here.

15       Q.    Okay.

16       A.    These were --

17       Q.    I'm sorry.

18       A.    No, go ahead.

19       Q.    I think you testified earlier you never

20   told Scott not to sell product samples; right?

21       A.    I said I didn't recall what I had said to

22   him about that.

23       Q.    Okay.  Have you told salespeople since

24   Scott was fired not to sell product samples?

25       A.    Randy and I have had several discussions

Page 232

1   that Randy was his new boss; is that correct?

2        A.    We were changing the way that the sales

3   for Chromatek and Full Spectrum were going to be

4   managed through Randy, yes.

5        Q.    Okay.  Was Scott told on June 1st that

6   Randy was his boss effective immediately?

7        A.    I mean, that was what we discussed, that

8   Randy was taking over the responsibility of all of

9   those things because I couldn't do it.

10       Q.    Okay.  But, I mean, is that something

11  that was going to take place in the future, or was it

12  effective immediately?

13       A.    It was effective immediately.

14       Q.    Is there anybody else that would be aware

15  that -- that Randy took that position on June 1st?

16       A.    Randy.

17       Q.    Was anybody else at the company aware

18  that Randy became VP of sales on June 1st?

19       A.    I don't know that -- I don't know if I

20  spoke with Karen about it or not.

21       Q.    Would anybody at the company have known

22  Randy was their boss on June 1st?

23       A.    Other than Scott?

24       Q.    Yes.

25             Or would anybody have known that Randy

Page 235

1                   C E R T I F I C A T E

2

3    STATE OF FLORIDA )

4    COUNTY OF BROWARD )

5

6         I, LISA MILEUR, Registered Professional

7    Reporter and Notary Public in and for the State of

8    Florida at Large, do hereby certify that the

9    foregoing testimony was taken before me; that the

10   witness was duly sworn by me; and that the foregoing

11   pages constitute a true record of the testimony

12   given by said witness.

13        I further certify that I am not a relative or

14   employee or attorney or counsel of any of the

15   parties, or a relative or employee of such attorney

16   or counsel, nor financially interested in the

17   action.

18        Under penalties of perjury, I declare that I

19   have read the foregoing certificate and that the

20   facts stated herein are true.

21        Signed this 13th day of March, 2006.

22

23   _____

     LISA MILEUR, Shorthand Reporter

24   Notary Public, State of Florida at Large

     Commission No.: DD123702

25   My commission expires: July 27, 2006

# *CONFIDENTIAL*

## Meeting Notes Regarding Possible Employee Theft
## March 30, 2005

Attendees:
> Karen
> Allen

Issues:
> Missing cash from register
> Shutters remaining unlocked
> Alarm not set
> Large swing in Cost of Goods Sold

Possible Employees:
> Laura
> 1. Keys and alarm code
> 2. Conducts inventory
> 3. Places orders
> 4. No outlet to sell materials
>
> Liz
> 1. Access to cash register
>
> Kristine
> 1. Access to cash register
>
> Scott
> 1. Manager responsible for closing
> 2. Keys and alarm code
> 3. Access to cash register
> 4. Previously admitted that he took samples from customers and sold them on E-bay.
> 5. Admitted to other employees that he stole items from previous employers dumpster and sold them on E-bay.
> 6. Admitted to other employees that he returned to previous employers and obtained customer documents
> 7. Would know where to sell materials

Action Items:
> Audit month-end inventory
> Review all receivings against purchase orders
> Balance cash register daily
> Background check on Scott



EXHIBIT

2

Chrom 0038



**chromatek**
**IMAGING**

T: 954-566-1022 • F: 954-563-6207 • 3400 POWERLINE RD • FORT LAUDERDALE • FLORIDA 33309

Date:        June 6, 2005

To:          W. Scott Tanis

From:        Allen Evans

Re:          Memo dated June 6, 2005


Dear Scott,

I have reviewed your memo and fully understand your concerns. I am reviewing all the circumstances surrounding what occurred.

Please understand that I will take appropriate actions to address the situation.

Regards.

**EXHIBIT**

tabbies®

8

**Chromatek**
IMAGING

T: 954-566-1082 . F: 954-563-6207 . ▪ 3400 POWERLINE RD ▪ FORT LAUDERDALE ▪ FLORIDA 33309

Date:       June 15, 2005

To:         Randy Schneider

From:       Allen Evans

Re:         Sales Commission

Randy,

Please be advised that effective July 1, 2005, all Chromatek Sales Personnel will be paid
on a commission basis only (10% of sales).  The company will continue to pay new sales
personnel a draw against commission for the first six months of employment, to allow
them time to their build a client base.

Please advise your organization accordingly.

Regards.

**EXHIBIT**

13

Chrom 0086



Federal Background Services, Inc

# Invoice

PO Box 6703
Lake Worth, FL 33466

| Date | Invoice # |
|------|-----------|
| 4/1/2005 | 2628 |

| Phone # | Fax # |
|---------|-------|
| 561-969-9966 | 561-969-9988 |

| Bill To |
|---------|
| CHROMATEK IMAGING<br>ATT: ACCOUNTS PAYABLE<br>3400 POWERLINE RD<br>FT LAUDERDALE, FL 33309 |

| Due Date | P.O. No. | Rep |
|----------|----------|-----|
| 5/15/2005 | | |

| Serviced | Item | Description | Quantity | Amount |
|----------|------|-------------|----------|--------|
| 4/18/2005 | FDOC<br>50 STATE CRIM....<br>7 YR FL DRIVER...<br>SINGLE CREDIT...<br>WORKERS COM... | TANIS, WILLIAM | | 10.00<br>30.00<br>7.00<br>15.00<br>5.00 |
| 7/22/2005 | | MAILED THIS INVOICE WITH RESULTS. | | |

| Web Site |
|----------|
| WWW.FEDERALINV.COM |

| Total | $67.00 |
|-------|--------|
| Payments/Credits | $0.00 |
| Balance Due | $67.00 |

EXHIBIT

tabbies

15

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE No.: 05-61283-CIV-COHN/Magistrate Snow

————————————————————————

WILLIAM SCOTT TANIS,

      Plaintiff,

-vs-

CHROMATEK IMAGING, INC.,

a Florida corporation; ALLEN

EVANS, an individual; and KAREN

HOULLI, an individual,

      Defendants.

————————————————————————

             Fort Lauderdale, Florida

             February 13, 2006

             9:15 a.m.


             DEPOSITION

                OF

             KAREN HOULLI

1     Q.    Let me tell you just a little bit about

2   what a deposition is.  I'll ask you questions.  You

3   were sworn.  You are under oath.  If you don't

4   understand a question I have asked, feel free to,

5   you know, ask me to repeat it or rephrase it.

6           As you can see, this court reporter here

7   is making a written record, so she needs verbal

8   responses to questions.  Say, you know, yes or no.

9   She can't get a shake of the head or a shrug, uh-huh

10  on the record.

11          Are you taking any medication this morning

12  that would affect your ability to give lucid and

13  truthful answers?

14     A.    No, but I'm a diabetic, and I do need

15  breaks every hour to check my glucose.

16     Q.    Okay.  Just let me know whenever you want

17  to take a break.

18     A.    Okay.

19     Q.    When did you first become employed at

20  Chromatek?

21     A.    September of 2004.

22     Q.    And let me do a little background

23  information.  Where were you born?

24     A.    I was born in Puerto Rico.

25     Q.    What is your date of birth?

Page 9

1      Q.   Did you have any accounting
2  responsibilities?
3      A.   Yes, as well.
4      Q.   How did that come about?
5      A.   I worked in the accounting department as
6  accounts payable manager and accounts receivable,
7  and I managed the accounting and managing department
8  by the time I left the company.
9      Q.   You said you started there in 1997?
10     A.   Correct.
11     Q.   And you worked there until when?
12     A.   2000 -- early 2000 -- 2004.
13     Q.   Do you remember the month?
14     A.   No.  I was freelancing at the end for
15  them.
16     Q.   Why did you leave Americall?
17     A.   It was a merger, and my position was
18  eliminated.
19     Q.   What did you do after that?
20     A.   I stayed home with my daughter.
21     Q.   How old is your daughter?
22     A.   She is three.
23     Q.   Do you have any other children?
24     A.   No.
25     Q.   Are you married?

Page 10

1    A.   Yes.

2    Q.   When did you get married?

3    A.   1996.

4    Q.   You are still married to the same person?

5    A.   Yes.

6    Q.   After you, I guess, were laid off -- is

7    that the term?

8    A.   Correct.

9    Q.   -- from Americall, what did you do next?

10   A.   I was a housewife.

11   Q.   And when did you next enter the workforce?

12   A.   When I started working for Chromatek.

13   Q.   When would that have been?

14   A.   September of '04.

15   Q.   And did you ever work for Chromatek Photo?

16   A.   No.

17   Q.   So you continuously worked for the company

18   with Allen Evans?

19   A.   Correct.

20   Q.   How did you come to be employed with

21   Chromatek?

22   A.   I answered an ad in Career Builder.

23   Q.   What was the ad for?

24   A.   Bookkeeping, part-time.  Bookkeeping and

25   accounting duties.

Page 11

1    Q.   Did it give a job title?

2    A.   No.

3    Q.   And so you applied and you were hired?

4    A.   Correct.

5    Q.   What was your job title when you were

6 hired?

7    A.   My job title on my business card says

8 accounting manager.

9    Q.   Say that again.

10   A.   Accounting manager.

11   Q.   Accounting manager.

12        Have you ever received your accounting

13 agree?  Do you have a two or four-year degree in

14 accounting?

15   A.   No.

16   Q.   Just sort of on-the-job experience?

17   A.   Correct.

18   Q.   So what were your job duties?  What did

19 you do day-to-day when you started work?

20   A.   Accounts payable, accounts receivable --

21   Q.   Okay.

22   A.   -- bank reconciliations.

23   Q.   Did your job title or duties change at any

24 point?

25   A.   They did.

Page 12

1    Q.    Tell me about that.

2    A.    In a small company where you just would

3    have a small amount of employees, you tend to get

4    other duties that are not part of your job

5    description.

6    Q.    Okay.  For example, what other duties have

7    you picked up over the course of your employment?

8    A.    Payroll duties, you know, helping out in

9    the front counter, some light HR duties, getting the

10   employees to come in, getting their timecards set

11   up.

12   Q.    So in addition to accounting, you do some

13   HR-related things?

14   A.    Correct.

15   Q.    And has your title changed at all?

16   A.    No.

17   Q.    I mean, do you have a business card?

18   A.    Not with me.

19   Q.    What does it say on your business card?

20   A.    Still accounting manager.

21   Q.    Do you have your own office at the

22   Chromatek facility?

23   A.    Yes.

24   Q.    Do you have a personal computer there or,

25   you know, a desktop computer, I assume?

1      as Plaintiff's Exhibit 1.

2          (Thereupon, the 3/29/05 memo referred to

3      was marked for Identification as Plaintiff's

4      Exhibit Number 1.)

5          MR. SMITH:  Is this mine?

6          MR. CASSATA:  Yes.

7     Q.   Okay.  Take a look at what has been marked

8  for Identification as Plaintiff's Exhibit Number 1.

9  A document like this, this is created in Word?

10    A.   Correct.

11    Q.   How is the letterhead attached to Word?

12 Is it a template that you use --

13         MR. SMITH:  Object to the form.

14    Q.   -- when you write a letter?

15    A.   Yes.

16    Q.   This is a memorandum template.

17         I guess what I'm wondering, the logo there

18 where it says Chromatek Imaging in the upper

19 right-hand corner, is that on the stationery that

20 you send to the printer?

21    A.   No.

22    Q.   No?  That's created by the computer and

23 then printed on the paper?

24    A.   Yes.

25    Q.   Is that right?

1    Q.   What was your understanding of his job

2  title?

3    A.   My understanding was that he was a sales

4  manager.

5    Q.   And what did that encompass?

6    A.   He was in charge of all commercial sales.

7    Q.   Now, how did your job interact with his?

8    A.   Basically, my job entailed making sure

9  that his invoices for his clients were sent out to

10 him.

11   Q.   Okay.  How was your working relationship

12 with Mr. Tanis when you began your employment?

13   A.   At the beginning, it was -- it was

14 professional.

15   Q.   Okay.  Was he your supervisor in any way?

16   A.   No.

17   Q.   Was he -- did he have any sort of -- How

18 should I say this?

19        When management was away -- I assume Allen

20 was your direct boss.  Okay?  He's the owner of the

21 company as well?

22   A.   Correct.

23   Q.   When Allen was away, who was your

24 supervisor?

25   A.   My supervisor was always Allen because my

Page 17

1    duties were always to report financing and

2    accounting -- were always reported to Allen.  If he

3    was going to be out, I would contact Allen directly.

4        Q.    If Allen was out of the office, let's say

5    for a week out on vacation, who was in charge of

6    running Chromatek?

7        A.    Basically, we were informed by Allen Evans

8    if he was not there, if we need anything, we needed

9    to talk to Scott.

10       Q.    Your understanding was Scott was in charge

11   while Allen was gone?

12       A.    When it came to the production, yes.

13       Q.    What about other areas besides production?

14       A.    I guess, you know, Allen was still on call

15   24/7.  If we had a financing or any kind of

16   accounting issue, we were instructed to contact him

17   directly.

18       Q.    I suspect at some point, your relationship

19   with Scott deteriorated; is that fair to say?

20       A.    Yes.

21       Q.    You said you started out as professional.

22   When did it become less than professional?

23       A.    Somewhere along the lines of just

24   communication lacking and not, you know, mis -- not

25   respecting in certain issues.

Page 18

1  Q.   Okay.  Give me -- you started September

2  '04.  When would you say things started to

3  deteriorate?

4  A.   Sometime before January.  Before --

5  Q.   Okay.  Now, you said there were issues of

6  respect or disrespect?

7  A.   Disrespect, yes.

8  Q.   Tell me what you mean by that.

9  A.   There was an issue once with a copier,

10  with the printer where basically we needed to --

11  Allen had got me the copier for my office, and Scott

12  decided it was best to put it out on the floor, and

13  my understanding -- you know, I said before we make

14  a decision, let's make sure that it is

15  cost-effective and that we are able to -- you know,

16  that it is okay to do so.  And he basically -- when

17  I walked away, he instructed the other employees not

18  to pay any attention to what I was saying, that it

19  was his decision what was going to happen with the

20  printer.

21  Q.   Okay.  Do you recall when this occurred?

22  A.   No.  I just remember that it occurred.

23  Q.   Sometime between September '04 and January

24  of '05?

25  A.   Uh-huh.

Page 21

1      A.    I was a bit frustrated because that my job

2   was a little behind.

3      Q.    Did you bring your concerns to Allen's

4   attention?

5      A.    At that time, no.

6      Q.    Did you bring it to the attention of

7   anybody?

8      A.    To Scott.

9      Q.    And you just felt he didn't take any

10  proactive actions regarding your concerns; is

11  that --

12     A.    Eventually, he did.

13     Q.    Basically, where I'm going with this, I

14  understood that you gave a resignation letter in

15  January of '05?

16     A.    Correct.

17     Q.    I'm just trying to establish what

18  happened, let's say, after the copier incident and

19  the events leading up to -- whatever prompted you to

20  send your resignation letter.

21          Can you tell me about that?

22          MR. SMITH:   Object to the form.

23     A.    The reason why I gave my resignation

24  letter was that a few days earlier, Scott had come

25  into my office with a list of things he needed to go

Page 22

1   over with me about what I was doing, and I told him

2   that I did not want to have this discussion with him

3   because I didn't feel comfortable with him, speaking

4   to him without in the presence of Allen.  I wanted

5   Allen to go over with us what the problems we were

6   having.

7       Q.   Why would you feel uncomfortable?

8       A.   Just because I didn't feel comfortable

9   with his being disrespectful to me, and I just

10  didn't feel comfortable around him anymore.

11      Q.   Had he treated you with disrespect in ways

12  other than this copier incident?

13      A.   There is -- his persona, how he came about

14  in talking to me.  And in my letter of resignation,

15  I said he belittled me and looked down on me.  And I

16  wanted him -- I wanted Allen to be in the meeting.

17  I didn't prefer to talk to him by myself.

18      Q.   Okay.  This was in January of '05?

19      A.   Correct.

20      Q.   And so did that occur?  Did Allen sit in

21  on your meeting?

22      A.   Yes, he did.

23      Q.   Do you recall the date of that meeting?

24      A.   I remember that it was a Thursday.

25      Q.   In January?

1    A.   Yes.

2    Q.   **And what happened at this meeting?**

3    A.   We went over the fact that, you know, that

4  I didn't feel comfortable, that, you know, Scott

5  didn't respect me as my job duties were.  We went

6  over -- we went back and forth on the little details

7  of what it were, you know, just --

8    Q.   **Was this a meeting regarding a personality**

9  **conflict between you and Scott?**

10    A.   It was work and personality.  It was work

11  and --

12    Q.   **What did Allen say?**

13    A.   Bottom line was, he said that Scott, you

14  know, was, you know, in charge, but that I would

15  report under Scott, that we needed to work together

16  and try to -- both teams were needed.

17    Q.   **So he told you both that you needed to try**

18  **to have a better professional relationship; is that**

19  **fair to say?**

20    A.   Yes.

21    Q.   **Then what happened?**

22    A.   After probably an hour of just going back

23  and forth, I felt ill and I went home, and I was ill

24  for two days, and then I returned back to work the

25  following Monday.

Errata Sheet for Deposition of: <u>Karen Houlli</u>
Taken: <u>February 13, 2006</u>

| Page No. | Line No. | Currently reads: | Amended to Read: |
|---|---|---|---|
| 23 | 13-16 | Bottom line was, he said that Scott, you know, was, you know, in charge, but that I would report under Scott, that we needed to work together and try to – both teams were needed. | Bottom line was, he said that Scott, was in charge, but that I would still only report to Allen, but that we needed to work together and try to – both teams were needed. |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Signature

Date: 3/22/06

Page 24

1    Q.   Okay.  And I'm just trying to establish

2  what led you to turn in your resignation.

3    A.   Just because I felt more uncomfortable

4  than I did before after the meeting in the office.

5    Q.   So you came back to work on a Monday.  And

6  did you turn in your resignation letter that day?

7  Did you talk to Allen?  What happened?

8    A.   No.  Allen comes in and out all the time,

9  so -- and I was part-time, so I dwelled on the idea.

10  And after I came to the conclusion I didn't want to

11  work, you know -- I didn't want to work in a

12  situation where I felt uncomfortable --

13    Q.   Did you go to Allen and tell him that

14  the --

15    A.   -- I turned in my resignation to Allen.

16    Q.   Where did you type up that letter?

17    A.   I don't remember.

18    Q.   At home or at the office?

19    A.   I don't remember.

20    Q.   So you took this letter on a Monday in

21  January and you hand-delivered it to Allen?

22    A.   I don't remember.  No, it was several days

23  after.

24    Q.   After this meeting?

25    A.   Correct.

Page 25

1   Q.   Between Allen and Scott?

2   A.   It was not -- it was not the following

3   Monday.  It was several days afterward.

4   Q.   Wasn't anyone else present at that

5   meeting, by the way?

6   A.   Which meeting?

7   Q.   The meeting between you and Allen and

8   Scott at which you discussed the personality

9   conflict?

10   A.   No.

11   Q.   Okay.  So a few days later, you take your

12   resignation letter and you hand-delivered it to

13   Allen.  Do you recall where you gave it to him?

14   A.   No.

15   Q.   Somewhere at the Chromatek facility?

16   A.   Yes.

17   Q.   And what did you say when you gave him the

18   letter?

19   A.   Basically, what is stated in my

20   resignation letter.

21   Q.   What did Allen say?

22   A.   He basically said that, you know, that

23   he -- that I play an important role in the company

24   and let's try to work it out, try to communicate

25   and --

1    Q.   Okay.  And what was the next step taken?

2    A.   I told him that I wasn't one to run away

3  from a job, since I was in my previous job for seven

4  years.  I'll do my best job to continue to do my job

5  and try to have a nice relationship -- professional

6  relationship within the company.

7    Q.   I guess what I'm getting at is, did Allen

8  convince you to stay or how --

9    A.   Basically.

10        MR. SMITH:  Object to the form.

11    A.   Yes, he did.

12    Q.   I mean, I don't want to put words in your

13  mouth.  Tell me what happened.

14    A.   Basically, he said that I played an

15  important role in the company, that I -- you know,

16  he wanted me to stay, that he liked the way I

17  worked, and, you know, for me to think about it,

18  that, you know, if that we can work through this.

19    Q.   Okay.  And did he tell you all this at the

20  time that you turned in your resignation letter?

21    A.   Yes.

22    Q.   Was anybody else aware that you were

23  resigning?

24    A.   Not to my knowledge.

25    Q.   You never told any other employees?

Page 29

1    here.

2        A.    Okay.

3        Q.    **What prompted you to the write this memo?**

4        A.    Basically, the -- as it states in the

5    memo, there were cash drawer issues and, you know,

6    that they were always short and that there was

7    problems with the unarmed coding and the shutters.

8        Q.    **When was this written?**

9        A.    The date of the memo, March 29th.

10       Q.    **How did you give this memo to Allen?**

11       A.    I left it on his chair.

12       Q.    **What date would you have left it on his**

13   **chair?**

14       A.    Probably the same date that it was

15   written.

16       Q.    **What was Allen's reaction to this memo?**

17       A.    He said that we needed to discuss it.

18       Q.    **When did he tell you that?**

19       A.    I don't recall.

20       Q.    **Well, would it have been that day?**

21       A.    No, because --

22       Q.    **The next day or a week later or when?**

23       A.    Probably sometime after, after March 29th.

24       Q.    **Do you recall -- I mean, I'm just trying**

25   **to get a time frame here.   Was this a month later or**

Page 30

1    a week later?

2        A.   No.   Probably a few days later.

3        Q.   What did he say, if anything?

4        A.   That we needed to discuss and try to

5    figure out -- get to the bottom of it.

6        Q.   Okay.  How did he come about to tell you

7    that?  Did he tell you that over the phone or in

8    person?

9        A.   In the office.

10       Q.   Okay.  So just take me through this.  Did

11   he come into your office?

12       A.   We shared an office.

13       Q.   And how did he broach the subject?  Did he

14   say I saw your memorandum of March 29th?

15       A.   I told -- I am usually the one that

16   approached him and asked him if he had read my memo.

17       Q.   What did he say?

18       A.   He said to keep a lookout on the drawers,

19   you know, just to make sure what was happening and,

20   you know, that he was going to come up with a -- you

21   know, some way of trying to come down to the

22   solution of where the drawer was short.

23       Q.   What did he say about the alarm code and

24   the shutters?

25       A.   You know, we decided that we were -- we

Page 31

1    had a meeting, and we came up with a plan of, you

2    know, what was happening.  There were other issues

3    other than the -- other than the cash register and

4    the shutters, so --

5        Q.   Correct.

6             Before we get to the meeting or anything

7    like that, I'm saying, he broached the subject with

8    you.  He said I saw your memo, or you brought the

9    subject to him?

10            What was his reaction?  Other than saying

11   watch and see what happens, what else did he say?

12            MR. SMITH:  Object to the form.

13       A.   Basically, he said that we were going to

14   discuss it further, you know.

15       Q.   Okay.  Did you discuss -- Let me back up

16   for a second.

17            At the time you wrote this, how long had

18   the drawer been coming up short at closing?

19       A.   You can say several weeks, just like it

20   states in the memo.

21       Q.   And how short would the drawer be?

22       A.   Big numbers.

23       Q.   How big?

24       A.   Twenty, 50, $75.

25       Q.   And tell me -- I don't know how Chromatek

1    representatives?

2        A.    Yes.

3        Q.    Who else was a customer service

4    representative at that time?

5        A.    At that time, it was Brian.

6        Q.    What is his last name?

7        A.    Bogader, B-O-G-A-D-E-R.

8        Q.    So Kristine and Elizabeth, they had access

9    to the cash register or they primarily were the ones

10   that operated the cash register?

11       A.    Correct.

12       Q.    Did Brian operate the cash register?

13       A.    At that time, not as much.

14       Q.    Did anybody else have access to the cash

15   register?

16       A.    Scott, myself and Allen, and possibly

17   Laura had access to the cash register.

18       Q.    Okay.  When you had this initial talk with

19   Allen after you wrote this, did you discuss which

20   employees you thought might be stealing from the

21   cash register?

22       A.    Yes.

23       Q.    And which employees did you mention?

24       A.    We came to the conclusion of Elizabeth and

25   Kristine.

1    Q.   Okay.   What was your conclusion about

2    them?

3         A.    That they had the most access to the cash

4    register.

5         Q.    What about the alarm code; what did Allen

6    say about the alarm code?

7         A.    Basically, we decided that we wanted a

8    list of the alarm codes and, you know, who would

9    most likely have access to it.

10        Q.    But the alarm code not being properly set,

11   what were the ramifications of that?  It is just

12   that the building wasn't secured when everybody left

13   for the night?

14             MR. SMITH:   Object to the form.

15        Q.    Is that the issue or what -- I mean, why

16   would you write a memo to him about the alarm code?

17        A.    Because the alarm was not set properly

18   when I came into the building.

19        Q.    Okay.   I mean, you had said that you were

20   in accounting and HR.   I was curious as to why --

21   you just thought it was a concern?

22        A.    Of course.   If the alarm code is not set

23   when you walk into a locked building, it should be a

24   concern.

25        Q.    Did you discuss your concerns with anybody

Page 35

1    else?

2        A.    I would ask him if, you know, the other

3    people -- the other person at the time, Laura, she

4    knew why the alarm code was not set.

5        Q.    Who is this?

6        A.    Laura.

7        Q.    Laura Morales?

8        A.    Correct.

9        Q.    What did she say?

10       A.    That, basically, she had no idea why it

11   would not be set.

12       Q.    Regarding the shortage of the cash drawer

13   in the weeks previous to March 29th, did you discuss

14   the shortage with people other than Allen?

15       A.    No.

16       Q.    You never discussed it with Laura?

17       A.    No.

18       Q.    Did you ever discuss it with the employees

19   who were operating the cash register?

20       A.    No.

21       Q.    Did you ever say, hey, you were short 50

22   bucks last night?

23       A.    No.

24       Q.    Why not?

25       A.    Because we were trying to figure out a way

Page 36

1   of -- you know, first I discussed this with Allen.

2   Then we were trying to, you know, find out if the

3   cash appeared or if they worked the balance or

4   something was wrong with the cash register.

5       Q.    Were you ever able to resolve -- did you

6   ever figure out what happened to these shortages?

7       A.    What time period?

8       Q.    Well, you tell me.  How many weeks prior

9   to March 29th were you having cash drawer issues?

10      A.    A few weeks.  More than three, four, five

11  weeks.

12      Q.    You said sometimes it would be 50 to $75

13  short?

14      A.    Once or twice.

15      Q.    What was the greatest amount that it was

16  ever short?

17      A.    Probably $75.

18      Q.    What would be the smallest?

19      A.    One or two dollars.

20      Q.    And did you ever determine whether you

21  were short cash or would it be --

22      A.    No.  It was always cash.

23      Q.    Cash would be missing?

24      A.    Correct.

25      Q.    And whatever happened with this issue?

Page 37

1  Did you ever determine why there were shortages?

2       A.    After I had the meeting with Allen, we

3  discussed about investigating, you know, the

4  potential employee theft.  We came up with a plan,

5  and shortages were not as big, but --

6       Q.    I didn't ask you that.  I'm just asking,

7  did you ever figure out why these drawers were short

8  in the weeks up to March 29th?

9       A.    No.  Once the cash is missing, you know,

10 unless you catch the person with the money in the

11 pocket, you can't figure out.

12      Q.    Are these cash drawer shortages still

13 going on today?

14      A.    No.

15      Q.    When did they stop appearing?

16      A.    Probably around July or August.

17      Q.    Of this year?

18      A.    Of 2005.

19      Q.    So your cash drawer shortages were from

20 four or five weeks preceding all the way up to

21 August of this year?

22      A.    Of 2005.

23      Q.    Yeah.

24      A.    July.

25      Q.    That's essentially eight months.  How

Page 41

1      A.    Correct.

2      Q.    I'm just trying to figure out when these

3   cash drawer issues stopped.

4      A.    When I put on this memo, cash drawer

5   issues, my issues were that a large amount of money

6   was being short on the drawers.  I'm not going to

7   write a memo of shortage of $2, $5 or even $10.

8   When there is a shortage of over $25, I will bring

9   it to the owner's attention.

10     Q.    So to this day, no one has ever been

11  arrested for shortages, you've never determined why

12  these drawers were short to this day; is that right?

13     A.    No.

14     Q.    You had mentioned a meeting with Allen.

15  So let me -- let's go through this again.

16           You wrote in the memorandum, you are

17  saying the date, it says 3/29/05?

18     A.    Correct.

19     Q.    A few days later, you brought these issues

20  to Allen's attention in the office, and he said to

21  keep an eye on the drawer or keep an eye on the

22  issue.  Is that fair to say?

23           MR. SMITH:  Object to the form.

24     A.    After I turned -- I approached Allen, we

25  went over the issues of the drawer and other

Page 42

1    potential items.

2        Q.    Okay.  I'm just -- so you brought up this

3    orally to him a few days later in the office, and

4    then at some point after that, you had an official

5    meeting regarding these?

6        A.    Yes.

7        Q.    When did you have that meeting?

8        A.    It was probably either the day after or a

9    few days later.

10       Q.    Okay.

11       A.    Because I approached him with the memo.

12       Q.    So you said you left this memo on his

13   chair a few days after that.  You had an informal

14   talk with him a day or so after that informal talk.

15   You had a meeting; is that correct?

16       A.    No.  The meeting was the day after this

17   memo.

18       Q.    There was -- there wasn't a few days gap?

19       A.    It was either the day of this memo or a

20   few days later.  I don't recall the exact date.

21       Q.    This meeting, where was it held?

22       A.    Probably in our office.

23       Q.    Probably or it was?

24       A.    I don't recall.

25       Q.    You don't recall where you had this.

1        What was the purpose of this meeting?

2        A.    To discuss the memo that I had given

3    Allen.

4        Q.    Was this meeting scheduled or how did it

5    come about?

6        A.    No.

7        Q.    Did Allen say let's have -- you know,

8    let's have a meeting in my office, or what did he

9    say?

10        MR. SMITH:  Object to the form.

11        A.    Basically, we shared an office.  So our

12    discussions in there were always business, you know.

13        Q.    But I'm saying, was it an agenda item for

14    a meeting?

15        A.    No.  We didn't take minutes.  It is not

16    like when he sat down and said let's have a meeting.

17    We had a discussion.

18        Q.    So what you've been telling me in the last

19    10, 20 minutes about Allen's reaction, that's the

20    meeting what you are saying to me?

21        A.    We -- yeah.  There was more to it.

22    Basically, we went over my memo.  We went over other

23    issues.

24        Q.    I want to talk about something else for a

25    minute.

1          When was the first time that you ever did

2    a background check on somebody?

3          And maybe I should define the term

4    "background check."  I don't mean like looking for

5    an address.  I mean, where you pay a service or an

6    investigator to get you private information about

7    somebody.

8          When would be the first time in your life

9    you did that?

10       A.   We ran background checks in my previous

11   employer.

12       Q.   At Americall?

13       A.   Correct.

14       Q.   Since you've been employed with Chromatek,

15   when would be the first time that you did a

16   background check on somebody?

17       A.   I don't recall the exact date.

18       Q.   This could be anybody.  It doesn't have to

19   be an employee of Chromatek.  It could be whoever.

20         Who was the first person that you did a

21   background check on while you were employed at

22   Chromatek?

23       A.   Terry.

24       Q.   Terry?

25       A.   Terry Davis.

Page 52

1         MR. SMITH:  Object to the form.

2    A.   It was a pre-employment.

3    Q.   It was pre-employment.  Okay.

4         And do you recall the company that you

5    used for -- is it Karen Alper?

6    A.   Yes.

7    Q.   Do you recall the company that you used to

8    do a background check on her?

9    A.   I don't recall.  I'm not sure of the exact

10   name of it, if it was Federal Background.

11   Q.   Do you recall the first time that you used

12   Federal Background?

13   A.   The first time, no, I don't recall.

14   Q.   So you do a background check on Karen

15   Alper.  Allen told you to do this as a

16   pre-employment.  What did you order on Karen?

17        MR. SMITH:  Object to form.

18   A.   Most likely, the same thing I ordered for

19   Terry.

20   Q.   Which would have been the 50-states

21   criminal background check and a Florida Department

22   of Law Enforcement report, and that's it?

23   A.   And the pre-employment verification.

24   Q.   What is the pre-employment verification?

25   A.   I mean, employment verification.  Just

1    online.

2        Q.   Okay.  So I assume you go to their

3    website, Federal Background's website.  You click,

4    you know, order this.  And take me through the

5    process.  What do you have to do to order it?

6            MR. SMITH:  Object to the form.

7        A.   You enter the employee's information or

8    potential employee information, and you check the

9    boxes of what you want to -- of the specifics that

10   you want to search.

11       Q.   You are saying for Karen Alper you clicked

12   basically -- you got three things, you got the

13   50-states criminal?

14       A.   I'm not for sure what I got.

15       Q.   Did you order a credit report?

16       A.   No, there was no need to.

17       Q.   Did you order her driver's license history

18   or motor vehicle record?

19       A.   There was no need to.

20       Q.   Why was there no need to?

21       A.   It is a pre-employment search.

22       Q.   When you go online to that screen, do you

23   recall whether you have to verify that you have the

24   person's authorization to --

25       A.   No.  I haven't looked at it, so --

Page 57

1    Q.   So if we were to look at Karen Alper's

2    personnel file, these documents would be in there --

3         MR. SMITH:  Object to form.

4    Q.   -- a signed Federal Background Services --

5    A.   I don't know if it is in there or not.

6    Q.   We'll move on.

7         What other -- who else have you conducted

8    a criminal background check on or any sort of a

9    background check on?

10   A.   No one else.  We just -- the last one that

11   we did was on Scott.

12   Q.   So you've done those three?  I mean, you

13   sought background checks on three people since you

14   started at Chromatek?

15        MR. SMITH:  Object to form.

16   Q.   Terry Davis?

17   A.   I have not seen my credit information on

18   all three.

19   Q.   I understand.  You have ordered some sort

20   of background information on those three people?

21   A.   Correct.

22   Q.   Terry Davis, Scott Tanis and Karen Alper?

23   A.   Correct.

24   Q.   Let's move ahead to when you ordered

25   Scott's information.

Page 58

1          What sort of background information did
2   you order on Scott?
3      A.   We would have ordered the same thing.  I
4   would have ordered -- plus a credit report because
5   we were investigating potential employee theft.
6      Q.   At the time that you -- First off, who
7   told you to order --
8      A.   Allen Evans.
9      Q.   Well, let me finish.
10         He told you to order what sort of
11   background information on Scott?
12      A.   He just asked me to order a background
13   check on him.
14      Q.   Did he say -- What did he say to order?
15      A.   He did not specify again what to order.
16      Q.   He never said order Scott's credit report?
17      A.   Not to -- I don't remember.
18      Q.   Well, why would you order Scott's credit
19   report but not the credit report on Terry?
20      A.   Because we were investigating a potential
21   employee theft with Scott and not with the others.
22      Q.   You said Allen did not tell you to order a
23   credit report?  Are you saying you made that
24   decision on your own?
25         MR. SMITH:  Object to the form.

Page 59

1    A.   Basically, I don't remember if he came in

2    and said -- specifically said he said we wanted to

3    do one.  It could have been mentioned at our meeting

4    and --

5        Q.   I just want to know who made the decision

6    to order the credit report.  Was it Allen or was it

7    you?

8        A.   Basically, it was me.

9        Q.   So you decided that for Scott, you would

10   order the credit report, but for Terry Davis or

11   Karen Alper, you did not order a credit report?

12       A.   Correct, because it goes back to the issue

13   that we were investigating employee -- a potential

14   for theft, and a credit report would be essential to

15   come to that determination.

16       Q.   And you knew all of that, you determined

17   that on your own?

18       A.   Yes.

19       Q.   Is it your testimony today that -- when

20   you made the decision to order Scott's credit

21   report, you --

22       A.   I did not make the decision.  I was

23   instructed to do so.

24       Q.   You were instructed to order the credit

25   report?

Page 60

1      A.   I was instructed to order a background

2  check on Scott Tanis because we were investigating.

3      Q.   Right.  But what I'm getting at is, for

4  Terry Davis and for Karen Alper, you did not order

5  their credit reports?

6      A.   Correct, because there was no need to do

7  so.

8      Q.   So I'm saying you made the decision to

9  order a credit report on Scott?

10      A.   Correct.

11      Q.   Why did you decide to order -- At the

12  time -- at the time, why would you decide to order

13  his credit report?

14      A.   Once again, we were investigating an

15  employee -- potential employee theft, so to my

16  knowledge, that's one of the things we needed to

17  look at to eliminate him as a suspect.

18      Q.   So are you telling me that the -- Let me

19  strike that.

20           Are you familiar with the Fair Credit

21  Reporting Act?

22      A.   Yes, I am.

23      Q.   Okay.

24      A.   Not to the scope of it, but as to what

25  everyone knows about it.

Page 61

1    Q.   At the time you ordered his credit report,

2   were you aware that there is an exception in the law

3   for ordering a report if you are conducting an

4   investigation on a suspected employee?

5    A.   Yes, because of my previous employer,

6   we've had situations.  We've had several cases with

7   employees, and our attorneys at that time did inform

8   us that if we were investigating an employee, that

9   we could do a background check.

10        Now, I was not aware of the exceptions in

11   total.

12    Q.   Hang on.  This is with Americall?

13    A.   Correct.

14    Q.   The attorneys there told you that you

15   could order an employee's credit report?

16    A.   That we could order a background check

17   without the person knowing about it, as long as we

18   were investigating a potential suspected employee

19   theft.

20    Q.   What I'm getting at is, is it your

21   testimony that when you were with Americall, you

22   were told by your employer that you could order an

23   employee's credit report without their written

24   authorization as long as the company was conducting

25   an investigation into a suspected employee theft?

UNITED REPORTING, INC.
877-525-2434

Page 62

1      A.   I was --

2           MR. SMITH:  Object to the form.

3      A.   I was not informed by my employer.  We

4    were informed by someone at our lawyer's office that

5    we were -- we could do so.

6      Q.   Americall's lawyers?

7      A.   Yes.

8      Q.   This is where you --

9           When did you leave Americall, again?

10     A.   Probably early of 2004.

11     Q.   You left in early 2004?

12     A.   Probably April, May.

13     Q.   Do you recall when?  I mean, did you order

14   other employees' credit reports when you were with

15   Americall?

16     A.   We ordered -- under an investigation, no.

17   We ordered credit reports with the employee's

18   authorization due to my job description, yes.

19     Q.   Did you ever order a credit report without

20   a signed authorization when you were with Americall?

21     A.   Not myself, no.

22     Q.   So in going back to ordering a report on

23   Scott Tanis, you are saying that Allen told you to

24   do a background check and you made the decision to

25   order a credit report because you were aware that

Page 63

1    you did not need his written authorization?

2         A.    Correct.

3         Q.    You are aware of the law that you didn't

4    need it?

5         A.    Under my previous conversations, as long

6    as we are holding an investigation, we were allowed

7    to investigate and pull a credit report.

8         Q.    Was it your understanding that an employee

9    investigation was open as to Scott?  When did this

10   investigation begin?

11             MR. SMITH:  Object to the form.

12        A.    Back in our meeting, we had an open

13   investigation not only on Scott but several other

14   employees.

15        Q.    Okay.  Who were the other employees?

16        A.    The customer service representatives and

17   more.

18        Q.    And did you do background checks on them?

19        A.    No.

20        Q.    Why not?

21        A.    Because our plan to eliminate them, you

22   know, took a different course.

23        Q.    What do you mean by that?

24        A.    To eliminate the suspects in the front,

25   we -- you know, the customer service reps, I

Page 64

1    balanced the drawers daily, to make -- we

2    double-checked, triple-checked inventory, you know;

3    and the last -- the last resort was Scott was

4    pulling the report according to our plan.

5         Q.   Was there other suspected misconduct?  I

6    mean, what misconduct was Scott suspected of?

7              MR. SMITH:  Object to the form.

8         Q.   You had mentioned that he was a suspect in

9    the cash drawer shortage issue.

10        A.   The reason why he was a suspect was

11   because he had the most access to the entire

12   building and he had access to the drawer and he had

13   access to inventory.

14        Q.   Okay.  Were there inventory shortages?

15        A.   Yes.

16        Q.   Tell me about those.

17        A.   Inventory number -- our costs of goods was

18   off.  Our numbers were off.

19        Q.   When did this first occur?

20        A.   Same -- around the same time.

21        Q.   Okay.  I noticed that issue is not in your

22   Plaintiff's -- you refer to Plaintiff's Exhibit

23   Number 1, your memo.  It says extremely concerned

24   about the situation, but you don't mention the --

25        A.   Because that had come from our account to

Page 65

1    Allen.

2        Q.    The inventory shortages surfaced later

3    after this memo?

4        A.    No.  It was prior to that.

5        Q.    Okay.  What was done about -- First of

6    all, tell me what inventory was missing.

7        A.    The numbers were not matching; the cost of

8    goods was not matching our sales, and the number was

9    extremely high, so we went back and checked our

10   inventory numbers and checked our invoices to make

11   sure that we were properly receiving all goods that

12   we were being charged for.

13       Q.    And did you ever determine that inventory

14   was stolen?

15       A.    We never came to a determination.

16       Q.    You never figured out if goods had been

17   stolen?

18       A.    No.  At that time, it wasn't my job to

19   figure it out.  I turned over my investigation to

20   Allen, and, at that time --

21       Q.    Well, I mean, to your knowledge, did --

22   Let me go back to this shortage.  What kind of

23   dollar figure are we talking about?

24       A.    It is not a dollar figure.  It is when you

25   look at a financial report, you have a percentage of

Page 66

1   cost goods according to yourself, so I can't

2   pinpoint and say -- I can't give you a dollar

3   figure.

4        Q.   Okay.   To your knowledge, how was this

5   issue resolved?   Were the books ever balanced or did

6   you determine that inventory was gone or did someone

7   overcharge for goods?   What was determined?

8        A.   According to my investigation, the numbers

9   matched the inventory number that we gave the

10  accountant and that we were being charged properly.

11       Q.   Okay.   So it turns out there was no

12  inventory shortage?

13       A.   Basically, the way that we did inventory,

14  it was very hard to tell, you know, something was

15  taken from the building.

16       Q.   Okay.   But I'm saying that as you sit here

17  today, it turned out there was no inventory

18  shortage?

19            MR. SMITH:   Object to form.

20       Q.   Is that right?

21       A.   To my knowledge, no, but, like I said, I

22  just turned my investigation over to Allen.

23       Q.   I'm sure you talked with him about it

24  since then.   You work together.   It is a small

25  company.   I'm sure you would know how this was

1    resolved.

2            MR. SMITH:  Object to the form.

3            THE WITNESS:  Can I answer?

4            MR. SMITH:  Yes.

5        Q.   Yes.

6        A.   No.  I would not know how it was resolved

7    because it is his decision.  It was his -- I did my

8    job to do the investigation, and I did my

9    investigation, and I came to my own personal

10   conclusions.

11       Q.   Now, you keep saying investigation.  You

12   are saying that there was an investigation into the

13   inventory shortage.  What was your role in this

14   investigation?

15       A.   My role was just to make sure that the

16   numbers matched, that we were -- I double and

17   triple-checked my invoices, making sure that they

18   matched with the receipt of goods.  I was just being

19   more -- a little more comfortable about my job

20   duties and making sure everything was properly done,

21   that my daily cash drawers were balanced, instead

22   of, you know, letting them go one or two days

23   without balancing them.

24       Q.   Anyway, let's go back.  So you ordered the

25   background information on Scott.  What was it again?

Page 68

1    The 50-state background criminal report.  What else

2    did you order?

3        A.    I don't remember exactly what I ordered,

4    but that's what I would have ordered.  Florida FDLE,

5    50 states and --

6        Q.    You also ordered his driver's license

7    information.  Was that your decision?

8        A.    What do you mean my decision?  I did it.

9        Q.    Okay.  Why would you order the driver's

10   license information on Scott but not on the other

11   employees that you do background checks on?

12            MR. SMITH:  Object to the form.

13       A.    I just ordered it, I mean, thinking that

14   it was essential to our investigation.

15       Q.    What if I told you that Federal Background

16   has a policy that they always require the employee's

17   written authorization?

18       A.    Okay.

19            MR. SMITH:  Object to the form.

20       Q.    I know what the law is, and there are

21   exceptions, and you don't need an employee's

22   signature for certain -- under certain

23   circumstances.  But if I told you that Federal

24   Background has a policy that they require an

25   employee's authorization for anything, would you

Page 69

1    dispute that?

2         MR. SMITH:  Object to the form.

3    A.    Yes.

4    Q.    You would dispute that?

5    A.    Yes.

6    Q.    Why would you dispute that?

7    A.    Because if we are doing an investigation

8    on an employee for possible theft, why would I let

9    an employee know I'm doing an investigation and I'm

10   pulling his report?

11   Q.    What I'm saying is, it is my understanding

12   that Federal Background doesn't really care what

13   circumstances you need it written and what you

14   don't; just to protect themselves, they might have a

15   policy where they always ask for the employee's

16   written authorization.  They're not going to release

17   a credit report to you unless you verify that you

18   have the employee's written authorization.  Would

19   you dispute that?

20        MR. SMITH:  Object to the form.

21   A.    Yes.  Once again, I will dispute that.

22   Q.    On what basis?

23   A.    On the basis that why would I let the

24   employee -- inform the employee and have them

25   authorize it?

Page 70

1      Q.   You know, I don't want to put words in

2   your mouth or anything like that.  I've talked with

3   Harvey Tucker, the owner of Federal Background.  He

4   tells me he doesn't release anything without written

5   authorization of the employee, that you have to go

6   on that computer screen and go on to Federal

7   Background's website and you have to certify that

8   you have the employee's written authorization;

9   otherwise, they're not going to give you anything.

10      A.   Okay.

11      Q.   Assuming that's true, wouldn't that have

12   to mean that you represented to Federal Background

13   that you have Scott's written authorization on a

14   credit report and you have a background?

15           MR. SMITH:  Object to the form.

16      A.   Okay.

17      Q.   Okay.  So, I mean, in your mind,

18   wouldn't -- didn't you obtain or order -- you at

19   least ordered this information under false pretenses

20   to Federal Background?

21           MR. SMITH:  Object to the form.

22      A.   Under the Federal Background guidelines, I

23   guess so, yes.

24      Q.   I mean, do you know whether you

25   represented that you had his written authorization

Page 71

1    or not?

2         A.   I don't remember.  No.

3         Q.   If you did, would it have been checking a

4    box on the website or how would you have represented

5    that you had his written permission?

6         A.   I don't remember, but all I know is it is

7    an entry form with boxes that is clicked off, so --

8         Q.   You said earlier that you were aware that

9    you did not have the written authorization.  You

10   were aware of this from Federal Background?

11        A.   At that time, I wasn't aware it was an

12   exception.  I was aware we could do so.

13        Q.   Well, no.  I mean, I thought your

14   testimony earlier was that you had learned through

15   your employment with Americall that if the

16   employee -- if the employer is doing an

17   investigation, that they don't have to have the

18   employee's written authorization --

19             MR. SMITH:  Object to the form.

20        Q.   -- for the credit report?

21        A.   Correct.  I was aware of it, but I was not

22   aware that it was an exception.

23        Q.   Okay.  You are saying that is why you made

24   the decision to order the credit report, because you

25   were conducting an investigation?

Page 72

1      A.   Correct.

2      Q.   **And you ordered the driver's license**

3  **information?**

4      A.   Correct.

5      Q.   **I mean, why did you choose to order the**

6  **driver's license information?**

7      A.   At that time, I thought that it was needed

8  as well.

9      Q.   **Why did you think it was needed?**

10     A.   Because we wanted to make sure that -- you

11 know, there was a lot of issues.  He was doing

12 deliveries to clients.  We just wanted -- I thought

13 it was essential to our investigation.

14     Q.   **Okay.  Can you tell me why?  Well, you**

15 **keep referring to this investigation.  Who is in**

16 **charge of this investigation?**

17     A.   Allen and myself.

18     Q.   **Who else would have been aware of this**

19 **investigation?**

20     A.   Just the two of us, that I'm aware of.

21 I'm not sure.

22     Q.   **And did the investigation exist prior to**

23 **this memo of 3/29/05 or is this what started the**

24 **investigation?**

25     A.   There were other issues, but prior to my

Page 73

1   memo, which were the inventory numbers.

2        Q.   Okay.  Is there a memorandum regarding the

3   inventory numbers?

4            You were the accounting person.  Did you

5   ever write a memo to Allen?

6        A.   I'm the bookkeeper.  The accountant is

7   Rubin & Associates.  Anything having to do with the

8   numbers would come from him.

9        Q.   Did you ever write any memorandum

10  regarding inventory shortages to Allen?

11       A.   No.

12       Q.   When did this investigation end?

13       A.   I'm not sure when it ended, because after

14  I ordered the report, the report was being sent

15  directly to Allen.  So it was his decision how to

16  take the next move on the investigation.

17       Q.   Okay.  So you ordered all this background

18  information on Scott; it was April 18?

19       A.   Correct.

20       Q.   When did you receive this information that

21  you ordered?

22       A.   I never received it.

23       Q.   Did Chromatek?

24       A.   Eventually, Chromatek did receive it.

25       Q.   When did they receive it?

Page 74

1    A.    Sometime in July.

2    Q.    **Why did it take so long?**

3    A.    I don't know.

4    Q.    **Okay.  I mean, you said you ordered all of**

5  **this information on April 18.  When did you expect**

6  **to receive it?**

7          MR. SMITH:  Object to form.

8    A.    Usually, it takes about 72 hours to

9  receive, but because it was not being given -- it

10  was not sent to me directly, it was being sent to

11  Allen, personal fax, there was no need for me to

12  follow up on it because the only one --

13   Q.    **You just assumed he received it?**

14   A.    Correct.

15   Q.    **What about for Karen Alper and Terry**

16  **Davis, when you ordered the background information**

17  **on them, how long did it take to receive it?**

18   A.    Within 72 hours.

19   Q.    **Okay.  Did you see the background**

20  **information on Terry and Karen?**

21   A.    Yes.

22   Q.    **How did you come to see it?  Was it mailed**

23  **to you?  Was it faxed?**

24   A.    It was faxed.

25   Q.    **It was faxed to your fax machine?**

Page 75

1    A.    Yes.

2    Q.    What is the fax number?

3    A.    Our regular fax number?

4    Q.    The fax number that you received the

5  background information from Terry Davis and Karen

6  Alper?

7    A.    (954) 563-6207.

8    Q.    Now, with Federal Background, you ordered

9  this information on April 18.  How did you expect to

10  receive it?

11    A.    Via fax.

12    Q.    Was it supposed to go to that fax number?

13    A.    No.

14    Q.    What fax number was it supposed to go?

15    A.    Allen's personal fax line.

16    Q.    You said -- Did you tell Federal

17  Background you wanted it sent to Allen's personal

18  fax?

19    A.    Yes.

20    Q.    Why did you do that?

21    A.    Because it was -- I didn't want to see it,

22  and it was Allen's -- should have gone to Allen's

23  direct fax number.

24    Q.    Why would you do that for Scott's

25  information but not for these other two employees?

Page 76

1    A.    Once again, there is a difference between

2    the pre-employment verifications we were doing and

3    pre-employment versus the investigation of possible

4    employee theft.

5        **Q.   Okay.  So you said because you are doing**

6    **an investigation, you didn't want to see Scott's**

7    **information?**

8        A.    I personally did not want to see it, I

9    personally.  Allen -- and it was up to Allen to look

10   at it and come to his own conclusion of what

11   Scott -- if Scott was a suspect or if we wanted to

12   dismiss the investigation.

13       **Q.   So you ordered this information on April**

14   **18.  And did you talk to Allen a few days later**

15   **about what he had learned?**

16       A.    No.

17       **Q.   Why not?**

18       A.    Because we were extremely busy, and it

19   really did not occur to me to ask him if he had

20   received it or not.

21       **Q.   Okay.  So what went on with this**

22   **investigation?**

23       A.    Basically, if you want to say, it was put

24   on hold until I figured Allen received the fax and

25   he was okay with it and the investigation was

Page 77

1   closed.  It was never -- I never followed up with

2   Allen on what was the next step.

3        Q.   Okay.  And you are saying -- your

4   testimony is that you didn't know whether he

5   received it or not?

6        A.   Correct.

7        Q.   Now, why would you order the information

8   on 4/18?

9        A.   That date, I was reminded by Allen if we

10  had finished the investigation and if we ordered his

11  background.

12       Q.   Now, you were aware that Scott was out of

13  the office from about 3/29 until 4/18?

14       A.   Okay.

15            MR. SMITH:  Object to the form.

16       Q.   I'm just curious why you would order this

17  information on him the day he comes back.

18       A.   It's just a coincidence.  It was the day

19  that Allen reminded me to order it.

20       Q.   Let's jump ahead a little bit.

21            When did it first come to your attention

22  that Scott had learned that you ordered his credit

23  report?

24       A.   When he confronted Allen and myself.

25       Q.   When did he confront you?

1    A.   Sometime in June.

2    Q.   **Was it -- How did he confront you?**

3    A.   He was waiting outside our door, and he

4  said that he wanted to talk to both Allen and

5  myself.  And he came in, and he said that Chromatek

6  had done a background and that I had -- I had pulled

7  it myself, and I instructed him that I had done so

8  under Allen's instructions.  And then he said that I

9  had pulled -- you know, he went down the list, and I

10 informed him I wanted to pull all the items, the

11 Florida 50 states.  Anything that was pulled was

12 probably because I was rushing out.  I clicked the

13 wrong button.

14   Q.   **Okay.  Let me say that again.  You told**

15 **him that you ordered the 50 states on purpose, but**

16 **what was missing?**

17   A.   I told him that there was a standard what

18 we ordered, and that anything other than the

19 standard was probably an error because I clicked the

20 boxes what we ordered it.

21   Q.   **What is the standard?**

22   A.   I did not want to go over with him the

23 standard because I didn't want him to think he were

24 investigating him.

25   Q.   **You are saying there are different search**

Page 79

1    packages or maybe --

2         A.    Correct.

3         Q.    What is included in that standard search?

4         A.    Depending on, again, the purpose of your

5    search.  If you are doing a pre-employment or if you

6    are doing an investigation or if -- depending on the

7    criteria you are doing the background on.

8         Q.    Well, I'm asking you with Federal

9    Background Services, when you do a standard search,

10   what do you get?  You get the 50-states criminal

11   background?

12        A.    Most likely you get the 50-states

13   background, the Florida FDLE and the pre-employment

14   employment verification.

15        Q.    So you told him that you had purposefully

16   ordered the standard package, but you may have in

17   error ordered other things?

18        A.    Yes, which was true.  In error, I had

19   ordered more than I wanted to order.

20        Q.    You know, let me remind you that you are

21   under oath.

22             You had testified earlier that you had

23   ordered the credit report on purpose.  You made a

24   deliberate decision to do that.  Now it is your

25   testimony you may have ordered that accidentally?

1    A.   No.   My testimony is after we received the

2    July invoice, it said on there we had ordered, for

3    example, a sex offender, and he --

4         Q.   **Hold on.**

5         A.   And he had gone down the list in front of

6    me.

7         Q.   **No.   I'm asking you at this meeting.**

8         A.   Okay.

9         Q.   **I believe it is June 3rd?**

10        A.   Okay.

11        Q.   **Since Scott was outside the door and he**

12   **confronted you about having ordered this**

13   **information --**

14        A.   Correct.

15        Q.   **-- your testimony a couple of minutes ago**

16   **was you told him that you had ordered a standard**

17   **package and that you had clicked other boxes in**

18   **error?**

19        A.   Yes, because previous to me responding to

20   him, he stated he went over every single item we

21   ordered from his background, and he had mentioned

22   that we had ordered sex offender and another item,

23   which I really did not -- was not my intention to

24   order that at that moment.

25        Q.   **What was it your intention to order?**

Page 81

1     A.    My intention to order was standard and the

2  credit report and the driver's license.

3     Q.    **And what did you order accidentally?**

4     A.    Everything else after that.

5     Q.    **Okay.  How did that happen accidentally?**

6  **I mean, what --**

7     A.    Rushing out of the office, getting it done

8  before I was out the door.  I did it right before I

9  had to go pick my daughter at day care.

10    Q.    **Okay.**

11    A.    It was -- I hit submit, and it was gone.

12    Q.    **What else did you tell Scott at that**

13 **June 3rd meeting?**

14    A.    That it was under Allen's instructions.

15 And Allen had to rush out, and he said that we were

16 going to -- he was going to get back to him on that.

17         (Thereupon, Allen Evans left the

18         deposition room.)

19    Q.    **Did Scott say I feel what you have done is**

20 **illegal?**

21    A.    I don't recall if he stated it in the

22 meeting.

23    Q.    **To your recollection, did he object to you**

24 **having done this?  Was he upset about ordering it?**

25         MR. SMITH:  Object to the form.

Page 86

1   Federal Background Services, and it is to Chromatek

2   regarding an audit of customers utilizing their

3   online ordering system.

4         Is it your testimony that this letter asks

5   Chromatek to fax a signed copy of the authorization

6   for the following applicant?  Right?

7         MR. SMITH:  Object to the form.

8     Q.   I'm just reading off of this.  It says

9   they asked you to fax a signed copy of the

10  authorization form for the following applicant.  You

11  see that?

12    A.   Yes.

13    Q.   It is your testimony that Chromatek just

14  ignored this letter?

15        MR. SMITH:  Object to the form.

16    A.   I ignored the letter.

17    Q.   Okay.  And you made the decision on your

18  own to ignore it?

19    A.   It wasn't to ignore it.  Basically, we did

20  not have a copy of it because we were investigating

21  a possible employee theft, so, therefore, I did not

22  want to reply back to them giving an explanation as

23  to why we did not have one.

24    Q.   Why not just respond and say, you know, we

25  are conducting an investigation in suspected

Page 94

1   why, I mean, he knew that we were investigating him.

2   There was no need to show him the letter.

3       Q.   Okay.  So did you show it to anybody else

4   at Chromatek?

5       A.   No.

6       Q.   What did you do with the letters or with

7   the audit request form?

8       A.   It was put in a pile to either file or to

9   look up or to do file.

10      Q.   And you don't know whatever happened to

11  it?

12      A.   No.  We had hurricane damage.  A lot of

13  our paperwork was destroyed.  Computers were

14  destroyed.

15      Q.   Okay.  Did you ever hear back -- Well, did

16  Federal Background cancel Chromatek order with them?

17      A.   To my knowledge, no.

18      Q.   How did -- how did Federal Background

19  follow up?

20           MR. SMITH:  Object to the form.

21      A.   I don't know.

22      Q.   Do you recall the next contact that you

23  had with Federal Background?

24      A.   I had no further contact with them, except

25  the letter that I sent them saying that I had not

Page 95

1   received the background myself when I received the

2   invoices.

3       Q.   Take a look at the bottom of that

4   handwritten note there.

5       A.   Okay.

6       Q.   Do you know who wrote that?

7       A.   No.

8       Q.   It says "June 9, Karen called regarding

9   William Tanis and information he was given regarding

10  the inquiry on his credit."

11          And it says here, they told you that we

12  were faxing an audit request form and with the fax

13  number.

14          That must be the audit request that you

15  are talking about that you cannot find; is that

16  right?

17          MR. SMITH:   Object to form.

18      A.   I don't know.  I'm assuming that, yes.  I

19  don't know.

20          MR. CASSATA:   I'm going to introduce

21      Plaintiff's Exhibit 5.

22          (Thereupon, the 7/20/05 letter referred to

23      was marked for Identification as Plaintiff's

24      Exhibit Number 5.)

25      Q.   This is a letter that you wrote to Federal

1    Background on July 20th?

2         A.    Correct.

3         Q.    Who told you to write this letter?

4         A.    Myself.   I wrote it because we had not

5    received -- we were being invoiced.

6         Q.    You made the decision all by yourself to

7    write this letter?

8         A.    When we decide -- when I'm being invoiced

9    for something that I don't have in hand, my job in

10   accounting is to dispute it.

11        Q.    I'm asking you, did you make the decision

12   to write this letter?

13        A.    Yes, I did.

14        Q.    You had already retained counsel in this

15   case by July 20th?

16        A.    Correct.

17        Q.    And you are telling me that you made the

18   decision to write this letter all by yourself?

19        A.    Yes.

20        Q.    Without the advice of counsel, without the

21   advice of Allen?

22        A.    Yes.

23              Once again, if you notice, there was an

24   invoice that was open, and I'm going to dispute an

25   invoice if I don't have the services rendered.

Page 97

1    Q.   Let me get this straight.   Nobody at

2  Chromatek, including Allen, knew you wrote this

3  letter when you wrote it and sent it out?

4    A.   Correct.

5    Q.   And you wrote this because you never

6  received the background information you ordered;

7  right?

8    A.   Correct.

9    Q.   Now, you had said earlier that you had

10 ordered the information on 4/18, background

11 information, and it went to Allen's private fax and

12 then you didn't discuss it with him after that.

13 Then how would you know whether he received the

14 information or not?

15   A.   Well, because then I later asked if he had

16 received it.  At that moment, I had not received it

17 either.  So I was going to dispute it.

18   Q.   When had you asked if he received it?

19   A.   When I got the invoice from Federal

20 Background.

21   Q.   When did you get the invoice?

22   A.   I don't remember the exact date.

23        MR. CASSATA:   Let me enter for

24        Identification Plaintiff's Exhibit 6.

25             (Thereupon, the invoice referred to was

Page 99

1    he had received this, all this background

2    information?

3            MR. SMITH:  Object to the form.

4            THE WITNESS:  Can I answer it?

5            MR. SMITH:  Anytime I say object to the

6        form, you can answer.

7        A.   I asked him if he received it, and he said

8    no, and that's when I decided I was going to dispute

9    the invoice with Federal Background.

10       Q.   (By Mr. Cassata) Okay.  And do you recall --

11   I mean, if you wrote the letter on July 20th, when

12   would you have had the conversation with him about not

13   receiving it?

14       A.   I can't tell you exact dates.

15       Q.   Would it have been the same day or the day

16   after -- before?  You wrote the letter July 20th?

17       A.   Sometime -- yeah.  Sometime between --

18   before that.  Apparently, I must have asked him.

19       Q.   But, I mean, it wouldn't have been a long

20   time before that, would it, because --

21       A.   No.

22       Q.   Okay.  It was probably maybe the same day,

23   a day or two?

24           MR. SMITH:  Object to the form.

25       Q.   I'm trying to find out when did you learn

Page 100

1    that all of this information that you ordered had

2    not been received by Allen?

3        A.    It had not -- It had not been received

4    back when I -- Apparently, we knew that we had not

5    received it when Scott confronted us because

6    apparently it was never faxed into us.  It was never

7    faxed in.

8        Q.    This letter is dated July 20.  It is a

9    month after he was fired.  I'm saying when did you

10   first learn that Chromatek did not receive any

11   background information that was ordered?

12       A.    Sometime between the time that Scott

13   confronted us and sometime after -- before I wrote

14   the letter.  I cannot tell you exactly when we found

15   out because I never -- I would not dispute an

16   invoice if we did receive it.  I have to pay.  I'm

17   going to dispute it if we did not receive it.

18       Q.    When Scott came to you with his complaint

19   on June 3rd and June 6, didn't you talk to Allen at

20   that point and say, hey, do we have the information

21   we ordered?

22            MR. SMITH:  Object to the form.

23       A.    Most likely.  Not that specific date or a

24   few days -- sometime, like I said, between the

25   confrontation between Scott and by the time I got --

Page 101

1   I wrote the memo, yes.  We had discussed when we

2   received it.  I needed to confirm it before I wrote

3   this letter.

4        Q.   You need do confirm --

5        A.   I'm not going to dispute it if the

6   services were rendered.

7        Q.   It just seems odd to me you retained

8   counsel in this matter in early July.  Okay?  And

9   you are telling me that you wrote this letter, you

10  know, on your own volition, you made the decision to

11  write it, you didn't even tell your lawyer about it?

12       A.   No.  I made the decision on my own.

13            MR. SMITH:  Object to the form.

14       Q.   Okay.  What if I told you that Federal

15  Background is of the position that Chromatek did

16  receive this background?

17            MR. SMITH:  Object to form.

18       A.   Can you repeat that?

19       Q.   What if I told you Federal Background

20  believes that Chromatek did receive the background?

21            MR. SMITH:  Object to the form.

22       Q.   Their position is they wouldn't have

23  billed for it if they didn't send it.

24            MR. SMITH:  Same objection.

25       A.   They could assume they sent me the

Page 102

1   invoice, they assume they sent everything.  I mean,

2   they could speculate that they sent it and they did

3   everything.  I know that I wrote the letter because

4   at that time, we had not received it.

5       Q.   Okay.  When did Chromatek receive the

6   background information?

7       A.   Sometime in July.

8       Q.   Okay.  Do you know why it was that you

9   received it so late?

10      A.   Apparently, because we were disputing the

11  invoice, and they wanted to make sure that we

12  received the report.

13      Q.   And then Chromatek eventually paid the

14  bill?

15      A.   Yes.

16      Q.   Take a look at the handwritten notes at

17  the bottom of Exhibit 5.

18      A.   Uh-huh.

19      Q.   Do you know who wrote those notes?

20      A.   No.

21      Q.   It says -- you see 6/9/05, "Karen called

22  and complained that we spoke with William Tanis."

23           You dispute that?

24      A.   Yes.  6/9, I asked them about the -- to

25  make sure that they were not disclosing any

1      A.   No.

2      Q.   Have you ever been indicted for a crime

3  that involves dishonesty or fraud?

4      A.   No.

5      Q.   Have you ever been a party to a lawsuit?

6      A.   No.

7      Q.   Never, okay.

8           MR. CASSATA:   I would like to introduce

9      for Identification Plaintiff's Exhibit 9.

10          (Thereupon, the meeting notes referred to

11     was marked for Identification as Plaintiff's

12     Exhibit Number 9.)

13     Q.   Do you recognize this document?

14     A.   Yes.

15     Q.   When was the first time that you saw this

16 document?

17          MR. SMITH:   Objection.   It calls for

18     attorney-client privilege.

19     Q.   I'm asking you for when.   When did you

20 first see this document?

21          MR. SMITH:   Same objection.

22          You can answer.

23     Q.   You can answer.

24     A.   Basically, sometime in the year 2005.

25 Don't exactly remember when.

1      A.   Correct.

2      Q.   You never ordered a credit report or

3  pulled any background information on those other

4  employees; right?

5      A.   No.

6           MR. SMITH:   Object to the form.

7      Q.   The action items down on the background

8  check of Scott --

9      A.   Correct.

10     Q.   Did Allen tell you about the background

11  check on March 30th on Scott?

12     A.   Yes, he did.

13     Q.   Why did it take until April 18 to do that

14  background check?

15     A.   Because I was working on the rest of the

16  action items.

17     Q.   Okay.  So you did the background check on

18  April 18, but you never followed up again until much

19  later as to whether he actually received the

20  information?

21     A.   Correct.

22     Q.   Do you know where this document was typed

23  up?

24     A.   Which document?

25     Q.   Plaintiff's Exhibit Number 9.

Page 114

1                C E R T I F I C A T E

2

3     STATE OF FLORIDA    )

4     COUNTY OF BROWARD   )

5

6          I, LAURIE SUSSKIND, Registered Professional

7     Reporter and Notary Public in and for the State of

8     Florida at Large, do hereby certify that the

9     foregoing testimony was taken before me; that the

10    witness was duly sworn by me; and that the foregoing

11    pages constitute a true record of the testimony

12    given by said witness.

13         I further certify that I am not a relative or

14    employee or attorney or counsel of any of the

15    parties, or a relative or employee of such attorney

16    or counsel, nor financially interested in the

17    action.

18         Under penalties of perjury, I declare that I

19    have read the foregoing certificate and that the

20    facts stated herein are true.

21         Signed this 24th day of February 2006.

22

23    _____

      LAURIE SUSSKIND, Shorthand Reporter

24    Notary Public, State of Florida at Large

      Commission No.: DD338373

25    My commission expires: September 22, 2008



# Memorandum

**To:**   Allen Evans

**From:** Karen Houlli

**Date:** 3/29/05

**Re:** Cash Drawer Issues

---

Allen,

I am extremely concern about a few situations. For the past several weeks, we have had problems with the cash register. On more than one occasion we have been short at the closing. The drawer has always been consistent, mostly always over.

On a few other occasions I have entered the property and the alarm code has not been set properly as well as the shutters have not been closed correctly.

I hate to be bold about this matter, but I think it might involve employee theft. Let me know if you have some time to discuss this further.

Thanks,

Karen Houlli
Chromatek Imaging – Accounting Manager





**chromatek**
IMAGING

T: 954-566-1082   F: 954-563-6207 • 3400 POWERLINE RD • FORT LAUDERDALE • FLORIDA 33309

EXHIBIT 5
Deponent Houlli
Date 2/13/06 Rptr. LS
WWW.DEPOBOOK.COM

July 20th, 2005

Chromatek Imaging, Inc
3400 Powerline Road
Ft. Lauderdale, FL 33309

Federal Background Services, Inc
Accounts Receivables Department
PO Box 6703
Lake Worth, FL 33466

4/18/05

To Whom It May Concern:

We received your invoice number 2628 for the amount of $67.00, but at this time, we are withholding delivery of payment, due to the fact that we have not received the report.

We will not be needing this service, since the employee; (William Scott Tanis) is no longer an employee of Chromatek Imaging, Inc.

Thank you for your prompt attention to this matter. If you have any questions please feel free to contact me at 954-566-1082

Sincerely,

Karen Houlli
Accounting Manager

7/20/05 Left message w/ Elizabeth for Karen to call back.

May 05 William Tanis Called to inquire about credit.

slw melissa
6/9/05 Karen called + complained that we spoke with William Tanis.

# *CONFIDENTIAL*

Meeting Notes Regarding Possible Employee Theft
March 30, 2005

Attendees:
> Karen
> Allen

Issues:
> Missing cash from register
> Shutters remaining unlocked
> Alarm not set
> Large swing in Cost of Goods Sold

Possible Employees:
> Laura
> 1.  Keys and alarm code
> 2.  Conducts inventory
> 3.  Places orders
> 4.  No outlet to sell materials
>
> Liz
> 1.  Access to cash register
>
> Kristine
> 1.  Access to cash register
>
> Scott
> 1.  Manager responsible for closing
> 2.  Keys and alarm code
> 3.  Access to cash register
> 4.  Previously admitted that he took samples from customers and sold them on E-bay.
> 5.  Admitted to other employees that he stole items from previous employers dumpster and sold them on E-bay.
> 6.  Admitted to other employees that he returned to previous employers and obtained customer documents
> 7.  Would know where to sell materials

Action Items:
> Audit month-end inventory
> Review all receivings against purchase orders
> Balance cash register daily
> Background check on Scott



1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-61283-CIV-COHN/Magistrate Snow

WILLIAM SCOTT TANIS,

                    Plaintiff,

          v.

CHROMATEK IMAGING, INC.,
a Florida corporation;
ALLEN EVANS, an individual;
and KAREN HOULLI, an individual,

                    Defendants.
_____x


                    100 S.E. Second Street
                    Suite 4500
                    Miami, Florida
                    Friday, February 24, 2006
                    10:05 a.m. - 3:00 p.m.


          DEPOSITION OF WILLIAM SCOTT TANIS

          Taken before Jeanne L. Volk, Notary

Public for the State of Florida at Large, pursuant

to Notice of Taking Deposition filed in the above

cause.

7

1      A.     Yes.

2      Q.     Page 8, paragraph 41, you

3  hand-delivered a memo to Allen Evans on June 6,

4  2005?

5      A.     Yes, I did.

6      Q.     Okay.  Page 9, paragraph 47, Randy

7  Schneider handed you a memo saying that on

8  July 1st, they were going to be changing the

9  compensation structure?

10      A.     I think that it was Randy.  I'm not

11  absolutely sure that it was Randy that handed it

12  to me, I'm pretty sure it was.

13      Q.     Okay.  And you explained that this was

14  going to be a drastic paycut for you?

15      A.     Yes.

16      Q.     Because you only averaged about 37,000

17  a month in sales?

18      A.     That's correct.

19      Q.     Okay.  So under that new policy, you

20  would only be getting around $3,700 a month.

21      A.     That's about right, yes.

22      Q.     Okay, and then paragraph 49 on page 10,

23  you were terminated from Chromatek Imaging on

24  June 20th, 2005?

25      A.     Yes.

28

1      A.    Digital photo imaging.

2      Q.    So similar to Associated Photo?

3      A.    Yes.

4      Q.    When were you hired by Chromatek Photo

5  Imaging?

6      A.    I was hired March 8th, 2004.

7      Q.    How did you find out about Chromatek

8  Photo Imaging?

9      A.    I was doing a search for other

10 companies within the industry that might be open

11 to hiring a sales manager.

12     Q.    Okay.  And Chromatek Photo Imaging was

13 one of those companies?

14     A.    Yes.

15     Q.    Did you approach them or did they

16 approach you?

17     A.    I approached them.

18     Q.    Do you remember approximately when that

19 was?

20     A.    Maybe around January of 2004, I started

21 talking with them.

22     Q.    So while you were still employed by

23 Color Reflections?

24     A.    Yes.

25     Q.    And did you give them any kind of

29

1   proposal as far as you coming on board?

2       A.   Yes, I did.

3       Q.   What was that?

4       A.   I gave them a proposal with a proposed

5   compensation package, that included a salary,

6   plus commission and bonuses.

7       Q.   So basically an employment contract?

8       A.   Yes.

9            MR. SMITH:   Exhibit 6.

10           (Thereupon, Defendants' Exhibit

11   Number 6 was marked for Identification.)

12   BY MR. SMITH:

13      Q.   Do you recognize this document,

14   Mr. Tanis?

15      A.   Yes.

16      Q.   Is this the contract you are talking

17   about?

18      A.   Yes.

19      Q.   Is this the document you prepared?

20      A.   Yes, it is.  I went back and forth with

21   Joe Castro, who was the owner at the time, and we

22   adjusted some of the numbers.

23      Q.   Such as?

24      A.   For the compensation, the salary.  And

25   also the bonus structure, I think, was also

30

1    adjusted.   There was a few versions that went

2    back and forth, but this was the final version.

3         Q.    Okay.   I would like to spend a couple

4    of minutes just going through this document.

5              Does this accurately reflect what your

6    responsibilities ended up being at Chromatek

7    Photo?

8         A.    Generally, yes.

9         Q.    These were your sales goals?

10         A.    Those were my target sales that I set

11   myself.

12         Q.    Okay.

13         A.    And Joe agreed to them.

14         Q.    Would you consider these reasonable

15   goals?

16         A.    I considered them target sales.   Since

17   this company, this was a new -- the type of

18   clients I would go after doing all this

19   commercial work that I sold, these commercial

20   accounts, this was new for this company, so I

21   came up with some target sales, but they were

22   just numbers I came up with.

23              I didn't know how it was really going

24   to work out because this was something completely

25   new for this company.

31

1      Q.    And these were, the numbers you came up

2   with, were numbers that you believed would be

3   attainable.

4          MR. CASSATA:   Objection to form.

5   BY MR. SMITH:

6      Q.    Correct?

7      A.    Like I said, I didn't know if they were

8   attainable.   I used the best of my abilities to

9   come up with numbers that I thought were

10  possible.

11     Q.    Did Mr. Castro have any input in these

12  numbers?

13     A.    No, he was as much in the dark as I

14  was --

15     Q.    Okay.

16     A.    -- in coming up with something that --

17     Q.    So these target sales numbers were

18  developed a hundred percent by you.

19     A.    Yes, they were.

20     Q.    And your initial salary was going to be

21  $48,000 per year?

22     A.    Yes.

23     Q.    And after six months, it was going to

24  be reduced to no less than 40,000 per year?

25     A.    Yes.

32

1      Q.    Was your salary reduced to 40,000 after

2  six months?

3      A.    Yes.

4      Q.    And then you were going to get a

5  10 percent commission on gross sales?

6      A.    That would be applied against my

7  $40,000 per year salary, yes.

8      Q.    So this is a similar structure to Color

9  Reflections?

10      A.    In that sense, yes.

11      Q.    And then on the second page under

12  Company's Responsibility, these were things that

13  Chromatek Photo didn't have implemented before

14  you got there?

15      A.    Yes, in my negotiations with Joe

16  Castro, we talked about things that we would need

17  right off the bat when I came to work for the

18  company, and these are some of the things that we

19  discussed.

20      Q.    Okay.  That would include buying new

21  equipment or used equipment; correct?

22      A.    Yes, which he did.

23      Q.    I assume that was equipment that would

24  be used in the production of the items that you

25  sold?

33

1       A.    Yes.

2       Q.    What exactly, what type of items did

3  Chromatek Photo sell?

4       A.    They sold photographic prints, they

5  sold film processing services, they sold mounting

6  and finishing services, scanning services,

7  digital file preparation services, those sorts of

8  things.

9       Q.    Can you tell me some of the clients or

10  companies, types of companies that would be

11  interested in those products?

12      A.    A lot, a lot of companies.  I

13  specialized in going after commercial accounts.

14      Q.    Such as?

15      A.    Fragrance and cosmetic companies, I

16  particularly targeted.

17      Q.    And were these -- some of your biggest

18  accounts were fragrance and cosmetics?

19      A.    Yes.

20      Q.    And what kind of items did you sell to

21  the fragrance and cosmetics companies?

22      A.    Backlit photographic prints, mounted

23  posters, displays for use in retail environments,

24  scanning services, digital file preparation

25  services, things like that.

34

1     Q.   So mainly marketing and advertising

2  type material?

3     A.   Yes.

4     Q.   And you were given a new, was it a

5  desktop or a laptop?

6     A.   When I started?

7     Q.   With Chromatek, in looking at item

8  number 6 on the second page under Company's

9  Responsibilities, a new PC based laptop or

10  desktop computer for your use, did they provide

11  that to you?

12     A.   They did not.

13     Q.   At any time?

14     A.   They did not give me a new PC based

15  laptop or desktop.

16     Q.   Did you have a computer to work with?

17     A.   Yes, they gave me one that was already

18  in the company.

19     Q.   Okay.  You got a company paid cell

20  phone?

21     A.   Yes, I did.

22     Q.   Did you get a company email account?

23     A.   Yes.

24     Q.   Do you remember what your e-mail

25  address was?

35

1      A.    I believe it was

2  stanis@chromatekphoto.com.

3      Q.    Did you get your own desk?

4      A.    It was either that or

5  scott@chromatekphoto.com, I don't recall.

6      Q.    One of the two?

7      A.    Yes.

8      Q.    Did you get your own office?

9      A.    I shared an office with the owner.

10     Q.    Did you have your own desk?

11     A.    Yes.

12     Q.    Did you get your own file cabinet?

13     A.    Yes.

14     Q.    So with this Employment Agreement, you

15  were basically naming yourself as sales manager;

16  correct?

17          MR. CASSATA:   Object to form.

18          THE WITNESS:   I applied for a sales

19      manager position, and I was hired as a sales

20      manager.

21  BY MR. SMITH:

22     Q.    Did you see a listing for an opening

23  for sales manager for Chromatek Photo Imaging?

24     A.    No.

25     Q.    How did you know that there was a sales

36

1   manager position open?

2       A.   After talking with them about expanding

3   their business, I told them that I wanted to come

4   on board as a sales manager.

5       Q.   So at that time -- strike that.

6            Before you approached them, they didn't

7   have a sales manager?

8       A.   From my understanding, no.

9       Q.   From your understanding, were you the

10  first sales manager ever at Chromatek Photo

11  Imaging?

12      A.   From my understanding, yes.

13      Q.   So would you say that you gave them the

14  idea to have a sales manager?

15      A.    Well, I suggested it, and Joe Castro at

16  the time told me that he had been trying to come

17  up with ways to increase the company's business.

18  I don't know if it had occurred to him as well or

19  not.

20      Q.   Do you recall what your actual sales

21  goals were at Chromatek Photo?

22      A.    I don't believe I -- besides what we

23  had as target goals, I don't think that I was

24  given any other goals.

25      Q.   So did the company use your target

37

1   sales as your sales goals?

2           MR. CASSATA:   Object to form.

3           THE WITNESS:   Those target sales were

4       what I was hoping to achieve, so.

5   BY MR. SMITH:

6       Q.   That wasn't my question, sir.   Did the

7   company use your target sales as your sales

8   goals?

9       A.   I don't know.

10      Q.   Did you have any sales goals for the

11  company?

12      A.   I guess the target sales would be my

13  sales goals.

14      Q.   But you are not sure?

15      A.   I mean, I discussed it with Joe, and I

16  said this is what I think I can do, so I would

17  say that probably yes, he would presume that

18  those would be my goals.

19      Q.   So is it fair to say that the

20  expectation by Joe and Chromatek Photo Imaging

21  were that you would be hitting those numbers that

22  you put in this Employment Contract?

23          MR. CASSATA:   Object to form.

24          THE WITNESS:   I don't know what his

25      expectations were.   I just know that those

38

1        were the goals that we set.

2   BY MR. SMITH:

3        Q.   Do you know if Chromatek Photo Imaging

4   expected you to hit at least $40,000 a month in

5   sales?

6        A.   Again, I don't know what they expected.

7   Those were the goals that we set.

8        Q.   Are you familiar with instant

9   messaging?

10       A.   Yes.

11       Q.   Did you ever have instant message

12  conversations with employees at Chromatek Photo?

13       A.   I don't recall offhand.

14       Q.   Did you ever have, do you recall having

15  instant messages, conversations, with people not

16  employed by Chromatek Photo while you were at

17  Chromatek Photo?

18       A.   Yes.

19       Q.   Do you recognize the email address

20  kimcheegirl1@hotmail.com?

21       A.   Yes.

22       Q.   Can you tell me who that is?

23       A.   That's my sister-in-law.

24       Q.   What's her name?

25       A.   Her name is Karen Fisher, F-I-S-H-E-R.

39

```
1            MR. SMITH:  I am going to introduce 7.
2            (Thereupon, Defendants' Exhibit
3   Number 7 was marked for Identification.)
4   BY MR. SMITH:
5       Q.   Does this appear to be an instant
6   message conversation between yourself and your
7   sister-in-law?
8       A.   Yes, it does.
9       Q.   Before I ask you anything else about
10  this, were you having any trouble hitting your
11  target sales numbers at Chromatek Photo?
12      A.   I don't recall what my sales were.
13      Q.   Do you recall ever not making your
14  targeted numbers?
15      A.   Yes, I'm sure there were months that I
16  didn't hit my targeted sales, because I wouldn't
17  make commission unless I broke like whatever it
18  was, 40,000 or 48,000.
19            MR. CASSATA:  Let me just ask something
20        on the record of Mr. Smith.  Is it your
21        position that this document is not
22        responsive to any of my requests for
23        production?
24            MR. SMITH:  I don't believe it is.
25        It's a conversation between your client and
```

40

1    his sister-in-law at his former employer.

2        MR. CASSATA:  Okay, I was just curious.

3    I had not seen it before.

4        MR. SMITH:  It hasn't been produced.

5    BY MR. SMITH:

6        Q.   I know there are no numbers on there,

7    but if you could turn to page, what I believe is

8    page 6 of this document.  It's going to be the

9    last line under scott@chromatekphoto.com, "have

10   to sell at least 40k per month of pretty

11   pictures."  Do you see that, sir?

12       A.   I'm trying to find it.  Yes, I see

13   that.

14       Q.   Does that refresh your memory what your

15   sales goals were?

16       A.   It refreshes my memory as to what my

17   personal sales goals were, yes.

18       Q.   But is it your testimony that Chromatek

19   Photo did not expect you to hit at least 40,000

20   per month?

21       MR. CASSATA:  Object to form.

22       THE WITNESS:  I mean, I guess that the

23       point is that we had a contract that had my

24       target sales, and in order for me to -- the

25       reference to the 40,000 may have been for me

41

1    to pay my bills, because I would need to --

2    I mean, I felt like I needed to at least

3    sell 40,000 per month, so that 10 percent of

4    that would basically cover my salary so that

5    I could pay my bills.

6  BY MR. SMITH:

7    Q.    That doesn't really explain why you

8  would put "but I get a lot of pressure to make

9  everyone happy."  Correct?

10    A.    I don't know.

11    Q.    Do you recall approximately when this

12  conversation took place?

13    A.    No.  Must have been during the time

14  when Joe was owner, I guess.

15    Q.    So sometime between March of '04 and

16  September of '04?

17    A.    I'm not sure.  Possibly.

18    Q.    Can you turn to the next page.  For the

19  record the bottom quarter, six lines up from the

20  bottom, "definitely an advantage that I'm

21  capitalizing on.  Also, I wrote my own contract,"

22  next line, "where I'm the sales manager."

23    A.    Um-hum, yes.

24    Q.    And that's correct, that you put

25  yourself as the sales manager in the contract you

42

1   wrote?

2         MR. CASSATA:   Object to form.

3         THE WITNESS:   Well, I wrote my own

4      contract.

5   BY MR. SMITH:

6      Q.   Where you named yourself as the sales

7   manager?

8      A.   I applied for the position of sales

9   manager.   That doesn't say that I named myself

10  the sales manager, it says "where I'm the sales

11  manager."   It doesn't say where I named myself

12  the sales manager.

13     Q.   Did Chromatek Photo ask you to prepare

14  your own employment contract?

15     A.   No.

16     Q.   Did you have any other sources of

17  income while you were working with Chromatek

18  Photo?

19     A.   I had hobbies.

20     Q.   Such as?

21     A.   I bought and sold items on Ebay.

22     Q.   What kind of items did you sell on

23  Ebay?

24     A.   Different things.   I sold a hot tub.   I

25  sold miscellaneous household items that I had.   I

49

1   Lui Rochas?

2       A.   That is a fragrance that I received as

3   a gift from Cosmopolitan Cosmetics, again long

4   before I worked for Chromatek Photo or Chromatek

5   Imaging.

6       Q.   Did you make Chromatek Photo aware that

7   you were selling some his samples or some of the

8   gifts that you got from customers?

9       A.   No.

10      Q.   Was there any policy at Chromatek Photo

11  against selling gifts from customers on Ebay?

12      A.   There was none that was made aware to

13  me.

14      Q.   Okay.  Did there come a time when you

15  stopped work for Chromatek Photo and you began

16  working for Chromatek Imaging, Incorporated?

17      A.   Yes.

18      Q.   Chromatek Imaging, Incorporated is the

19  current corporate defendant in your lawsuit;

20  correct?

21      A.   Chromatek --

22      Q.   Imaging, Incorporated?

23      A.   I believe that's correct.

24      Q.   Do you remember when you started

25  working for them?

50

1        A.    September 14th, 2004.

2        Q.    I apologize, real quick I want to go

3   back to Chromatek Photo.  Did you complete an

4   employment application with them?

5        A.    Yes, I did.

6             MR. SMITH:   Let me introduce this as

7        Exhibit 9.

8             (Thereupon, Defendants' Exhibit

9   Number 9 was marked for Identification.)

10  BY MR. SMITH:

11       Q.    Is that your handwriting at the top,

12  sir?

13       A.    Yes, it is.

14       Q.    You have listed your name, your Social

15  Security number, your address, your telephone

16  number?

17       A.    Yes.

18       Q.    And you were applying for or employment

19  desired as sales manager; correct?

20       A.    Correct.

21       Q.    Do you know if you had to give them --

22  by them, I mean Chromatek Photo Imaging -- proof

23  of your employment eligibility?

24       A.    If I had to give it to who?

25       Q.    To Chromatek Photo Imaging before you

51

1   could start working, similar to the I-9 Form I

2   showed you earlier.

3        A.    I don't recall.  I think they may have

4   asked me for my driver's license or something, I

5   don't recall exactly.

6        Q.    Okay.  When you started working for

7   Chromatek Imaging -- I am done with the

8   application.

9        A.    Okay.

10       Q.    When you started working for Chromatek

11   Imaging -- and I know it's confusing because I'm

12   going back and forth between two names, but I

13   think we are done with Chromatek Photo now --

14   when you begin working at Chromatek Imaging, did

15   there come a time that you had to fill out

16   employment eligibility verification for them?

17       A.    I was asked for a copy of my driver's

18   license, I believe.

19            MR. SMITH:   Number 10.

20            (Thereupon, Defendants' Exhibit

21   Number 10 was marked for Identification.)

22   BY MR. SMITH:

23       Q.    Do you recognize this document, sir?

24       A.    It looks like something I filled out,

25   partially.

52

1     Q.   It's an Employment Eligibility

2 Verification Form?

3     A.   Yes.

4     Q.   I think at the bottom there on the left

5 side, it says Form I-9; correct?

6     A.   Yes.

7     Q.   So this is similar to what I showed you

8 for Color Reflections; correct?

9     A.   That's correct.

10     Q.   And this document, does it contain your

11 name?

12     A.   Yes.

13     Q.   This is your handwriting?

14     A.   Yes, at the top it is my handwriting.

15     Q.   Okay.  And your address?

16     A.   Yes.

17     Q.   Your Social Security number?

18     A.   Yes.

19     Q.   Your date of birth?

20     A.   Yes.

21     Q.   The second page of this exhibit.

22     A.   Yes.

23     Q.   Is that a correct copy of your driver's

24 license?

25     A.   Yes.

53

1     Q.    And again, that has your driver's

2  license number on it?

3     A.    Yes, it does.

4     Q.    Your address?

5     A.    Yes.

6     Q.    Date of birth?

7     A.    Yes.

8     Q.    Do you recall completing a W-4 tax

9  form?

10    A.    I guess I filled one out.

11          (Thereupon, Defendants' Exhibit

12  Number 11 was marked for Identification.)

13  BY MR. SMITH:

14    Q.    Do you recognize this document?

15    A.    Yes.

16    Q.    Tell me what it is.

17    A.    It's a W-4 Form, Employee's Withholding

18  Allowance Certificate.

19    Q.    W-4?

20    A.    Yes.

21    Q.    And is this your handwriting at the

22  bottom?

23    A.    Yes, it is.

24    Q.    And this is your name?

25    A.    Yes.

54

1    Q.   Social security number?

2    A.   Yes.

3    Q.   Address?

4    A.   Yes.

5    Q.   And you filled this out and gave it to

6    Chromatek?

7    A.   Yes.

8    Q.   Who at Chromatek did you give this to?

9    A.   I don't recall.

10   Q.   Do you know if you might have given it

11   to Karen Houlli?

12   A.   Probably.

13   Q.   What about Exhibit 10, the I-9, did you

14   give that to Karen Houlli?

15   A.   Probably.  I don't recall.

16   Q.   Is that her name towards the bottom?

17   A.   Yes, it is.

18   Q.   Any other person that you can think of

19   that you might have given this form to at

20   Chromatek Imaging?

21   A.   No.

22   Q.   Can you tell me what your salary was at

23   Chromatek Imaging?

24   A.   $57,000 per year.

25   Q.   Was that your initial salary?

55

1    A.    Yes.

2    Q.    And do you recall -- and I might have

3 already asked this, I apologize -- do you recall

4 when you started working at Chromatek Imaging?

5    A.    I guess I starting working there the

6 day that Allen purchased the assets of the

7 company.

8    Q.    Do you recall when that was?

9    A.    I know that we met and talked on

10 September -- shortly after he purchased the

11 company, I guess it was around September 14th,

12 2004.

13    Q.    So you got your pay raise on

14 September 14th, 2004?

15    A.    I don't recall exactly when I got it.

16    Q.    Excuse me, not a pay raise, your

17 salary.

18    A.    I don't recall exactly when.

19    Q.    Does October 1st, 2004 sound familiar

20 when you got the $17,000 -- well, when you got

21 the $57,000 salary?

22    A.    That might be accurate.

23    Q.    So possibly for the first two weeks

24 that you were employed by Chromatek Imaging, you

25 were still making your 40,000, your old

56

1 compensation structure?

2     A.   I don't recall exactly.

3     Q.   Okay.   There came a time, though, that

4 you went from making a $40,000 base salary to 57;

5 correct?

6     A.   Correct.

7     Q.   I would like to inquire into that for a

8 little bit.  Did you ask for a raise?

9     A.   Can you qualify that?  I mean --

10     Q.   Did you ask for an increase?

11     A.   You said before that --

12     Q.   Did you ask for an increase from 40,000

13 to 57,000?

14     A.   Well, I asked, I negotiated the salary.

15 As far as I was concerned, I was being hired by a

16 new company.

17     Q.   And who did you negotiate that with?

18     A.   With Allen.

19     Q.   And why did you ask for $17,000 more

20 than what you had been making?

21     A.   Because I thought that I deserved it.

22     Q.   Would you have stayed at Chromatek

23 Imaging if Mr. Evans hadn't given you that

24 additional amount?

25     A.   I don't know.

57

1    Q.   Did you ever indicate to Mr. Evans that

2    you would leave if he didn't give you that

3    additional amount?

4    A.   I don't recall.

5    Q.   Now, you testified earlier that you

6    left Color Reflections in part because they

7    weren't paying you the way you felt you deserved

8    to be paid; correct?

9    A.   Yes.

10   Q.   Did you ever tell Mr. Evans that you

11   needed the pay raise because you weren't hitting

12   your sales quotas?

13   A.   I don't recall.

14   Q.   Is that a conversation that could have

15   taken place?

16   A.   I don't recall.

17   Q.   At the time that Mr. Evans purchased

18   the assets of Chromatek Photo, how many other

19   sales -- were you the only sales person there?

20   A.   I believe I was, yes.

21   Q.   So you were the sole sales

22   representative.

23   A.   I was the sales manager.

24   Q.   But you also did sales; correct?

25   A.   So my duties were not just in sales,

58

1    but also to act as a manager.

2         Q.    Was there anyone else doing commercial

3    sales at Chromatek Photo other than yourself?

4         A.    At that time, no.

5         Q.    When Allen bought -- well, on

6    September 14th, 2004 when Mr. Evans came into the

7    picture, did he bring any sales staff with him?

8         A.    To my knowledge, no.  Not to Chromatek.

9         Q.    So if you had left at that time,

10   Mr. Evans would not have had any sales

11   representatives?

12        A.    Well, he had customer service people

13   which were, you could -- technically you could

14   say they were sales representatives.

15        Q.    Did they do commercial sales?

16        A.    They would assist me in administrative

17   tasks with commercial sales.

18        Q.    But did they do what is thought of as

19   commercial sales?

20        A.    No.

21        Q.    So you were the only one at that time

22   with experience in commercial sales?

23        A.    Yes.

24        Q.    And so if you had left, Mr. Evans would

25   have been left with not having anybody

59

1    experienced in commercial sales?

2        A.    I suppose.  I don't know.

3        Q.    That made you a pretty valuable person;

4    correct?

5        A.    I guess.

6        Q.    Would you consider yourself a valuable

7    employee at that time?

8        A.    I considered myself very valuable.

9        Q.    Okay.  Now, you had testified that you

10   negotiated this $57,000 salary.  Was there also

11   commission?

12       A.    Yes.

13       Q.    And do you know what the number was,

14   what percentage, for the commission?

15       A.    10 percent commission that would be

16   applied against my salary.

17       Q.    How were the commissions paid?

18       A.    Monthly.

19       Q.    Would you get them on a separate check

20   from your normal salary paycheck?

21       A.    I don't recall.  I think they were

22   separate.

23       Q.    So you would get -- the months you made

24   your commission, you would get two paychecks,

25   essentially?

60

1    A.    I believe that's correct.

2    Q.    Okay.  Did you and Mr. Evans ever come

3 up with a proposed or draft employment agreement?

4    A.    Yes, we did.

5    Q.    Was it similar to the one you had at

6 Chromatek Photo?

7    A.    Yes.

8          (Thereupon, Defendants' Exhibit

9 Number 12 was marked for Identification.)

10 BY MR. SMITH:

11    Q.    Do you recognize this document?

12    A.    Yes.

13    Q.    Can you tell me what it is?

14    A.    It looks like an Employment Agreement.

15    Q.    Does it look like the proposed

16 Employment Agreement you and Mr. Evans came up

17 with?

18    A.    It looks like the one -- I'm not sure

19 if this is the final version or not, but he had

20 his attorney look at it and add some things

21 and -- yes, it looks like the final version --

22    Q.    Was this contract ever signed?

23    A.    -- that was supplied by his attorney,

24 that was modified by his attorney.

25    Q.    Was this contract ever signed?

61

1    A.   No.

2    Q.   So you never actually entered into this

3  agreement?

4    A.   No.

5    Q.   Why not?

6    A.   I don't know.

7    Q.   Did Mr. Evans ever say that he wasn't

8  going to sign it?

9    A.   No.

10   Q.   Did you ever say you weren't going to

11  sign it?

12   A.   No.

13   Q.   So it just didn't get signed.

14   A.   Correct.

15   Q.   Now, looking at item number 4, the

16  target sales --

17   A.   Yes.

18   Q.   -- these appear to be the same numbers

19  that were in the Chromatek Photo contract;

20  correct?

21   A.   I would have to compare them but, yes,

22  they look like they are.

23   Q.   Feel free to compare.

24   A.   Yes, they look like the same numbers,

25  yes.

62

1    Q.    Okay.  And you had been at Chromatek

2  Photo for a little over six months when this

3  draft Employment Agreement was prepared; correct?

4    A.    That's correct.

5    Q.    And you kept the same target sales

6  numbers?

7    A.    Yes.

8    Q.    So at this point, these sales numbers

9  were reasonable; correct?

10   A.    I don't know.  Because Allen was a new

11 owner with no experience in the industry as far

12 as I could tell.

13   Q.    But you now had six months --

14   A.    With the previous owner, I had a lot of

15 assistance and support because he was very

16 familiar with the industry, and he had built that

17 business for 15 years, and when Allen came along,

18 I felt that Allen had no experience at all in the

19 industry.

20   Q.    Did your duties change when Allen came

21 along?

22   A.    I felt that they kind of did.

23   Q.    How so?

24   A.    Due to Allen's lack of experience.

25   Q.    How so?

63

1        A.    I felt that he needed more help in

2   managing the company, whereas the previous owners

3   were very strong in managing.

4        Q.    Okay.  But after six months of working

5   at this location, you did not change the target

6   sales numbers; correct?

7        A.    No.

8        Q.    Was there any reason for you to think

9   that you would not be able to hit these target

10  sales numbers when you created this agreement?

11       A.    The thing with the target sales is that

12  I had been there six months, and in my opinion,

13  that's not really an adequate amount of time to

14  generate business to really see how the business

15  is going, to generate enough sales to really see

16  where things are going.

17       Q.    Was your commission payment based on

18  these target numbers?

19       A.    No, they were based on a commission

20  that would be applied against my salary.

21       Q.    Did you have any sales goals?

22       A.    These, again, were my target sales.

23       Q.    How would you make your commission?

24       A.    We would take the 10 percent of the

25  gross sales for a given month and apply that

64

1  against my salary.  If I sold more than, I think

2  it was 47,500, then I would get an additional --

3  then I would get a commission check for that

4  particular month.

5      Q.   So 47,500 was your sales goal?

6      A.   I believe that was the number,

7  47,500 -- that was not my sales goal.

8      Q.   That was the number you needed to hit

9  to get a commission.

10     A.   Exactly.

11     Q.   So if you did not hit that number, you

12  didn't get commission.

13     A.   That's correct.  I would just get my

14  salary.

15     Q.   Do you have any idea where the number

16  47,500 came from?

17     A.   Yes, I believe that if you take 57,000

18  and divide it by 12 and then multiply it by 4.33,

19  you end up with 4,750.

20     Q.   Okay.  In your position as a sales

21  manager, and I know you have already gone through

22  some of the responsibilities you had that were

23  listed in your Complaint, can you tell me what

24  your responsibilities and duties were as sales

25  manager for Chromatek Imaging at this point?

65

1      A.    Primarily to get business from

2   commercial accounts through outside sales.   In

3   addition to that, I would oversee any other sales

4   personnel that would be hired.

5           I was involved in ongoing training of

6   production, staff, because they were still

7   learning a lot about how to produce materials for

8   these types of accounts, the types of accounts

9   that I brought in, the commercial accounts.

10          I also acted a lot as a project

11  manager.   It wasn't just that I brought in the

12  sales, it's that I managed the projects through

13  production to make sure that they were done right

14  and on time and shipped or delivered properly.

15     Q.    Did a lot of the same staff at

16  Chromatek Photo stay on and work at Chromatek

17  Imaging?

18     A.    Yes.

19     Q.    So a lot of them had five months plus

20  experience now with a lot of the products that

21  you were bringing in?

22     A.    Yes, that's correct.

23     Q.    Were you aware of any departments that

24  Chromatek Imaging had?

25     A.    Was I aware of any departments?

66

1    Q.   You were the sales department; correct?

2    A.   Correct.

3    Q.   Were there any other departments?

4    A.   I guess there is the digital

5    department.  Is that what you mean?  Like just --

6    Q.   Well, you tell me.  What departments

7    were you aware of at Chromatek Imaging.  Sales

8    department being one.

9    A.   I guess you could say the digital

10   department was a department.

11   Q.   Was that more of a production

12   department?

13   A.   Yes, that was a production department.

14   Q.   Okay.

15   A.   There was the finishing department, the

16   printing department.  Those were all production

17   departments.

18   Q.   Okay.  So would you group that into one

19   department, production?

20   A.   I saw them as separate, but --

21   Q.   Okay.

22   A.   -- I guess you could do it either way.

23   Q.   Was there an accounting department?

24   A.   Well, there was a person that worked on

25   the accounting.  I don't know if you would call

67

1   that a department per se but, yes, I guess you

2   could call it that.

3       Q.   Okay, and you were in charge of the

4   sales department; correct?

5       A.   Yes.

6            (Thereupon, Defendants' Exhibit

7   Number 13 was marked for Identification.)

8   BY MR. SMITH:

9       Q.   Do you recognize this document, sir?

10      A.   Yes, I have seen it.

11      Q.   Tell me what it appears to be.

12      A.   It looks like a hire date and a

13   terminate date and a rehire date for Chromatek

14   employees.

15      Q.   Chromatek Imaging?

16      A.   I presume.  I don't know.

17      Q.   But the hire date is no earlier than

18   September 14th, 2004, and I assume these are all

19   Chromatek Imaging employees?

20      A.   Yes.

21           MR. SMITH:  I don't know if you want to

22      take a break.  Are you okay?

23           THE WITNESS:  Yes, let's take a break.

24           (Thereupon, a recess was taken, after

25   which the following proceedings were had:)

68

BY MR. SMITH:

    Q.   Where we left off, I had just given you Exhibit Number 13, which is a chart of the Chromatek Imaging employees.

    A.   Yes.

    Q.   I am just going to spend a few minutes on this document. Alice Rivera, first name. Can you tell me what position she had at Chromatek?

    A.   She worked in production, primarily on the Fuji Frontier.

    Q.   And she was not a direct report of yours, was she?

    A.   I'm not sure.

    Q.   Bryan Bogater, do you know what position he held?

    A.   He was a customer service representative, and then he moved into film processing.

    Q.   Was customer service under the sales department?

    A.   It was made known in a company meeting that when Allen was absent that I was left in charge. Later on, that seemed to change, but I never really was sure at some point who I was in charge of and who I was not in charge of.

69

1    Q.   Earlier, you had testified that the

2  customer service people did administrative tasks

3  for you?

4    A.   That's correct.

5    Q.   So would you have considered customer

6  service under the sales department?

7    A.   Generally speaking, yes.  Bryan didn't

8  do as much for me as Elizabeth Menconi.

9    Q.   Okay.

10   A.   She was my primary administrative --

11   Q.   Did Bryan Bogater directly report to

12  you?

13   A.   Like I said, it wasn't really clear.

14   Q.   Did anyone directly report to you that

15  you were clear on?

16   A.   I was told that when Allen was out of

17  the office, that I was in charge, and he stated

18  that in a company meeting.

19   Q.   Okay.

20   A.   That was shortly after he purchased the

21  assets of Chromatek.  Later on, I had discussions

22  with Allen about that, and it left me wondering

23  what my position was exactly.

24   Q.   And what conversation was that that

25  left you wondering?

70

1    A.   It was several conversations.  We

2  talked about putting together a flow chart for

3  like company structure, and we never came up with

4  anything definitive.  He came up with some, I

5  came up with some, some of them showed me in

6  charge of all production staff, with the

7  exception of Karen Houlli.

8    Q.   Let me ask this a different way.  When

9  Allen was there, did you have anyone that

10 directly reported to you?

11   A.   You see, that was really never made

12 clear.  I would give direction to people, I would

13 give direction to Elizabeth Menconi, Justin

14 Bordeaux, the other sales people, Karen Alper,

15 Terry Davis.  I would give direction to most of

16 the production staff.

17   Q.   There were other sales people there?

18   A.   Yes.

19   Q.   Karen Alper was a sales person?

20   A.   Karen Alper was a sales person.

21   Q.   Terry Davis was a sales person?

22   A.   Yes.

23   Q.   You were the sales manager?

24   A.   Yes.

25   Q.   You weren't sure if they directly

71

1  reported to you?

2      A.   I felt I had more -- I felt that they

3  did report to me more than some of the other

4  people.  I would give direction to a lot of

5  people, but the people -- it was kind of unclear.

6      Q.   Did you have the authority to issue

7  disciplinary actions against any employees at

8  Chromatek Imaging?

9      A.   I don't know.

10     Q.   Did you ever issue disciplinary actions

11 against anyone at Chromatek Imaging?

12     A.   I wanted to.

13     Q.   Did you?

14     A.   But I was told by Allen not to.

15     Q.   So is it fair to say that Allen had

16 final say in any disciplinary action taken

17 against any Chromatek Imaging employees?

18     A.   Yes.

19     Q.   Did you have the authority to hire or

20 fire employees?

21     A.   I had the authority to hire.

22     Q.   Was it final authority?

23     A.   I don't know.

24     Q.   If you wanted to hire someone, did you

25 have to confer with Allen first?

79

1   Allen walking in, they were all either customer

2   service or sales reps; correct?

3        A.   Yes.  Well, Bryan had experience in

4   film processing, and he eventually went into a

5   production role.

6        Q.   But he started with the company in

7   customer service; correct?

8        A.   That's correct.  But we hired him

9   because of his experience in film processing,

10  among other things.

11       Q.   Did you ever have any problems with any

12  of the employees that we just listed?

13       A.   Can you clarify what you mean by

14  problems?

15       Q.   Did you have any problems with any of

16  the work performance by any of these people?

17       A.   Yes.

18       Q.   Who?

19       A.   I had issues with Laura Morales.

20       Q.   What kind of issues did you have with

21  her?

22       A.   She wanted to become a production

23  manager, so Allen promoted her to production

24  manager.

25            From my experience, I have seen a lot

80

1   of production managers in that industry, and I

2   know that she had -- it was my impression that

3   she had very little experience as a production

4   manager, so I was trying to help her learn how to

5   be a production manager, and I think that because

6   she had been there longer than I had, that she

7   somehow felt like not taking direction from me,

8   so there was some tension between us as a result.

9           My goal was to help her learn to do her

10  job, and that would facilitate the sales process.

11  Kind of going back to what I said before, you can

12  sell all you want, but if you can't produce it,

13  then you are limited by what you can bill in a

14  given month based on what production can produce,

15  so it was in my best interest to help her be a

16  good production manager so that we could increase

17  our production and handle a bigger volume of

18  sales.

19      Q.   Sure.

20      A.   So our tension was work-related.

21      Q.   Okay.  Did you agree with Allen's

22  decision to make her the production manager?

23      A.   Allen and I had a lot of conversations

24  about like restructuring production staff to

25  different positions and trying to figure out

81

1   better ways to streamline the company and make it

2   work more efficiently.   I guess -- I don't recall

3   if I agreed with it or not.   I knew that she had

4   no experience.

5        Q.   Did you believe she was capable of

6   handling the job at that point in time when she

7   was named the production manager?

8        A.   I believe that she could learn how to

9   do it, but I knew that her experience and

10   actually -- I had a feeling that her perception

11   of what a production manager was was different

12   than what it really needed to be for the company

13   at that time.

14        Q.   Is it fair to say, sir, that you had

15   doubts about her ability to do the job at the

16   point in time that she was named the production

17   manager?

18        A.   To a degree.

19        Q.   Did you ever relay those doubts to

20   Ms. Morales?

21        A.   What I tried to do was to help her and

22   educate her.

23        Q.   That wasn't my question though, sir.

24   Did you ever relay those doubts to her?

25        A.   I don't recall.

82

1      Q.   Was there any other employee that you

2  had performance issues with?

3      A.   There was tension between myself and

4  Karen Houlli.

5      Q.   Did that have to do with performance?

6      A.   I would say yes.

7      Q.   How so?

8      A.   I don't really know what the issue was

9  with her.  I felt like she engaged me in a power

10 struggle, and I never felt like I was trying to

11 engage her in a power struggle.

12          She would make comments about like,

13 respect and things like that, that I didn't

14 really know where it was coming from.  One time I

15 wanted to meet with her and review some items

16 that we needed to go over with some issues that

17 we were having at work, and she refused to meet

18 with me and said that she only wanted to meet

19 with me in the presence of Allen.

20          So we had a meeting with her, myself

21 and Allen, and we were going over some of those

22 issues, and at some point she just like basically

23 went off on me and started making remarks about

24 my income.  And I'm looking at Allen like, what

25 is she talking about, like what does this have to

83

1  do with what we are talking about?

2         And it's that instance and some other

3  instances that made me wonder what motives does

4  she really have, does she have something against

5  me, and I didn't understand what her beef with me

6  was, what her problem with me was.

7         Q.  Do you remember approximately when that

8  meeting was between you, Karen and Allen?

9         A.  I think it was -- I don't remember

10  exactly when, but I think it was shortly after

11  Allen bought the company, and he had made that

12  announcement at the meeting that when he was out,

13  that I was the number two guy in charge.

14         Q.  Do you know if it would have been

15  approximately January of 2005?

16         A.  I don't recall exactly.

17         Q.  Now, you said you had presented to

18  Ms. Houlli a list of items that you had

19  concerning issues at work?

20         A.  Yes.

21         Q.  Was that general issue work issues or

22  work issues with her?

23         A.  There were specific things that she

24  was -- that we had to work together on and it was

25  those issues.

84

1      Q.   So it was issues with her or involving

2   her.

3      A.   Yes, involving her.

4      Q.   Okay.

5      A.   Whether it was in regard to accounting

6   or the cash drawer or procedures for the front

7   counter or whatever.

8      Q.   And she had just told you that she

9   didn't feel comfortable discussing that alone

10   with you?

11     A.   Right.

12     Q.   And that's when Allen was brought in?

13     A.   That's correct.

14     Q.   Was there anyone else you had any

15   performance issues with?

16     A.   I see that -- is Randy Schneider on

17   this list?

18     Q.   No, he's not.  You had issues with

19   Randy Schneider, performance issues?

20     A.   I had disagreements with him about the

21   way to conduct business, among other things.

22     Q.   When did those start?

23     A.   When he came -- when he was officially

24   announced as the V.P. of Sales, which I think was

25   on June 6, 2005.

85

1      Q.    Tell me about what some of those

2  disagreements were.

3      A.    They were in reference to the way to

4  conduct business.

5      Q.    And can you give me some specific

6  examples?

7      A.    He wanted me to introduce him to all of

8  my accounts so that he could sell them these

9  other types of services that he was selling with

10  this other company called Full Spectrum Media,

11  and I felt that that was inappropriate for two

12  reasons:  One, because I felt I had a certain

13  relationship with these accounts and didn't feel

14  that the people that I worked with on a

15  day-to-day basis were the appropriate people to

16  solicit for these other types of services;

17  secondly, I felt that I was being pushed out at

18  that point.

19      Q.    Did he ask you to take him on some of

20  these sales calls?

21      A.    Yes, he did.

22      Q.    Did you ever take him on any of those

23  sales calls?

24      A.    I don't think so, no.

25      Q.    Anyone else besides the two you have

86

1  already named and Randy?

2      A.   Not to the best of my recollection.

3           MR. CASSATA:  Can I just ask something?

4           MR. SMITH:  Sure.

5           MR. CASSATA:  I don't know if you

6      prepared this or not, but someone like Jason

7      Weeks was not on this.  Are there people

8      that -- I don't know what this is exactly.

9           MR. SMITH:  This is a list of

10     employees.

11          MR. CASSATA:  Put together by the

12     defendant or counsel?

13          MR. SMITH:  By the defendant, yes.

14          MR. CASSATA:  Okay.

15          (Discussion off the record)

16  BY MR. SMITH:

17     Q.   Prior to your termination from

18  Chromatek Imaging, were you aware, outside of the

19  three people you have already discussed, were you

20  aware of any employees who had issues with you?

21     A.   Yes.

22     Q.   Can you tell me who those people were?

23     A.   Laura Morales and Karen Houlli.  Those

24  were the ones that I was aware of.  And well, I

25  guess Randy Schneider, as well.

87

1      Q.    Did there come a time when you got

2  access to the company car?  Strike that.

3           Did there come a time when Chromatek

4  Imaging got a company car?

5      A.    I think there was a time when Allen

6  used his van as a company vehicle.

7      Q.    And did there come a time when Allen

8  had certain employees registered to be drivers of

9  that vehicle, essentially?

10     A.    I don't know.

11     Q.    Did there come a time when Allen

12 allowed employees, certain employees to have

13 access to use that van?

14     A.    I think that he at some point mentioned

15 that he was going to put me on his insurance as a

16 driver.

17     Q.    Do you know if he ever did?

18     A.    I don't know.

19     Q.    Did you ever give him any information

20 to put, for him to use in putting you on the

21 company insurance plan?

22     A.    I don't recall.  I mean, I know they

23 had a copy of my driver's license.  I don't

24 recall.

25

88

1          (Thereupon, Defendants' Exhibit

2   Number 14 was marked for Identification.)

3   BY MR. SMITH:

4        Q.   Have you seen this document before?

5        A.   Yes, I have.

6        Q.   Can you to tell me what it appears to

7   be?

8        A.   Driver Management and a policy number.

9        Q.   Has five people listed?

10       A.   Yes.

11       Q.   Are these people that all had access to

12   the company vehicle?

13            MR. CASSATA:   Object to form.

14            THE WITNESS:   I wasn't in charge of

15       making that decision, so I don't know.

16   BY MR. SMITH:

17       Q.   Did you ever use the company vehicle?

18       A.   I never drove Allen's van.  I drove a

19   company vehicle with the previous owners, and

20   that was a Ford Explorer, and when Allen

21   purchased the company, they took the vehicle with

22   them.

23       Q.   Meaning the previous owners took the

24   vehicle with them.

25       A.   Yes, but I don't think I ever drove the

89

1    company van.

2         Q.   Okay.  And you don't recall ever

3    telling Allen that you would be amenable to being

4    added as a driver for the company vehicle?

5         A.   I think he may have mentioned that he

6    was going to add me to the insurance.

7         Q.   Did you tell him no?

8         A.   No, I don't recall what I told him, but

9    I don't think I told him no.

10        Q.   Okay.  I believe you testified earlier

11   that while you were at Chromatek Imaging, you

12   sold approximately $37,000 per month; correct?

13        A.   I think that's right.  I'm not

14   absolutely sure.

15        Q.   That's what's reflected in your

16   Complaint; correct?

17        A.   Yes.

18        Q.   I believe you testified earlier that

19   the number you needed to hit to get commissions

20   was 47,500; correct?

21        A.   That's correct.

22        Q.   Did you ever get any commissions while

23   you were at Chromatek Imaging?

24        A.   Yes.

25        Q.   Do you remember how many times you got

90

1    them?

2        A.   I don't recall exactly the number of

3    times.   I think at least two times.

4        Q.   Do you know if it was more than two?

5        A.   I don't recall.

6            MR. SMITH:   Defendants' Exhibit 15.

7            (Thereupon, Defendants' Exhibit

8    Number 15 was marked for Identification.)

9    BY MR. SMITH:

10       Q.   Have you seen this document before,

11   sir?

12       A.   Yes.

13       Q.   If you can flip through the whole

14   exhibit.   Can you tell me what it appears to be?

15       A.   Looks like my payroll distribution.

16       Q.   Now, you testified earlier that you

17   believed you were paid separate checks for when

18   you made commissions; correct?

19       A.   I thought I was.

20       Q.   Okay.   If you could turn to page

21   Chrom 0101, I believe it's the third page of the

22   packet.   If you look under the -- I apologize,

23   that was the wrong page.   Did I say 101?

24       A.   Yes.

25       Q.   I was on it.   The entry for 12-16.   It

92

1    you see any other dates other than the two we

2    went over where you got more than one paycheck?

3         A.    I'm not sure what the check on page 100

4    is, it's the second one from the bottom,

5    check 105 dated November 1st, '04, I don't know

6    if -- that doesn't seen like the regular amount

7    that I would receive on my payroll.  I don't know

8    what that is, if that's a payroll check or not.

9         Q.    Okay.   There is not two checks for

10   11-1-04, though; correct?

11        A.    Correct.

12        Q.    And the entry immediately before that

13   is 10-15-04 and immediately after that is

14   11-16-04; correct?

15        A.    That's correct.

16        Q.    You were paid on a biweekly schedule?

17        A.    Well, it was -- I'm trying to recall,

18   there was something weird about it, it was like

19   bimonthly or something.

20        Q.    Bimonthly, every two weeks,

21   approximately?

22        A.    Approximately, but it was not biweekly.

23        Q.    Okay.   I apologize, I misspoke.

24             Other than the two dates we discussed,

25   do you see any other dates where you received

93

1   more than one paycheck?

2       A.   No, I don't.

3       Q.   Does that appear to indicate that you

4   were only paid commissions twice?

5       A.   That appears to be correct.

6       Q.   And that's for the time period covering

7   approximately October 1st, '04, through June 15th

8   of '05?

9       A.   Well, the first one is dated 9-17-04.

10      Q.   September 17th of '04, and then

11  June 30th of '05?

12      A.   Yes.

13      Q.   Going back to your proposed contract

14  for Chromatek Imaging, looking at your target

15  sales, your target sales for the year was

16  $570,000; correct?

17      A.   Correct.

18      Q.   I'm not sure how good you are at math,

19  but if you average $37,000 a month in sales, that

20  would be approximately $440,000 per year;

21  correct?

22      A.   I don't have a calculator, but I will

23  take your word for it.

24      Q.   So essentially that's 130,000 less than

25  what was listed as your target sales; correct?

94

1      A.    The target sales was for one full year.

2      Q.    For a full year, $570,000.

3      A.    Right.

4      Q.    Gives you the number 440,000, that's

5   130,000 less than this target sales number;

6   correct?

7      A.    But are these for a full year?

8      Q.    I am basing it off your statement that

9   you were selling approximately $37,000 a month.

10     A.    Right, but those sales were not for a

11  full year.

12     Q.    I understand that.  But averaging

13  $37,000 a month, times 12 months, we come out --

14  we agree that you are going to take my word for

15  it, comes out to be about $440,000 per year;

16  correct?

17     A.    That math sounds correct, but I don't

18  know what my sales would have been.

19     Q.    Okay.  But what you said, you testified

20  that you were selling about $37,000 a month;

21  correct?

22     A.    Approximately, yes.

23     Q.    So using that number, multiplying it by

24  12, we get 440,000; correct?

25     A.    I guess.

102

1    representative of Full Spectrum Media?

2        A.    Yes.

3        Q.    Were you aware of any professional

4    relationship Mr. Schneider had with Mr. Evans at

5    the time?

6        A.    It appeared that they were friends.

7        Q.    Professional relationship?

8        A.    I was not aware of a professional

9    relationship.

10       Q.    After that introduction, do you recall

11   the next time you came in contact with

12   Mr. Schneider?

13       A.    He referred me to some client he had, I

14   think on the West Coast of Florida, for some

15   printing job that he asked me to help him with.

16       Q.    Do you remember when that was?

17       A.    I don't remember when.

18       Q.    Did there come a time when

19   Mr. Schneider started frequenting the office of

20   Chromatek Imaging?

21       A.    He would always come sporadically,

22   relatively infrequently, I would say less than

23   once a month, I would see him around the office.

24       Q.    Did there come a time prior to June of

25   '05 that he would be showing up around the office

103

1  more than once a month?

2       A.   There was two meetings that I had with

3  Randy and Allen that were lunch meetings.

4       Q.   That was prior to June of '05?

5       A.   I think one might have been at the end

6  of May, I don't recall exactly, it was either

7  late May or early June, but both meetings

8  happened pretty close to each other.

9            The first meeting we discussed a plan

10 to have me sell PR services, to kind of work with

11 Randy so that I could sell his services and he

12 could sell Chromatek's services, and he would

13 introduce me to clients and then I could

14 introduce him to clients.  It was proposed to me,

15 this idea was proposed to me at these lunch

16 meetings.

17      Q.   So kind of you scratch my back, I will

18 scratch your back kind of?

19      A.   Yes.  But I was not told he was V.P. of

20 Sales at that those meetings.

21      Q.   Sure.

22      A.   I was not told that he had a business

23 relationship with Allen beyond them just being

24 friends and working together.

25      Q.   Okay.  How much time did you spend in

104

1   the office on average a day at Chromatek Imaging?

2       A.   I would spend the majority of my time

3   at the office, and I would go out as needed.

4   Initially when you are in an outside sales

5   position, you are out a lot more because you are

6   meeting clients and making presentations and that

7   kind of stuff.

8           After you start getting some business

9   coming in, then my role as kind of a project

10  manager to make sure all this work was getting

11  through to the lab required more attention, so at

12  first I was out a lot making sales calls.

13          Later on I was not going out as much

14  because I was managing incoming orders, I was

15  managing accounts and projects more.

16      Q.   Okay.   During the first quarter of

17  2005, did there come a time when you became aware

18  of any issues with Chromatek's cost of goods?

19      A.   Allen brought to my attention a

20  discrepancy in the accounting that he was trying

21  to figure out what it was, and he asked me about

22  it and he showed me some documents that he never

23  left with me, but he showed me some documents and

24  he just asked me if I thought that somebody might

25  be stealing from the company.

105

1    Q.   Do you remember when that conversation

2  was?

3    A.   I believe it was in March of 2005,

4  because the discrepancy happened the month prior,

5  and so it was discovered the following month.

6    Q.   So he was trying to figure out if

7  someone was stealing from the company?

8    A.   That was one of the things he

9  suggested, among others.  He suggested that there

10 was gross errors in the inventory, that maybe it

11 was a payroll issue or overtime issue.  He kind

12 of ran through a whole list of possibilities.

13   Q.   Did he ever share with you any concerns

14 over cash register shortages?

15   A.   I know that there were concerns that

16 were raised by Karen about the cash register

17 shortages, and I don't recall if Allen ever

18 talked to me about them.

19   Q.   Do you recall when Karen raised those

20 concerns?

21   A.   It was early on when Allen bought the

22 company.  She had a lot of problems, I think,

23 just balancing the drawer.  I don't know what

24 specific issues there were in total, but I know

25 some of the things were like missing receipts,

106

1    improper handling of cash transactions by

2    customer service representatives.

3            In fact, at one point, her, Allen and I

4    had a meeting, and I ended up writing a memo to

5    the customer service representatives to reiterate

6    and to implement procedures for conducting

7    transactions and the paperwork that they were

8    supposed to file.

9        Q.    You wrote the memo on that?

10       A.    I wrote the memo under the direction of

11   Allen in a meeting with Karen.

12       Q.    Was that in your capacity as the sales

13   manager?

14       A.    At that time, I was overseeing the

15   customer service representatives, and they were

16   the ones that were handling the cash transactions

17   at the front counter, so yes.

18       Q.    So at that time, was it fair to say

19   that customer service representatives reported to

20   you?

21       A.    Yes.

22       Q.    Now, you have already testified that

23   Allen mentioned to you that he suspected that one

24   of the possible reasons for this cost of goods

25   issues was somebody stealing from the company;

107

1  correct?

2      A.   Yes, he did.

3      Q.   Were you aware of any investigation

4  being conducted by Allen and Karen into that cost

5  of goods issue?

6      A.   I mean, I know, like I said, that Allen

7  was asking me, like we had spoken about it and he

8  was trying to figure out like was it this, was it

9  that, was it an inventory problem, was it

10  somebody stealing, was it payroll, was it

11  overtime, you know, but I didn't know if they

12  were doing an investigation or not.

13     Q.   So you also, I assume, weren't aware if

14  they were doing any kind of investigation into

15  suspected employee theft; correct?

16     A.   Correct.

17          (Thereupon, a lunch recess was taken,

18  after which the following proceedings were had:)

19  BY MR. SMITH:

20     Q.   Mr. Tanis, there came a time you went

21  out sick from Chromatek Imaging; correct?

22     A.   Correct.

23     Q.   Do you remember when that was?

24     A.   It was the end of March -- I'm sorry,

25  yes, the end of March.

113

1  going through your Complaint about June 3rd,

2  2005.  In your Complaint you stated that you

3  accessed your credit report via Equifax at work;

4  correct?

5      A.   That's correct.

6      Q.   You were applying for a home equity

7  loan?

8      A.   Yes.

9      Q.   Did you end up applying for that home

10  equity loan?

11      A.   Yes, I did.

12      Q.   Did you get that loan?

13      A.   Eventually I did get it.

14      Q.   When did you get it?

15      A.   I got it after I was fired from

16  Chromatek.  I don't remember the exact date.

17      Q.   Do you remember when you applied for

18  it?

19      A.   No, I don't recall exactly.

20      Q.   Sometime after June 3rd?

21      A.   I think I applied for it prior to

22  June 3rd.

23      Q.   Did you check your credit report before

24  applying?

25      A.   I don't recall when I checked my credit

114

1    report.  It was on or around the time that I

2    applied for the loan.

3         Q.   Well, you testified earlier in your

4    Complaint, you said you accessed your credit

5    report on June 3rd, 2005; correct?

6         A.   That's correct.  Then I guess I did

7    apply for it prior to June 3rd.

8         Q.   You applied for the loan prior to

9    checking your credit report?

10        A.   Yes.

11        Q.   Why did you check your credit report

12   after you had already applied for the loan?

13        A.   I heard that you can do -- that was the

14   time when they came out with you could do free

15   credit checks at no cost, so I decided to check

16   my credit.

17        Q.   And then you noticed after applying

18   for -- or excuse me, strike that.

19             You noticed after accessing your credit

20   report at work that there was an entry on it from

21   Federal Background Services; correct?

22        A.   Yes.

23        Q.   And I believe in your Complaint, you

24   also state that you then did online research into

25   Federal Background Services?

115

1     A.   Yes, I did a search for Federal

2  Background Services, and found out company

3  information on them.

4     Q.   How long did it take you to pull up

5  your credit report via Equifax?

6     A.   Maybe ten minutes, something like that.

7     Q.   How much time did you spend reviewing

8  it?

9     A.   I don't recall.

10     Q.   Do you remember how much time you spent

11  doing your online research into Federal

12  Background Services?

13     A.   That came up pretty quick.  Probably

14  ten, 15 minutes.  I don't know exactly.

15     Q.   Okay.  And then you made contact with

16  Federal Background Services?

17     A.   Yes, I called them.

18     Q.   And who did you speak to?

19     A.   A lady who identified herself as

20  Melissa.

21     Q.   How long did you speak with her,

22  approximately?

23     A.   It was a brief conversation, maybe ten

24  minutes.

25     Q.   So up to this point, you spent at least

116

1   30 minutes between the credit report, searching

2   for Federal Background Services and speaking with

3   them?

4        A.   At least.

5        Q.   This was on company time?

6        A.   Yes.

7        Q.   Using company equipment.

8        A.   Yes.

9        Q.   What did you ask Melissa?

10       A.   I asked her if she could verify that

11  they had pulled my credit as I had discovered in

12  my Equifax report, and she gave me information

13  that said that they had been authorized to do it

14  by Chromatek, and they gave me the name Karen

15  Houlli, they told me that Karen Houlli had

16  ordered it, and they gave me the date and she

17  gave me a list of the reports that were pulled.

18       Q.   And why were you curious, what made you

19  decide to call Federal Background?

20       A.   Because it was something I hadn't

21  authorized and I wanted to find out what it was.

22       Q.   And you were familiar enough with the

23  Fair Credit Reporting Act at that time to make

24  that decision?

25       A.   I wasn't familiar with the Fair Credit

117

1    Reporting Act, I just knew that there was

2    something suspect on my credit report and I was

3    finding out what it was.

4        Q.   Was there anything else that Melissa

5    told you during that first phone call?

6        A.   Not to my recollection.

7        Q.   Would you say that was a regular habit

8    of yours to do personal work on the company's

9    time?

10       A.   I did personal things on and off

11   company time.

12       Q.   Such as speak on the phone?

13       A.   Yes.

14       Q.   Nonwork-related?

15       A.   Speak on the phone, look at various

16   things on the Internet, have personal

17   conversations.

18       Q.   You were issued a work cell phone;

19   correct?

20       A.   That's correct.

21       Q.   Was that paid for by Chromatek?

22       A.   Yes, it was.

23       Q.   Did you ever use that phone for

24   personal calls?

25       A.   Yes.

118

1    Q.   How often would you use that phone for

2  personal calls?

3    A.   Daily.

4    Q.   Did you have your own cell phone?

5    A.   No.

6    Q.   You had an office phone; correct?

7    A.   Yes.

8    Q.   Would you use that for personal calls?

9    A.   Yes.

10    Q.   How often?

11    A.   On a daily basis, I guess.

12    Q.   Is there a reason why you used the

13  cellular phone rather than the office phone?

14    A.   Convenience.

15    Q.   Would you use --

16    A.   Just depending on where I was.  If I

17  was in the office, I would typically use the

18  office phone.  If I was out, I would typically

19  use the cell phone, or if I got a call on the

20  cell phone, I would typically take the call on

21  the cell phone.

22    Q.   If it was a personal call?

23    A.   Yes.

24    Q.   So you gave out the cell phone's number

25  to nonbusiness-related parties?

119

1    A.    Yes, I did.

2    Q.    Would you ever step out of the office

3 to use the cell phone to make a personal call?

4    A.    Yes.

5    Q.    How often would you do that?

6    A.    Very rarely.

7    Q.    Who were most of these personal phone

8 calls made to?

9    A.    Most of them were my wife.

10    Q.    Okay, going back to the conversation

11 you had with Melissa, you stated that Chromatek

12 had pulled your credit report; correct?

13    A.    No, she stated that to me.

14    Q.    She stated.  She stated that Chromatek

15 had pulled your credit report; correct?

16    A.    Yes, and she told me that the person

17 that had ordered it was Karen Houlli.

18    Q.    And what concerned you about that?

19    A.    That it was something that I didn't

20 authorize.

21    Q.    But it's your employer; correct?

22    A.    Yes.

23    Q.    So what concerned you about your

24 employer doing that?

25    A.    I thought that you needed a written

120

1   signature to pull somebody's credit report,

2   regardless of whenever they were your employer or

3   not.

4       Q.   So it just bothered you that someone,

5   regardless of who they were, pulled your credit

6   report without your permission?

7       A.   Yes, it made me upset.

8       Q.   Okay.  Again, in your Complaint, I

9   believe you said you spoke with Karen Houlli and

10   Allen Evans on that same day, correct, June 3rd?

11       A.   Yes, I did.

12       Q.   How long did that meeting last for?

13       A.   It was very brief because they were

14   both on their way out.

15       Q.   And who called the meeting?

16       A.   I did.

17       Q.   And what did you discuss in that

18   meeting?

19       A.   I basically confronted them with the

20   information that I found out from my Equifax

21   report and my conversation with Federal

22   Background Services.

23       Q.   And again, in your Complaint, I believe

24   you said over the weekend you drafted a

25   memorandum?

121

1          A.    Yes.

2          Q.    And delivered that by hand to Mr. Evans

3    on June 6, 2005?

4          A.    That's correct.

5              (Thereupon, Defendants' Exhibit

6    Number 18 was marked for Identification.)

7    BY MR. SMITH:

8          Q.    Do you recognize this document?

9          A.    Yes, I do.

10         Q.    Is this the memo you prepared?

11         A.    Yes.

12         Q.    Does this accurately reflect the brief

13   conversation you had on June 3rd?

14         A.    Yes.

15         Q.    During that June 3rd conversation with

16   Mr. Evans and Ms. Houlli, did you tell them you

17   believed that that background check was done

18   illegally?

19         A.    I objected to it by confronting them

20   about it.  I think it was very clear that I

21   objected to it in my calling a meeting and

22   bringing it to their attention.

23         Q.    And you also demanded that Ms. Houlli

24   be terminated; correct?

25         A.    In this memo, I did.  During that

122

1    meeting, I did not.

2        Q.    Okay.  I'm just talking about this memo

3    now.

4        A.    Okay.

5        Q.    Why did you demand her termination?

6        A.    Because I thought that she, by pulling

7    my credit report without written consent,

8    violated the law and that she should be fired for

9    it.

10       Q.    Did you ever tell Allen that you

11   would -- during this time period, did you ever

12   tell Allen that it would be a nonissue if he

13   fired Karen?

14       A.    No.

15       Q.    Did you ever have any -- strike that.

16             After learning that Ms. Houlli had

17   ordered a background report on you, did you have

18   animosity towards her?

19       A.    Not -- yes, I did.

20       Q.    You were angry at her?

21       A.    Yes.

22       Q.    You were angry that she had ordered

23   this credit report or background report?

24       A.    I was angry that the report was pulled,

25   yes.

123

1      Q.    Was this the first time you had any

2   animosity towards her?

3      A.    No.

4      Q.    Can you tell me when else you had

5   animosity towards her?

6      A.    There was a couple of times.  One was

7   regarding an office printer.  Shortly after Allen

8   had said that when he was out I was the second

9   one in charge, I was working with Laura Morales

10  and Justin Bordeaux in moving an office printer

11  to a different location where she -- and during

12  the activity, she came out and she stated to --

13  she basically directed me not to do that and

14  walked away, and she walked back to her office.

15          She wasn't really part of that deal

16  that we had going on there, and I felt that it

17  was inappropriate for her to do that.

18     Q.    Let's delve into that for second.  That

19  office printer, was that a new printer?

20     A.    I don't recall.

21     Q.    Was it one of the better printers in

22  the office?

23     A.    It might have been.

24     Q.    What location were you trying to move

25  it to?

128

1    A.   I don't know if it was -- I don't think

2  it was that weekend necessarily, I don't remember

3  if it -- I think it was the following week,

4  actually.

5    Q.   So it was after you had submitted your

6  June 6th memorandum?

7    A.   I think so.

8    Q.   Okay.  Did there come a time after

9  June 6th that you prepared another memorandum to

10 Allen?

11   A.   Yes.

12   Q.   What date was that?

13   A.   I don't recall exactly.  You are

14 probably referring to the one where I asked him

15 to surrender my reports.

16      MR. SMITH:  You knew I was going to do

17    that.  Number 19.

18      (Thereupon, Defendants' Exhibit

19 Number 19 was marked for Identification.)

20 BY MR. SMITH:

21   Q.   Do you recognize this memo?

22   A.   Yes, I do.

23   Q.   Is this the June 8th memo?

24   A.   Yes, it is.

25   Q.   This is the memo you wrote after the

129

1    June 6th?

2        A.    Yes.

3        Q.    Following up on the June 6th?

4        A.    Yes, it is.

5        Q.    And why did you write this memorandum?

6        A.    Because I thought that they had

7    obtained those reports illegally and that they

8    didn't belong to them.

9        Q.    At that point, did you know whether or

10   not they had those reports in their possession?

11       A.    They did not deny having them.

12       Q.    That was not my question, sir.  Did you

13   know whether or not they had those reports at

14   that time?

15       A.    No, I didn't.

16       Q.    Okay.

17       A.    But in my initial confrontation with

18   Allen and Karen on June 3rd, I asked -- I told

19   them what I had found out, and I said something

20   to the effect of don't you need a written

21   authorization in order to pull my credit report,

22   and Karen Houlli's response to that was that it

23   may have been done in error.

24       Q.    The ordering of the report.

25       A.    She didn't say specifically what

130

1   report, but her response was something to effect

2   of it may have been done in error.

3       Q.   But the ordering; correct?  Regardless

4   of what reports were pulled or ordered, the

5   ordering of the report might have been done in

6   error; correct?

7       A.   Correct.  And Allen's response was we

8   do background checks on employees.

9       Q.   Okay.  Now, you asked to have the

10  report returned to you in this June 8th memo;

11  correct?

12      A.   Yes.  This was after I had repeatedly

13  asked verbally for the reports, to which Allen's

14  response was always I'm checking and I will get

15  back to you, I just want to make sure that I'm

16  doing the right thing.

17      Q.   But he never stated that he had the

18  report; correct?

19      A.   He never stated or denied that he had

20  the report.

21      Q.   Okay.  Also in your Complaint,

22  paragraph 38, I am going to backtrack just a

23  second, I apologize, you stated that -- I will

24  let you get the Complaint, sorry -- page 8,

25  paragraph 38.

133

1  had been terminated from Chromatek Imaging?

2        A.    I believe that's true, yes.

3        Q.    At no point during your employment at

4  Chromatek Imaging were you aware that Allen Evans

5  was also the owner of Full Spectrum?

6        A.    I don't recall exactly when I found

7  that out.

8        Q.    Well, he's going to object to the form

9  of this question because I'm going to ask you a

10  hypothetical.

11        I believe you had testified earlier

12  that you had declined a "I will scratch your back

13  if you scratch mine" kind of arrangement with

14  Randy Schneider; correct?

15        MR. CASSATA:   Object to form.

16        THE WITNESS:   Yes, I did.

17  BY MR. SMITH:

18        Q.    And that was concerning Randy Schneider

19  basically wanting to cross-sell company products

20  with you to each other's customers; correct?

21        A.    That's correct.  I felt at that time

22  that I had enough trying to generate sales at

23  Chromatek, and that it would be too much for me

24  to try to sell these other services that I wasn't

25  really familiar with anyways, and when I rejected

134

1   it, at that point I was not aware that he was the

2   V.P. of Sales for Chromatek Imaging.

3       Q.   Okay, and now here's my hypothetical:

4   If Allen was the owner of Full Spectrum Media at

5   that time, would it have been inappropriate for

6   the two companies that Allen owned to cross-sell

7   to each other's customers?

8           MR. CASSATA:   Object to form.

9           THE WITNESS:   I guess it wouldn't have

10      been inappropriate.

11          (Thereupon, Defendants' Exhibit

12  Number 20 was marked for Identification.)

13  BY MR. SMITH:

14      Q.   Do you recognize this document?

15      A.   Yes.

16      Q.   Have you seen a copy of it before?

17      A.   Yes, I have.

18      Q.   Can you tell me what it is?

19      A.   A report on my driver's license.

20      Q.   And this lists your name; correct?

21      A.   Yes.

22      Q.   Your address?

23      A.   Yes.

24      Q.   Driver's license number?

25      A.   Yes.

135

1    Q.   Date of birth?

2    A.   Yes.

3    Q.   And it also lists your driving record,

4 correct, or lack thereof?

5    A.   Yes.

6    Q.   And there is no entries there over the

7 past seven years concerning any violations;

8 correct?

9    A.   That's correct.

10    Q.   And this is one of the items that you

11 were complaining about; correct?

12    A.   Yes.

13    Q.   Were you complaining about this

14 document because you didn't think it was

15 appropriate for your employer to have your

16 driving record?

17         MR. CASSATA:   Object to form.

18         THE WITNESS:   I protested the pulling

19     of all the reports.   There were seven in

20     total.

21 BY MR. SMITH:

22    Q.   What specifically about this report did

23 you object to?

24    A.   That it was unnecessary and

25 unauthorized.

136

1       Q.   I believe you had testified earlier

2   concerning the I-9 form you filled out for

3   Chromatek Imaging; correct?

4       A.   Yes.

5       Q.   And that's Exhibit 10; correct?

6       A.   This one?

7       Q.   Yes.

8       A.   Yes.

9       Q.   That form contains your driver's

10  license number; correct?

11      A.   Yes.

12      Q.   And that's the driver's license?

13      A.   Written by, it looks like in Karen

14  Houlli's handwriting.

15      Q.   And a copy of the driver's license is

16  attached on the second page; correct?

17      A.   Yes.

18      Q.   And you gave that driver's license to

19  Karen Houlli; correct?

20      A.   I believe I gave it to her.

21      Q.   Okay.  Your date of birth is on that

22  driver's license; correct?

23      A.   Yes.

24      Q.   And on this I-9 form?

25      A.   Yes, it is.

137

1     Q.    Your address?

2     A.    Yes.

3     Q.    Your Social Security number is not on

4  this driver's report; correct?

5     A.    Actually, it is.

6     Q.    Where is that?

7     A.    It's in the column Prior DL number.

8     Q.    That's your Social Security number?

9     A.    Yes, it is.

10    Q.    Okay.  So your Social Security number

11  is on the I-9 form; correct?

12    A.    Yes.

13    Q.    Is there any information on Exhibit 20

14  that isn't in Exhibit 10?

15         MR. CASSATA:  Object to form.

16         THE WITNESS:  Yes.

17  BY MR. SMITH:

18    Q.    What's that?

19    A.    The history.

20    Q.    Okay, the history, your driving record

21  is not contained in the Form I-9; correct?

22    A.    Correct.

23    Q.    Is that it?

24         MR. CASSATA:  Object to form.

25         THE WITNESS:  Chromatek's information

138

1        and Karen Houlli's name and signature are

2        not on this report.

3   BY MR. SMITH:

4        Q.   Okay, but is there anything on this

5   report --

6        A.   Oh.

7        Q.   -- that's not contained in the I-9?

8             We have already establish the driving

9   record is not on there, the driving status isn't

10  on there; correct?  The driving status is on

11  Exhibit 20, but not on Exhibit 10; correct?

12       A.   Driving status, where is that?

13       Q.   I'm looking at the last column on the

14  right of the little chart.

15       A.   Yes.

16       Q.   Says Eligible on Exhibit 20.

17       A.   And then on the I-9, it doesn't say it.

18       Q.   Okay.  There is no medical history on

19  either of those documents; correct?

20       A.   Not that I see, no.

21       Q.   All right.  Do you remember when Randy

22  Schneider was made Vice-President of Sales?

23       A.   I was told he was V.P. of Sales on

24  June 6th by Allen.

25       Q.   Is that before or after you delivered

139

1   your memo to Allen?

2        A.    That was right after I delivered my

3   memo to Allen.

4        Q.    Okay.  Do you know why Mr. Schneider

5   was at Chromatek Imaging on June 3rd?

6        A.    He was there to, I'm not sure if -- I

7   don't recall.

8        Q.    Do you know how Mr. Schneider was being

9   compensated?

10       A.    No.

11       Q.    Did you remain a sales manager after

12   Mr. Schneider came on board as the

13   vice-president?

14       A.    I was told that I was still the sales

15   manager.

16       Q.    Did you keep that title?

17       A.    I kept the title, but my duties

18   drastically changed.

19       Q.    On June 6th, did you suffer a decrease

20   in salary?

21       A.    I don't think it was on June 6th, I

22   think it was --

23       Q.    On June 6th, did you have a decrease in

24   salary?

25            MR. CASSATA:   Object to the form.

140

```
 1            THE WITNESS:  I don't recall, I don't

 2      think so.

 3  BY MR. SMITH:

 4      Q.    You said your duties dramatically

 5  changed; correct?

 6      A.    Yes.

 7      Q.    Were you still responsible for doing

 8  sales?

 9      A.    Yes, I was.

10      Q.    Did you still have some authority over

11  the customer service people?

12      A.    It was never said whether I did or not,

13  but I felt like my position in the company

14  changed from one of having a certain level of

15  authority to one of having basically no

16  authority.

17      Q.    Did the number of sales people under

18  you change on June 6th?

19      A.    Under me -- can you please qualify what

20  you mean by under me?  Because when Randy stepped

21  in, he took over the whole show, and I felt like

22  at that point that he was treating me as one of

23  the sales people, so at that point I didn't know

24  who was under me and who wasn't.

25      Q.    Did you still have customer service
```

141

1    people doing administrative tasks for you?

2        A.    Yes.  Elizabeth Menconi did the

3    majority of my administrative work.

4        Q.    Did you train new sales people?

5        A.    I was asked to help train sales people

6    and I did to a degree.

7        Q.    Now, there came a time -- strike that.

8              You testified earlier that you had

9    issues with some of Randy Schneider's sales

10   strategies; correct?

11       A.    It was not just his sales strategies,

12   it was the whole feeling that I had that ever

13   since the thing with the credit report came up, a

14   lot of things seemed to change, Randy was

15   suddenly the V.P. of Sales.

16       Q.    I'm asking you, sir, about your earlier

17   testimony about issues you had with Randy

18   Schneider.

19       A.    Okay.

20       Q.    And I believe one of the things you

21   testified to was the sales strategies; correct?

22       A.    Yes, that was one of them.

23       Q.    And what issues did you have with the

24   sales strategies?

25       A.    Basically that he was inexperienced in

142

```
 1   selling the services we were offering at

 2   Chromatek.

 3        Q.   Okay.

 4        A.   He was asking me basically to train

 5   him, Jason Weeks and J.J. Walker.

 6        Q.   Okay.  Are you familiar with Randy

 7   Schneider's experience in sales?

 8        A.   I know he was a copier salesman for a

 9   while.

10        Q.   Okay.

11        A.   That's basically it.

12        Q.   And still at this the point, you did

13   not know whether or not Mr. Schneider was a

14   business partner with Allen Evans; correct?

15        A.   I don't recall when it dawned on me or

16   when I realized it, but at no time did Allen ever

17   tell me prior to announcing Randy as the V.P. of

18   Sales that Randy was the V.P. of Sales.

19        Q.   To your knowledge at that point in June

20   of '05, was Chromatek Imaging showing a profit?

21        A.   I don't know.

22        Q.   You never had any discussions with

23   anyone about that?

24        A.   I had discussions with Allen and he

25   would run reports and show me the numbers, and
```

143

1  give me general ideas of how we were doing and we

2  would have verbal conversations about it, but as

3  far as like what the actual profitability of the

4  company was, I didn't have access to that

5  information to make that determination.

6      Q.   So you had no idea how well or how

7  poorly the company was doing financially;

8  correct?

9      A.   No.

10      Q.   Did there ever come a time when two new

11  sales people were hired by Chromatek after Randy

12  Schneider's being made a vice-president?

13      A.   Yes, there was an announcement that was

14  posted on I think June 8th that Jason Weeks and

15  J.J. Walker were going to be new sales people.

16          (Thereupon, Defendants' Exhibit

17  Number 21 was marked for Identification.)

18  BY MR. SMITH:

19      Q.   Is this the announcement you were just

20  talking about?

21      A.   Yes.

22      Q.   Did you disagree with the hiring of

23  those two people?

24      A.   My frame of mind at that time, I felt

25  that I was being pushed out of the company, so in

144

1   that sense, yes, I did disagree with it.

2       Q.    Exhibit 21, the June 8 memo, does it

3   list what their backgrounds were, J.J. Walker and

4   Jason Weeks?

5       A.    Yes, it looks like it does, yes.

6       Q.    In looking at their background, do they

7   look like they had the experience sufficient to

8   work in a sales position?

9       A.    To work in a sales position?

10      Q.    Or in a marketing position?

11      A.    Well, which one?

12      Q.    J.J. Walker.

13      A.    No, which, sales or marketing?

14      Q.    Both, sales and marketing.

15      A.    My opinion is that neither one of them

16  had any experience with selling the services that

17  Chromatek offered.

18      Q.    That's wasn't quite my question.

19      A.    Okay.

20      Q.    My question is sales in general.

21      A.    Yes, they have sales experience.

22      Q.    And do you have any idea how

23  J.J. Walker was compensated?

24      A.    No.

25      Q.    Do you have any idea how Jason Weeks

145

1  was compensated?

2      A.   No.

3      Q.   Would it surprise you that Jason Weeks

4  was working on a hundred percent commission?

5      A.   I don't know.

6      Q.   Do you know if anyone had vouched for

7  or recommended J.J. Walker to start working at

8  Chromatek?

9      A.   Can you repeat that, please?

10     Q.   Do you know if anyone had vouched for

11 or recommended J.J. Walker to begin working at

12 Chromatek?

13     A.   It was my impression that both J.J. and

14 Jason were friends of Allen's or of Randy

15 Schneider's or both.

16     Q.   Okay.  Did there come a time when

17 Mr. Schneider asked you to essentially show J.J.

18 Walker the ropes?

19     A.   Yes.

20     Q.   Did he ask you to let him sit in your

21 office?

22     A.   Yes, he did.

23     Q.   Was there a spare table in your office?

24     A.   There was a conference, a small

25 conference table in my office.

150

1  conversation with Mr. Schneider?

2      A.   I don't recall exactly.  I think I

3  learned of it when I was handed the memo by

4  Randy.

5          (Thereupon, Defendants' Exhibit

6  Number 23 was marked for Identification.)

7  BY MR. SMITH:

8      Q.   Is 24 the memo that Mr. Schneider

9  handed you?

10     A.   Yes.

11     Q.   It was changing the structure to a

12 commission basis only; right?

13     A.   That's correct.

14     Q.   10 percent of sales?

15     A.   Yes.

16     Q.   And sales people would continue to get

17 a draw against commissions for the first six

18 months of their employment; correct?

19     A.   New sales personnel.

20     Q.   Is it unusual for a company to set six

21 months as the standard for when they switch the

22 compensation structure for sales people?

23     A.   I don't know.

24     Q.   Is it out of the ordinary?

25         MR. CASSATA:  Object to form.

151

1          THE WITNESS:   I couldn't tell you.   All

2      I know is that it affected me immediately.

3   BY MR. SMITH:

4          Q.   Going back to your employment at Color

5   Reflections, how many months was it after

6   starting there that your salary was adjusted from

7   700 a week to 500 a week?

8          A.   I believe it was after six months.

9          Q.   In the contract that you prepared for

10  your employment at Chromatek Photo Imaging, how

11  many months was it going to be after you started

12  that your salary would be reduced to 40,000

13  annual, to no less than 40,000 annual?

14         A.   I believe that was also six months.

15         Q.   You are currently working at T-Square

16  Express; correct?

17         A.   That's correct.

18         Q.   Your initial salary -- strike that.

19              Your salary changed after your first

20  three months there; correct?

21         A.   That's correct.

22         Q.   And it changed again after your second

23  three months; correct?

24         A.   Correct.

25         Q.   And that was the last change?

152

1      A.    I believe so, yes.

2      Q.    So after six months, you had your last

3  change?

4      A.    Yes.

5      Q.    So now I will repeat my earlier

6  question, is it out of the ordinary for a company

7  to change its compensation structure for sales

8  people after six months?

9            MR. CASSATA:   Object, form.

10           THE WITNESS:   If you are asking if it's

11     out of the ordinary for routine business,

12     no.

13  BY MR. SMITH:

14     Q.    Okay.

15     A.    If you are asking if it's out of the

16  ordinary --

17     Q.    That's all I was asking, thank you.

18           Now, according to your Complaint, the

19  only person that was going to be affected by this

20  compensation change was yourself, correct, or

21  immediately impacted by the compensation

22  structure?

23     A.    That was my understanding, yes.

24     Q.    And at that time, you did not know what

25  the compensation structure was for Mr. Schneider

153

1 or Mr. Weeks; correct?

2    A.    It was my understanding -- no.

3    Q.    Would you be surprised to know that

4 they both were paid a hundred percent commission?

5    A.    I couldn't tell you if I would be

6 surprised or not.

7    Q.    Because you did not know what their

8 compensation structure was.

9    A.    Right.

10   Q.    And what was your salary at the time

11 prior?

12   A.    At that time, it was 57,000 a year.

13   Q.    And your salary is never below 57,000 a

14 year up until your termination; correct?

15   A.    Correct.

16   Q.    At Chromatek Imaging.

17       So in order -- under the new structure,

18 in order for you to make $57,000 a year, you

19 would have to sell $570,000 worth of product;

20 correct?

21   A.    Per year, yes.

22       MR. CASSATA:  I'm sorry, I didn't catch

23   that.

24       MR. SMITH:  In order for him to make

25   $57,000 a year, he would have had to sell

154

1    under this new structure $570,000.

2         MR. CASSATA:  Oh, I see what you mean.

3    BY MR. SMITH:

4         Q.   It's a 10 percent base commission on

5    all sales; correct?

6         A.   That's correct.

7         Q.   And the old structure was you got a

8    10 percent commission on all sales over $47,500;

9    correct?

10        A.   That's correct.

11        Q.   So if you sold $47,500 a month, you

12   would make $57,000 under the new compensation

13   structure.

14        A.   That's correct.

15        Q.   Did you speak with Randy about this

16   change after he had given you the memo?

17        A.   Yes, I did.

18        Q.   How many times did you speak with him?

19        A.   I called him later that day from my

20   cell phone and I tried to call -- we had kind of

21   a heated discussion, and then I tried to call him

22   back to kind of resolve it, and I was not able to

23   get through to him.

24        Q.   And he was the vice-president at the

25   time; correct?

155

1    A.    Correct.

2    Q.    Did you ever tell him that he was

3  nothing but a puppet for Mr. Evans?

4    A.    I may have said that.

5    Q.    Did you tell him he knew nothing about

6  the business?

7    A.    I may have said that.

8         MR. CASSATA:   I'm sorry, what day is

9    this that you are talking about?

10  BY MR. SMITH:

11    Q.    This is June 17th, I believe, on or

12  around June 17th.   Correct?

13    A.    I'm not sure of the date.   I thought it

14  might have been the same day that I got this

15  memo.

16    Q.    June 15th?

17    A.    But I'm not absolutely sure.

18    Q.    Somewhere in that general time period.

19    A.    Yes.

20    Q.    You made that phone call.

21    A.    Yes.

22    Q.    Quickly going back to Laura Morales, I

23  believe you said that you weren't aware why she

24  stepped down from her production manager

25  position; correct?

156

1      A.    I don't know what reason she gave

2  Allen, but Allen communicated to me something to

3  the effect that it was too much for her.

4      Q.    Do you have any idea if she blamed her

5  having to step down on her relationship with you?

6      A.    I was not aware of it that that was her

7  reason.

8      Q.    Did you ever push Ms. Morales with

9  deadlines?

10     A.    All the time.

11     Q.    Did you ever tell her she was

12 insubordinate if she wasn't making a deadline?

13     A.    I wanted to write her up for being

14 insubordinate for blowing up at me in front of

15 other employees, and Allen told me to hold off on

16 it.

17     Q.    Can you tell me when that happened?

18     A.    It was at some point, I think after I

19 had come back from my surgery.

20     Q.    Do you know why she blew up at you?

21     A.    I can't speak for her.

22     Q.    Do you recall what she said when she

23 blew up at you?

24     A.    Something, it was something about maybe

25 in relation to me putting pressure on her to get

157

1  the work done.

2       Q.    Okay.

3       A.    Because I had been out for that period

4  of time, a lot of the commercial accounts, the

5  work for the commercial accounts had been

6  neglected.

7       Q.    Okay.  Do you recall having a meeting

8  with Ms. Morales in the morning in the kitchen at

9  Chromatek Imaging in or around March 2005?

10      A.    I don't recall.  I may have.

11      Q.    Do you recall at that meeting, if there

12 was such a meeting, asking her if she had

13 something personal with you?

14      A.    I may have asked her that.

15      Q.    Do you recall what her response was?

16      A.    No.

17      Q.    Do you recall asking Ms. Morales at

18 some point to hire a friend of yours for a couple

19 days as a production supervisor or to work in the

20 production department?

21      A.    Can you repeat that?  I didn't --

22      Q.    Do you recall asking Ms. Morales at

23 some point to hire a friend of yours to work for

24 a day or two in the production department?

25      A.    To hire a friend of mine?

158

1      Q.    Angel?

2      A.    Yes.

3      Q.    Can you tell me about that?

4      A.    We had outsourced -- we would typically

5   outsource certain things that we couldn't produce

6   in-house, and there was a project that I had for

7   creating these wooden bases that we weren't set

8   up to produce in-house, so I contacted Angel

9   Perez and used him for outsourcing these

10  materials.

11     Q.    And you wanted him to come work

12  in-house for a couple of days?

13     A.    Yes, at some point, I -- not as a

14  production manager.

15     Q.    But just in the production department

16  in general?

17     A.    In the production, yes, I recommended

18  that.

19     Q.    Now, is that something that she would

20  have the authority to sign off on?

21     A.    Laura?

22     Q.    Yes.

23     A.    She was involved in overseeing

24  production personnel.

25     Q.    Wouldn't Mr. Evans be the person that

159

1   would have to sign off on any hiring, temporary

2   or otherwise?

3       A.   Yes, he would have the final say.

4       Q.   Okay.  In the confrontation that you

5   had testified earlier about where you said that

6   Laura Morales blew up at you, was that in the

7   digital department?

8       A.   Yes, it was.

9       Q.   Was that in front of Justin Bordeaux

10  and Fernando Cruz?

11      A.   Yes, it was.

12      Q.   And that was after you had pushed her

13  to get a job completed for you?

14      A.   Possibly.

15      Q.   And she was the production manager;

16  correct?

17      A.   Yes.

18      Q.   And you were the sales manager.

19      A.   That's correct.

20      Q.   So each manager of your own

21  departments; correct?

22      A.   As I said, my role was also --

23      Q.   But in title, you were both --

24      A.   My title as sales manager, correct.

25      Q.   And you were unaware of whether or not

160

1   Ms. Morales ever complained to Mr. Evans about

2   you, correct, prior to your termination?

3       A.   I don't recall.

4       Q.   Okay.  You testified earlier concerning

5   a meeting you had with Karen Houlli and Mr. Evans

6   in or around January of 2005; correct?

7       A.   Yes.

8       Q.   And that was after you had brought a

9   list of issues that you wanted to discuss

10  involving Ms. Houlli to Mr. Evans' attention;

11  correct?

12      A.   That's correct.

13      Q.   Were you aware that as a result of that

14  meeting, Ms. Houlli submitted a letter of

15  resignation?

16      A.   No.

17      Q.   You testified earlier that Karen Alper

18  was a person that you had recommended for hiring;

19  correct?

20      A.   Yes.

21      Q.   Were you aware of any complaints she

22  had concerning you?

23      A.   No.  At that time, no.

24      Q.   When she was hired, you were still the

25  sales manager; correct?

161

1     A.    Yes.

2     Q.    Mr. Schneider was not the

3  vice-president at that time; correct?

4     A.    To my knowledge, no.

5     Q.    So would it be fair to say that you

6  were the person that was in charge of her

7  training?

8     A.    Yes.

9     Q.    Would it be fair to say that her

10  success as a sales person was dependent on the

11  training that you gave her initially?

12     A.    No, her success as a sales person is

13  dependent on her own abilities.

14     Q.    Would one factor in her success be the

15  support and training that her sales manager gave

16  her?

17     A.    Yes.

18     Q.    Would it be fair to say that if she

19  didn't feel she was getting the proper support,

20  that she wouldn't feel that she would be able to

21  excel as a sales person?

22     A.    I couldn't tell you what her feelings

23  are.

24     Q.    We are almost done.

25          I just want to ask you a little bit

169

1        five minute break.

2            (Thereupon, a recess was taken, after

3    which the following proceedings were had:)

4    BY MR. SMITH:

5        Q.    Just a few more things.

6            Were you aware that after you had

7    applied for a home equity loan -- strike that.

8            Who did you apply for a home equity

9    loan from?

10       A.    I applied through Lending Tree.

11       Q.    Do you know if Lending Tree sends out

12   Verification of Employment requests after

13   receiving those?

14       A.    Yes.   I told them at the time, because

15   my application was in process when I was fired, I

16   told them that I was fired.

17       Q.    Okay.

18       A.    And they said that they would keep my

19   file not active, but they would hold my file, and

20   if I was to gain employment that I should contact

21   them right away and then they can proceed with

22   my --

23       Q.    So your home equity loan was held up

24   because of your termination.

25       A.    That's correct.

170

1      Q.    Okay.  And that was the sole reason it

2  was held up?

3      A.    Yes.

4            MR. CASSATA:   Object to form.

5            THE WITNESS:   As far as I know.

6            (Thereupon, Defendants' Exhibit

7  Number 26 was marked for Identification.)

8  BY MR. SMITH:

9      Q.    Have you seen this document before?

10     A.    I don't recall.

11     Q.    Can you tell me what it appears to be?

12     A.    A Request for Verification of

13 Employment.

14     Q.    And can you tell me who completed it --

15 can you tell me who it was directed to?

16     A.    It was directed to Chromatek Imaging.

17     Q.    Can you tell me who appears to have

18 filled it out on behalf of Chromatek Imaging?

19     A.    Well, I see Karen Houlli's signature at

20 the bottom, so it may have been filled out by

21 her.

22     Q.    Okay.  Is there any information on this

23 form that's inaccurate?

24           MR. CASSATA:   Object to form.

25           THE WITNESS:   I would have to check it

174

1       A.    Yes, it's notes that I made on

2   June 3rd.

3       Q.    Which was during your phone call with

4   Melissa and then during your meeting or after

5   your meeting with Allen and Karen?

6       A.    I'm not sure exactly when I made the

7   notes, but it was sometime in and around that

8   time.

9       Q.    Okay.  Now in your notes, you said

10  that, "Ms. Houlli made it sound like she wasn't

11  even aware of it by saying it was 'probably an

12  error.'"

13          By "it," did you mean the pulling of

14  the credit report or the viewing of the credit

15  report?

16      A.    It was in reference to pulling the

17  credit report and the other reports.

18      Q.    And you go on to say, "but wouldn't she

19  have known for sure after she reviewed the

20  report?"

21      A.    Right.

22      Q.    And you meant by that, if she had

23  reviewed the report, she would know whether or

24  not she accidentally ordered it?

25      A.    Correct.

175

1     Q.   Okay.  On the next page, notes from

2   June 6, 2005.

3     A.   Um-hum.

4     Q.   And this was after you submitted your

5   memorandum to Mr. Evans?

6     A.   Yes.

7     Q.   Which was after the announcement that

8   Randy was going to be vice-president?

9     A.   Right.

10     Q.   That first line says "losing money."

11   Correct?

12     A.   Yes.  Allen -- these are notes from my

13   meeting with Allen, and he was telling me that

14   the company was losing money.

15     Q.   Now, earlier you testified that you

16   weren't aware of how the company was doing around

17   that time; correct?

18          MR. CASSATA:  Object to form.

19          THE WITNESS:  Up to that point,

20     correct.

21   BY MR. SMITH:

22     Q.   But on June 6th, you were aware that

23   according to Mr. Evans, Chromatek was losing

24   money; correct?

25     A.   Yes, that's when he stated this, yes.

185

1   through the grapevine and he came to me

2   concerned.

3       Q.   Have you ever spoken to Harvey Tucker

4   from Federal Background Services?

5       A.   No.

6       Q.   I'm looking in answer to interrogatory

7   number 3, under T-Square Express, you get $400 a

8   month for car allowance?

9       A.   That's correct.

10      Q.   Have you ever been arrested?

11      A.   No.

12      Q.   In your answer to interrogatory 9, the

13  last paragraph of the answer, you say, "I may

14  have lost the commission I would have earned on

15  orders in production when I was fired."  Correct?

16      A.   Yes.

17      Q.   And you testified earlier that you only

18  made commission twice out of the -- two months

19  out of the nine months you were employed by

20  Chromatek Imaging; correct?

21      A.   Correct.

22           MR. SMITH:  I believe I'm done.  I just

23      need one more minute to make sure.

24  BY MR. SMITH:

25      Q.   I have two more questions and that will

190

1      A.   He never gave me something that says

2    here is what you need to sell every month.

3      Q.   Did you have an unwritten goal or

4    understanding?

5      A.   He said that if we sold $100,000 a

6    month, that that was kind of our break-even

7    point; so if the whole company did $100,000, that

8    was about our break-even point.

9      Q.   So he was looking for the sales

10   department to sell a minimum of $100,000 a month.

11     A.   Well, that was for a combination of the

12   walk-in business through the front counter and

13   the outside sales from myself and the other sales

14   people.

15     Q.   But he wanted the emphasis to be on

16   outside sales; correct?

17     A.   I don't know.

18          MR. SMITH:  That's all I have.

19     Anything else?

20          MR. CASSATA:  No.

21          THE REPORTER:  Do you waive reading and

22     signing?

23          MR. CASSATA:  Yes.  I mean, it's really

24     up to you.

25          THE WITNESS:  What?

192

1              CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF MIAMI-DADE

4              I, the undersigned authority, certify

5    that WILLIAM SCOTT TANIS personally appeared

6    before me and was duly sworn.

7              WITNESS my hand and official seal.

8    this 24th day of March, 2006.

9

10

11    _____

      JEANNE L. VOLK

12    Notary Public - State of Florida

      My Commission No. DD195715

13    Expires:  May 1, 2007

14

15

16

17

18

19

20

21

22

23

24

25

193

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

      I, JEANNE L. VOLK, Court Reporter
and Notary Public, certify that I was authorized
to and did stenographically report the deposition
of WILLIAM SCOTT TANIS; that a review of the
transcript was not requested; and that the
transcript is a true and complete record of my
stenographic notes.

      I further certify that I am not a
relative, employee, attorney, or counsel of any
of the parties, parties' attorney, or counsel
connected with the action, nor am I financially
interested in the action.

      DATED this 24th day of March, 2006.


_____
JEANNE L. VOLK, Court Reporter

**Employment Agreement between**
**W. Scott Tanis and Chromatek Photo Imaging**

**Position**
Sales Manager for Chromatek Photo Imaging
3400 Powerline Road
Fort Lauderdale, FL 33309

**Duration**
One year. This agreement will automatically renew itself unless a written termination of
the contract is submitted by either party 30 days prior to the end of the agreement.

**Responsibilities**
To develop and expand the business through outside sales, account management, and
marketing programs. Includes soliciting prospects through cold calling, setting
appointments, making presentations, providing estimates, writing orders, managing
projects, and arranging terms. Will also maintain and develop relationships with new and
existing accounts. As the company grows, I will also oversee and act as manager for any
new and existing sales and administrative personnel. I will conduct sales meetings and
help associates with sales related activities, approve estimates, and participate in
marketing activities.

**Target Sales**
Will be set per quarter and are as follows:

| Quarter | Target Sales |
|---------|--------------|
| 1 | $120,000 |
| 2 | $135,000 |
| 3 | $150,000 |
| 4 | $165,000 |
| Total one year from start date: | $570,000 |

**Benefits**
Health insurance, vacation time, sick time, and retirement plan are part of the standard
company benefits are provided to me as an employee of the company.

**Compensation**
Will be based on salary plus commission. The salary will be in the sum of $48,000 per
year payable weekly. The salary may be reduced after six months to no less than $40,000
per year. A commission of 10% will be paid on gross sales for any of my prospects or
accounts whether they are brought in by me, received by the company through the mail,
or taken at the company's place of business without my assistance. A sale is considered
complete at the time of invoicing, not based on the terms provided to the customer.
Commission will be paid on a monthly basis on the first Friday of each month and will be
figured by subtracting the monthly salary from 10% of the gross monthly sales. No
underage, should it occur, shall be subtracted from future month's commissions.
Commissionable sales include outsourced services marked up by at least 30% and will
include packing, handling, and other charges incidental to the performance of said
services.

DEPOSITION
EXHIBIT

**Bonuses**
Bonuses are additional to salary and commission and will be paid quarterly based on gross quarterly sales according to the following schedule:

| Gross Quarterly Sales | Bonus |
|---|---|
| $120,000 to $160,000 | 0.25% |
| $160,000 to $200,000 | 0.50% |
| $200,000 to $240,000 | 0.75% |
| $240,000 to $280,000 | 1.00% |
| $280,000 and above | 1.00% |

**Expanding Sales Commission**
Sales from new and existing salespersons and administrative personnel which result from marketing, hiring, and sales related activities will be considered new sales or new house accounts and will be paid according to the same bonus plan described in this agreement. A commission of at least 1.00% of the gross amount of any new sales by other associates as defined here will be paid on a monthly basis in addition to the regular salary, commission, and bonus schedule.

**Company's Responsibility**
Chromatek agrees to provide, implement, or purchase the following immediately upon the commencement of this contract:

1. Hire a person to work in the digital department to perform duties including making layouts for customer approval, archiving, and preparing files for imaging.
2. Procure a new or used mounting machine that can accommodate 48" substrates.
3. Expand into adjacent owned building to acquire additional 1500 square feet of usable space.
4. Implement any changes needed to accommodate increased production volume.
5. Augment pick up, delivery, shipping, handling, and packing services.
6. New PC based laptop or desktop computer for my use.
7. Company paid cell phone.
8. E-mail account with high-speed Internet access.
9. Desk / office with phone, calculator, and file cabinet.

**Continued Company Success**
Upon proven, continuing success of the company during and beyond the length of this agreement, Chromatek agrees to provide additional compensation and support including but not limited to:

1. Promotions
2. Administrative assistant
3. Participation in profit sharing or stock option program
4. Company car
5. Involvement in equipment purchases
6. Negotiating with suppliers
7. Company credit card
8. Salary increases

## Expenses Paid by Company

1. Meals with customers
2. Cell phone and service
3. Gifts for customers
4. Social events with customers
5. $500.00 monthly car allowance or use of company vehicle.

**Compensation Examples**

**Example A**

| Month | Sales | Quarterly Totals | Comm. (10%) | Bonus | Salary |
|-------|-------|------------------|-------------|-------|--------|
| January | 40,000 | | | | |
| February | 40,000 | | | | |
| March | 40,000 | 120,000 | 12,000 | 300 | 12,000 |
| April | 45,000 | | | | |
| May | 45,000 | | | | |
| June | 45,000 | 135,000 | 13,500 | 337.50 | 12,000 |
| July | 50,000 | | | | |
| August | 50,000 | | | | |
| September | 50,000 | 150,000 | 15,000 | 375 | 10,000 |
| October | 55,000 | | | | |
| November | 55,000 | | | | |
| December | 55,000 | 165,000 | 16,500 | 825 | 10,000 |
| | | | | | |
| Totals | | 570,000 | 57,000 | 1,837.50 | 44,000 |

| | |
|---|---|
| Salary / Commission | 57,000 |
| Bonuses | 1,837.50 |
| **Total Gross Annual Income** | **$58,837.50** |

**Example B**

| Month | Sales | Quarterly Totals | Comm. (10%) | Bonus | Salary |
|---|---|---|---|---|---|
| January | 60,000 | | | | |
| February | 60,000 | | | | |
| March | 60,000 | 180,000 | 18,000 | 900 | 12,000 |
| April | 70,000 | | | | |
| May | 70,000 | | | | |
| June | 70,000 | 210,000 | 21,000 | 1,575 | 12,000 |
| July | 80,000 | | | | |
| August | 80,000 | | | | |
| September | 80,000 | 240,000 | 24,000 | 2,400 | 10,000 |
| October | 90,000 | | | | |
| November | 90,000 | | | | |
| December | 90,000 | 270,000 | 27,000 | 2,700 | 10,000 |
| | | | | | |
| **Totals** | | | **900,000** | **90,000** | **7,575** | **44,000** |

| | |
|---|---|
| Salary / Commission | 90,000 |
| Bonuses | 7,575 |
| **Total Gross Annual Income** | **$97,575** |

**Example C**

| Month | Sales | Quarterly Totals | Comm. (10%) | Bonus | Salary | Other Sales by Associates and House Accounts |
|---|---|---|---|---|---|---|
| January | 60,000 | | | | | |
| February | 60,000 | | | | | |
| March | 60,000 | 180,000 | 18,000 | 1,575 | 12,000 | 30,000 |
| April | 70,000 | | | | | |
| May | 70,000 | | | | | |
| June | 70,000 | 210,000 | 21,000 | 2,450 | 12,000 | 35,000 |
| July | 80,000 | | | | | |
| August | 80,000 | | | | | |
| September | 80,000 | 240,000 | 24,000 | 2,800 | 10,000 | 40,000 |
| October | 90,000 | | | | | |
| November | 90,000 | | | | | |
| December | 90,000 | 270,000 | 27,000 | 3,150 | 10,000 | 45,000 |
| | | | | | | |
| **Totals** | | | **900,000** | **90,000** | **9,975** | **44,000** | **150,000** |

| | |
|---|---|
| Salary / Commission | 90,000 |
| Commission from Other Sales | 1,500 |
| Bonuses (Includes other Sales) | 9,975 |
| **Total Gross Annual Income** | **$101,475** |

This agreement is executed by and between Joao and Rosa Castro, owners of Chromatek Photo Imaging, whose address is 3400 Powerline Road, Fort Lauderdale, Florida, 33309 and William Scott Tanis, whose address is 11600 SW 57th Street, Cooper City, Florida, 33330 on the 2 5 day of February, 20 04, to become effective as of March 8 , 20 04 . Either party may choose to terminate this agreement at any time with 30 days prior written notice.

Signed:

Joao Castro (Owner) _____

Rosa Castro (Owner) _____

William Scott Tanis (Sales Manager) _____

APPLICATION FOR EMPLOYMENT

# APPLICATION FOR EMPLOYMENT
## PRE-EMPLOYMENT QUESTIONNAIRE
### EQUAL OPPORTUNITY EMPLOYER

## PERSONAL INFORMATION

DATE 1-27-04

| NAME (LAST NAME FIRST) | | SOCIAL SECURITY NO. |
|---|---|---|

PHONE NO. (954) 689-0865

REFERRED BY

## EMPLOYMENT DESIRED

| POSITION | DATE YOU CAN START | SALARY DESIRED |
|---|---|---|

ARE YOU EMPLOYED NOW? [X] [ ]   IF SO MAY WE INQUIRE OF YOUR PRESENT EMPLOYER? [ ] [X]

EVER APPLIED TO THIS COMPANY BEFORE? [ ] YES [X] NO   WHERE?   WHEN?

## EDUCATION HISTORY

| | NAME & LOCATION OF SCHOOL | YEARS ATTENDED | DID YOU GRADUATE? | SUBJECTS STUDIED |
|---|---|---|---|---|
| GRAMMAR SCHOOL | | | | |
| HIGH SCHOOL | | | | |
| COLLEGE | | | | |
| TRADE, BUSINESS OR CORRESPONDENCE SCHOOL | | | | |

## GENERAL INFORMATION

SUBJECTS OF SPECIAL STUDY/RESEARCH WORK OR SPECIAL TRAINING/SKILLS

## FORMER EMPLOYERS (LIST BELOW LAST FOUR EMPLOYERS, STARTING WITH LAST ONE FIRST)

| DATE MONTH AND YEAR | NAME & ADDRESS OF EMPLOYER | SALARY | POSITION | REASON FOR LEAVING |
|---|---|---|---|---|
| FROM July '98 TO Present | Color Reflections 3901 SW 47 Ave | | Sales | |
| FROM Feb '96 TO Jul '98 | DNA | | Sales | |

DEPOSITION EXHIBIT
Def 9
2-24-06

Adams 9661
APR 1998

**APPLICATION FOR EMPLOYMENT**

CONTINUED ON OTHER SIDE

Chrom 0020

REFERENCES — GIVE BELOW THE NAMES OF THREE PERSONS NOT RELATED TO YOU WHOM YOU HAVE KNOWN AT LEAST ONE YEAR.

| NAME | ADDRESS | BUSINESS | YEARS KNOWN |
|---|---|---|---|
| Alain Rodriguez | | Accountant | 5 |
| Valery Castillo | | Salon Owner | 6 |

## AUTHORIZATION

   "I certify that the facts contained in this application are true and complete to the best of my knowledge and understand that, if employed, falsified statements on this application shall be grounds for dismissal.

   I authorize investigation of all statements contained herein and the references and employers listed above to give you any and all information concerning my previous employment and any pertinent information they may have, personal or otherwise, and release the company from all liability for any damage that may result from utilization of such information.

   I also understand and agree that no representative of the company has any authority to enter into any agreement for employment for any specified period of time, or to make any agreement contrary to the foregoing, unless it is in writing and signed by an authorized company representative.

   This waiver does not permit the release or use of disability-related or medical information in a manner prohibited by the Americans with Disabilities Act (ADA) and other relevant federal and state laws."

DATE __1-27-04__ SIGNATURE _____

INTERVIEWED BY _____ DATE _____

## —— DO NOT WRITE BELOW THIS LINE ——

## REMARKS

1st day — March 05, 2004 Friday

DL# — T520 937 633800

D.O.B → Oct. 20, 63

| NEATNESS | CHARACTER |
|---|---|
| PERSONALITY | ABILITY |

| HIRED | FOR DEPT. | POSITION | WILL REPORT | SALARY WAGES |
|---|---|---|---|---|
| | | | | |

APPROVED: 1. _____   2. _____   3. _____
EMPLOYMENT MANAGER      DEPARTMENT HEAD      GENERAL MANAGER

This application for employment is sold only for general use throughout the United States. Adams assumes no responsibility and hereby disclaims any liability for the inclusion in this form of any questions or requests for information upon which a violation of local, state and/or federal law may be based. It is the user's responsibility to ensure that this form's use complies with applicable laws, which change from time to time.

Chrom 0021

U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0135
Employment Eligibility Verification

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. ANTI-DISCRIMINATION NOTICE. It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins.

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| Tanis | William | S | |

| Address (Street Name and Number) | Apt. # | Date of Birth (month/day/year) |
|---|---|---|
| 11600 SW 57 St | | 10-20-63 |

| City | State | Zip Code | Social Security # |
|---|---|---|---|
| Cooper City | FL | 33330 | 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 |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
- [X] A citizen or national of the United States
- [ ] A Lawful Permanent Resident (Alien # A
- [ ] An alien authorized to work until
  (Alien # or Admission #

| Employee's Signature | Date (month/day/year) |
|---|---|
| | 11-2-04 |

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
|---|---|
| | |

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|
| | |

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: | | FL Dept of Motor Vehicles | | |
| Issuing authority: | | Drivers License | | |
| Document #: | | T520-931-63-380-0 | | |
| Expiration Date (if any): ___/___/___ | | 10 20 09 | | ___/___/___ |
| Document #: | | | | |
| Expiration Date (if any): ___/___/___ | | | | |

**CERTIFICATION** - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) 11.5.104 and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment.)

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| | Karen Haulli | Accounting Manager |

| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|---|
| Chromatek Imaging | 3400 Powerline Rd. FL 33309 | 11/05/04 |

**Section 3. Updating and Reverification.** To be completed and signed by employer.

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|
| | |

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

| Document Title: | Document #: | Expiration Date (if any): ___/___/___ |
|---|---|---|

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|
| | |

Form I-9 (Rev. 11-21-91) N



DEPOSITION EXHIBIT
Dep't 10
2-24-06



# EMPLOYMENT AGREEMENT

On this _____ day of October 2004, Chromatek Imaging, Inc., a Florida Corporation (the "Company") and W. Scott Tanis ("Mr. Tanis") agree to the terms and conditions set forth below (the "Agreement").

**1. Position**
Sales Manager for Chromatek Imaging
3400 Powerline Road
Fort Lauderdale, FL 33309

**2. Duration**

This Agreement shall be for a term of one (1) year from the date hereof unless terminated by either party with sixty (60) days prior written notice.

**3.Responsibilities**
To develop and expand the business through outside sales, account management, and marketing programs. Includes soliciting prospects through cold calling, setting appointments, making presentations, providing estimates, writing orders, managing projects, and arranging terms. Mr. Tanis will also maintain and develop relationships with new and existing accounts. As the Company grows, Mr. Tanis will also oversee and act as manager for any new and existing sales and administrative personnel. Mr. Tanis will conduct sales meetings and help associates with sales related activities, approve estimates, and participate in marketing activities. Mr. Tanis shall diligently perform all services, to the best of his ability, at such times and at such places, as may be assigned to him from time to time by the Company's President.

**4. Target Sales**
Will be set per quarter and are as follows:

| Quarter | Target Sales |
|---------|--------------|
| 1 | $120,000 |
| 2 | $135,000 |
| 3 | $150,000 |
| 4 | $165,000 |
| Total one year from start date: | $570,000 |

**5. Benefits**
As an employee of the company, Mr. Tanis is eligible for the standard benefit package.

**6. Compensation**



DEPOSITION EXHIBIT

Will be based on salary plus commission. The salary will be in the sum of $57,000 per year payable on the Company's regularly scheduled payroll dates. A commission of 10% will be paid on the gross sales for all prospects or accounts that are a result of the direct efforts of Mr. Tanis.   A sale is considered complete at the time of invoicing, not based on the terms provided to the customer.  Commission will be paid on a monthly basis on the first Friday of each month and will be figured by subtracting the monthly salary from 10% of the gross monthly sales.  No underage, should it occur, shall be subtracted from future month's commissions.  Commissionable sales include outsourced services marked up by at least 30% and will include packing, handling, and other charges incidental to the performance of said services.

## 7. Bonuses

Bonuses are additional to salary and commission and will be paid quarterly based on gross quarterly sales according to the following schedule:

| Gross Quarterly Sales | Bonus |
|---|---|
| $120,000 to $160,000 | 0.25% |
| $160,000 to $200,000 | 0.50% |
| $200,000 to $240,000 | 0.75% |
| $240,000 to $280,000 | 1.00% |
| $280,000 and above | 1.00% |

## 8. Expanding Sales Commission

Sales from new salespersons supervised by Mr. Tanis that result from marketing and sales related activities will be considered new sales or new house accounts.  A commission of at least 1.00% of the gross amount of any new sales by other associates supervised as defined herein will be paid on a monthly basis in addition to the regular salary, commission, and bonus schedule.

The term "Other Associates" as defined in this paragraph 8 shall mean only those employees of the Company and not other sales organizations whose services are contracted by the Company.

## 9. Restrictive Covenants.

(a). Mr. Tanis shall not at any time divulge, communicate, use to the detriment of the Company or for the benefit of any other person or persons, or misuse in any way, any Confidential Information (as hereinafter defined) pertaining to the business of the Company.  For purposes of this Agreement, "Confidential Information" means information disclosed to Mr. Tanis or known by Mr. Tanis as a consequence of or through the unique position of his employment with the Company, and not generally or publicly known, about the Company or its employees, clients, customers or business. Notwithstanding the foregoing, nothing herein shall be deemed to restrict Mr. Tanis from disclosing Confidential Information to promote the best interests of the Company or to the extent required by law.

( b ). It is recognized and hereby acknowledged by the parties hereto that a breach by Mr. Tanis of any of the restrictive covenants contained in paragraph 9 (a) of this Agreement will cause irreparable harm and damage to the Company, the monetary amount of which may be virtually impossible to ascertain, and for which it will have no adequate remedy at law. As a result, Mr. Tanis recognizes and hereby acknowledges that the Company shall be entitled to an injunction from any court of competent jurisdiction enjoining and restraining any violation of any or all of the restrictive covenants contained in paragraph 9(a) of this Agreement by Mr. Tanis and that such right to injunction shall be cumulative and in addition to whatever other remedies the Company may possess.

## 10. Continued Company Success

Upon proven, continuing success of the company during and beyond the length of this agreement, the Company, agrees in its discretion to consider additional compensation and support including but not limited to:

1. Promotions
2. Administrative assistant
3. Participation in profit sharing or stock option program
4. Company car
5. Involvement in equipment purchases
6. Negotiating with suppliers
7. Company credit card
8. Salary increases

## 11. Expenses Paid by Company.

Upon the submission of proper substantiation by Mr. Tanis, and subject to such rules and guidelines as the Company may from time to time adopt, the Company will pay for the following:

1. Meals with customers
2. Cell phone and service
3. Gifts for customers
4. Social events with customers

## 12. Future Position.

Any future salaried position will be negotiated at the time of the promotion.  Any portion of this agreement can be renegotiated at any time as long as both parties agree to the new terms.

## 13. Sale of Business.

Should the business be sold without notice during the term of this contract, 2 months salary will be due at the time of the sale unless Mr. Tanis is offered a position by the purchaser at a similar compensation level.

## 14. Assignability.

Neither party shall have the right to assign or delegate his rights or obligations hereunder, or any portion thereof, to any other person.

## 15. Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the Florida without reference to conflicts of laws principles.  In the event of litigation venue shall exclusively lie in Broward County, Florida.


IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.


COMPANY:  Chromatek Imaging, Inc, a Florida Corporation


By:_____
    Allen Evans, President



_____

W. Scott Tanis

**chromatek**
IMAGING

T: 954-566-1082 ▪ F: 954-563-6207 ▪ 3400 POWERLINE RD ▪ FORT LAUDERDALE ▪ FLORIDA 33309

MEMO
To: Allen Evans
From: W. Scott Tanis
Date: June 6, 2005
Subject: Illegal activities

Dear Allen,

The purpose of this memo is to recap our conversation on June 3, 2005 and to pursue appropriate action as the result of illegal activities that were disclosed to you on that date.

On June 3, 2005, I brought to your attention in the presence of Karen Houlli that a background check was conducted on me and processed on April 18, 2005 through Federal Background Services, Inc.

The report ordered by Karen Houlli included a criminal history, department of corrections, 7 year driver's license, sexual offender / predator, worker's comp, and credit history checks.

These background checks were done without my consent or authorization as required by law. This activity was not disclosed to me and I neither received verbal nor written notification.

Additionally, Karen Houlli's actions were done contrary to the company's policy of pre-screening new applicants as I have been an employee of the company since your purchase of the business on September 14, 2004. To this date, I have not been given a valid reason for these background checks.

Your knowledge of these illegal events obligates you to immediately terminate Karen Houlli for her illegal actions and failure to do so constitutes negligence on your part.

I appreciate your prompt action on this matter.

W. Scott Tanis

DEPOSITION
EXHIBIT
Dept 18
2-24-06

**chromatek**
I M A G I N G

**T:** 954-566-1082   **F:** 954-563-6207   •   3400 POWERLINE RD   •   FORT LAUDERDALE   •   FLORIDA 33309

MEMO
To: Allen Evans
From: W. Scott Tanis
Date: June 8, 2005
Subject: Surrender Report

Dear Allen,

The purpose of this memo is to ask you to surrender to me the illegally obtained
documents that were ordered from Federal Background Services, Inc. on 4-18-05.

I have asked you several times to give me these documents and to date you have refused
to give them to me, even though they were obtained without notice, consent, or written
authorization. As they were obtained illegally, these documents do not belong to you and
keeping them in your possession exhibits further negligent behavior.

Thank you for your prompt response to this issue that needs immediate resolution and
action on your part.

Best regards,

W. Scott Tanis



**LICENSEE NAME/ADDRESS**
WILLIAM SCOTT TANIS
11600 SW 57TH ST
COOPER CITY FL. 33330-4148

**REPORT PREPARED FOR**
FEDERAL BACKGROUND SERVICES IN
PO BOX 6703
LAKE WORTH, FL. 33466

| LICENSE NUMBER | D.O.B. | SEX | HGT | RACE | SOC.SEC |
|---|---|---|---|---|---|
| T520-937-63-380-0 | 10/20/1963 | M | 601 | W | |

| ORIG. ISSUED | ISSUED | EXPIRES | CLASS | STATUS |
|---|---|---|---|---|
| 07/26/1991 | 10/14/2003 | 10/20/2009 | E | ELIGIBLE |

| RESTRICTIONS | ENDORSEMENTS | PRIOR STATE | PRIOR DL# | C.D.L. ISSUED |
|---|---|---|---|---|
| | | IA | 479949138 | |

| NO ENTRY WITHIN THE PAST 7 YEARS AGAINST RECORD IN ABOVE NAME |
|---|

```
TYPE VIOL/SUS CONV/REI HISTORY ENTRY                                    PTS
---- -------- -------- ------------------------------------------------ ---
                      NO ENTRY WITHIN THE PAST 7 YEARS AGAINST  RECORD IN ABOVE
                      NAME
                      ** BLOCK PERSONAL INFORMATION **
                      ** BLOCK FOR MAILING LIST **
                      ** THIS PERSON HAS A DIGITAL IMAGE **


***** END OF RECORD *****
```



DEPOSITION
EXHIBIT
Deft 20
2-24-06

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA


CASE No.: 05-61283-CIV-COHN/MAGISTRATE SNOW

---

WILLIAM SCOTT TANIS,


   Plaintiff,

-vs-


CHROMATEK IMAGING, INC.,

a Florida corporation; ALLEN EVANS,

an individual; and KAREN HOULLI,

an individual,


   Defendants.

---

     Fort Lauderdale, Florida

     March 10, 2006

     11:15 a.m.



     DEPOSITION

      OF

     HARVEY TUCKER

Page 36

1      Q.    For item number one, is it your testimony,

2  sir, that you've already produced to the parties any

3  documents that would be related to item number one?

4      A.    Yes.

5      Q.    For item number two, is it fair to say

6  that that document doesn't exist?

7      A.    Yes.

8      Q.    And what about item number three, do you

9  have any written policies concerning authorizations?

10     A.    No.   Only what's on the application.

11         MR. SMITH:   Okay.   Enter this as

12     Defendant's Exhibit 2.

13         THE WITNESS:   Did I receive this?

14         MR. SMITH:   I don't believe you received

15     the top.   I believe you received the second

16     page.

17         THE WITNESS:   Also Monday?

18         MR. SMITH:   No.

19     (Whereupon, said document was marked as Defendant's

20  Exhibit Number 2 for Identification.)

21     Q.    (By Mr. Smith) Let's look at page 2.   This

22  is a subpoena duces tecum without deposition from

23  Mr. Cassata.

24     A.    Right.

25     Q.    Do you recall receiving this?

1      Q.    Are you aware of any search that your

2   company has done on behalf of a client on a current

3   employee of that client?

4      A.    Driver's licenses.

5      Q.    Driver's licenses?

6      A.    Every year.

7      Q.    Okay.

8      A.    For the DOT.

9      Q.    Any others?

10     A.    No.

11     Q.    Okay.

12     A.    I'm sorry.  Yes.  My nursing homes and

13  health centers require, for a level-two license, to

14  do a criminal background check every year, as a

15  state-licensed health agency.  Those two.

16     Q.    If an employer was doing a background

17  check on a current employee, what policies do you

18  have in place for that situation?

19     A.    None.  The only law that I'm aware of is

20  that you can't fire somebody for prior Workers'

21  Compensation injuries after he's hired and they

22  found out he has a Workers' Compensation claim.

23  That is my interpretation of the law, on Workers'

24  Comp. law.

25          Most of my clients do require that they

1  fill out an application, and I ask them to please

2  put in, were you ever convicted of a crime or

3  arrested of a crime.

4          If for some reason they do a check later

5  on -- once in a while they might have somebody say

6  this person was in jail last weekend -- then I might

7  do another criminal check on that person while he's

8  employed, for criminal reasons, because they heard

9  something.  So I might do, you know, another

10  criminal report on that person.

11     Q.    If one of your customers is investigating

12  one of its employees, say, for potential employee

13  theft, and wanted to do a background investigation

14  on that employee, would your company be a company

15  that it could go to to do something like that?

16     A.    Investigation on what level?

17     Q.    Let's say that as part of their

18  investigation into employee theft, they wanted to do

19  a background report, which would include a Florida

20  criminal history, a criminal record, 50 states, a

21  driver's license history, and a credit history.

22     A.    Yes.

23     Q.    That is something that you would be able

24  to offer?

25     A.    Yes.

1      Q.    But you don't have any policies with

2   regard to a current employee of your client,

3   correct?

4           MR. CASSATA:   Object to form.

5      A.    If somebody was hired last year and they

6   wanted to do another search on them this year, and

7   the person was still working for him, I have no

8   policy against not doing a search, another search on

9   the person.

10     Q.    What if you hadn't done a search before?

11  I believe you testified that you don't have any

12  policies for current employees, correct?

13     A.    Right.  You know, it's pre-employment, you

14  need a release, we do it.

15     Q.    If a company was investigating an employee

16  for a suspected misconduct such as employee theft,

17  would it make sense for the company to have to get

18  that employee's authorization prior to doing that

19  investigation?

20          MR. CASSATA:   Object to form.

21          THE WITNESS:   Am I to answer?

22          MR. CASSATA:   Yeah, you can answer.

23          THE WITNESS:   I'm sorry.

24     Q.    (By Mr. Smith) If a company is

25  investigating one of its employees for, let's say,

1  suspected theft, and they want to order a number of

2  these reports to make a determination as part of

3  that investigation, would it make sense for the

4  company to have to go to that employee and get

5  written authorization from that employee, to tell

6  them, hey, we're doing an investigation on you?

7           MR. CASSATA:  Object to form.

8       A.   If they didn't have an original one, is

9  that --

10      Q.   Correct.

11      A.   Yeah, I require a --

12      Q.   But would it make sense that they have

13 to --

14      A.   I would never know it, whether he's --

15      Q.   But that's not my question.

16           Would it make sense for the company to

17 have to inform the employee, hey, we're doing an

18 investigation on you into suspected theft?

19           MR. CASSATA:  Object to form.

20      A.   You're asking me the law.  I can't answer

21 it.  If we're going to get technical with the law,

22 then I'll bring Tom Tookey in, my attorney.

23      Q.   Okay.  Other than the online form or this

24 fax form, is there any way a client of yours can

25 order background reports?

1        A.    No.

2        Q.    So the only way they can do it is --

3        A.    We do not take verbal, over the phone or

4    verbal order.

5        Q.    But you have no other order form other

6    than the ones you've provided --

7        A.    No.

8        Q.    -- today, correct?

9        A.    These have been changed, which I explained

10    to you before.

11        Q.    Sure, sure.

12        A.    But these formats have always been our

13    policy.

14        Q.    I'm going to ask you a hypothetical that

15    Mr. Cassata will object to, appropriately enough,

16    and my question to you is going to be, if an

17    employer is requesting a search where they are not

18    required to have the customer's signature -- I mean,

19    excuse me, their employee's signature, how would

20    they go about ordering it from you?

21            MR. CASSATA:   Object to form.

22        A.    A signature at all?

23        Q.    Correct.

24        A.    We wouldn't accept it.

25        Q.    You wouldn't accept it?

Page 48

1    A.   No.   Our policy is, no matter what the

2    search is, there has to be a release.

3    Q.   And is it also your policy that you won't

4    release the search unless you have that written

5    authorization?

6    A.   That, or initials of somebody saying it's

7    on file.

8    MR. SMITH:   Okay.   I'm going to enter this

9    as Defendant's Exhibit 4.

10   (Whereupon, said document was marked as Defendant's

11   Exhibit Number 4 for Identification.)

12   Q.   (By Mr. Smith) Can you take a look at

13   Defendant's Exhibit Number 4 for me.

14        I had four copies.

15   A.   I have one.

16   Q.   Actually, I'll take the one you have, and

17   if you want to look at the one --

18   A.   It's the same thing.

19   Q.   Okay.   Could you turn to page 2.   I'm

20   looking at a box, "Initials of Requester," right

21   next to the date.

22   A.   Right.

23   Q.   And the line above that reads, "Searches

24   will be held until we have received the signed

25   authorization," correct?

1      A.    Right.

2      Q.    So unless you have the signed

3  authorization, you won't -- you'll hold the search?

4  You'll run the search, but you won't release it,

5  correct?

6      A.    This is new.  Before this one -- I said

7  this one was changed a couple of months ago.

8      Q.    Okay.

9      A.    I can't tell you the exact wording, but it

10  was worded that if the initial of the requester was

11  signed, then they're attesting that they have a

12  release in their files.

13      Q.    But we don't have that, you don't have

14  that form with you?

15      A.    No, I don't, sir.

16      Q.    So we don't know what the actual language

17  is on that release form?

18      A.    No, I don't.  After this case here, we

19  revised it.

20      Q.    After you received the call from --

21      A.    It was after --

22      Q.    -- Mr. Tanis and --

23      A.    It was after all this.  We -- we just

24  tightened the reins a little bit.

25      Q.    Sure.

1   correct?

2        A.   Yes.

3        Q.   Okay.  And just my last question is, so if

4   an employer did not have an employee's written

5   authorization to do the reports, there was no other

6   way for them to get your company to do a background

7   report unless they filled out either this fax or the

8   online report, online request form, correct?

9        A.   Yes, yes.

10       Q.   And initialed it, correct?

11       A.   Yes.

12            MR. SMITH:  Okay, that's all I have.

13            MR. CASSATA:  We're done.

14            You have the right to read, or you can

15       waive it if you don't want to read?

16            THE WITNESS:  No.

17                      STIPULATION

18   It is hereby stipulated by and between counsel for the

19   respective parties and the witness that the reading and

20   signing of the foregoing deposition and notice be, and the

21   same are, hereby waived.

22            AND FURTHER DEPONENT SAITH NAUGHT

23            (Deposition concluded at 12:30 p.m.)

24

25

Page 60

# C E R T I F I C A T E

I, LAURIE VELO, Registered Merit Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing testimony was taken before me; that the witness was duly sworn by me; and that the foregoing pages constitute a true record of the testimony given by said witness.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, nor financially interested in the action.

Dated this 29th day of March, 2006.

LAURIE VELO, R.M.R.

Notary Public, State of Florida at Large

Commission No.: DD137599

My commission expires: 9/10/06

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 05-61283-CIV-COHN/Magistrate Snow

WILLIAM SCOTT TANIS,                    :
                                        :
     Plaintiff,                       :
                                        :
vs.                                     :
                                        :
CHROMATEK IMAGING, INC.,                :
a Florida corporation; ALLEN EVANS      :
an individual; and KAREN HOULLI,        :
an individual,                          :
                                        :
     Defendants.                      :
_____ :

## DECLARATION OF ALLEN EVANS

I, Allen Evans, a resident of Broward County, Florida, under penalty of perjury and from personal knowledge make the following declaration:

1.    I am the sole Owner and President of Chromatek Imaging, Inc. I have been in this position since September 14, 2004.

2.    On September 14, 2004, I purchased the assets of Chromatek Photo Imaging, Inc., including the building, land, equipment, and customer lists.

3.    I named the new company Chromatek Imaging, Inc. ("Chromatek"), and offered employment to all of the employees who had been with Chromatek Photo Imaging, Inc. The majority of them decided to come to work for Chromatek Imaging, Inc., including William Scott Tanis, who became as Chromatek Imaging, Inc.'s sales manager.

4.    I divided Chromatek into three distinct departments: sales, production, and accounting, and assigned the employees to the appropriate departments.

5.      Soon after Chromatek was created, Mr. Tanis approached me and requested a $17,000 raise, from $40,000 per year to $57,000 per year.  We prepared a proposed employment contract based on sales goals proposed by Mr. Tanis.

6.      Mr. Tanis' sales goals were $47,500 in sales per month, for a total of $570,000 per year.  Because his proposed salary would be the equivalent of his receiving a ten percent commission on $570,000 in sales per year, I was comfortable with Mr. Tanis' proposed sales goals.  Mr. Tanis would also receive a ten percent commission on all sales in excess of $47,500 per month

7.      Based on his assurances that he would be able to meet and exceed his sales goals, and due to the fact that at the time in late September 2004, Mr. Tanis was my only sales person, I agreed to increase his pay to $57,000 per year, plus ten percent commission on all sales in excess of $47,500 per month.

8.      As the sales manager, Mr. Tanis was in charge of the customer service employees who handled walk-in customers such as photographers or others seeking film developing.  Mr. Tanis also was in charge of training and supervising all new commercial sales people that Chromatek hired.

9.      At no point during his employment with Chromatek did Mr. Tanis have supervisory authority over the managers or supervisors of the accounting or production department.

10.     As the sales manager, Mr. Tanis was also responsible for Chromatek hitting its goal of $100,000 in sales per month, with Mr. Tanis' own commercial sales accounting for $47,500 of that total.

11.     Despite his assurances, Mr. Tanis only hit his personal sales goals twice, out of the approximately 9 months he worked at Chromatek; and averaged only $37,000 per month in sales, approximately $10,500 per month below his own proposed sales goals

12.     In late 2004, I decided to begin using a van for Chromatek deliveries, and asked several of Chromatek's employees, including Mr. Tanis, if they wanted to be placed on Chromatek's auto insurance so they could use the van.  Mr. Tanis agreed and he provided Chromatek with his drivers' license information.  This information was forwarded to Chromatek's auto insurance company so Mr. Tanis could be added to the policy.  A true and correct copy of a list of those employees added to the insurance policy is attached at Exhibit 1.

13.     On January 6, 2005, Houlli approached me and requested that I meet with Mr. Tanis and herself concerning a list of issues that Mr. Tanis had with Ms. Houlli.  During the meeting, Ms. Houlli stated that Mr. Tanis continually mistreated and berated her in front of other employees, and did not treat her with the respect due a fellow manager.

14.     After the meeting, Ms. Houlli went out on leave, and on January 18, 2005, submitted her resignation to me.  I was able to convince Ms. Houlli to withdraw her resignation after assuring her that I valued her as an employee and we would be able to work through the issues with Mr. Tanis.

15.     On April 22, 2005, Laura Morales, Chromatek's production supervisor, submitted her resignation from her supervisor position.  Ms. Morales explained that the verbal harassment by Mr. Tanis, and her constant stress as a result, was overwhelming and prevented her from performing her job efficiently.  A true and correct copy of the memorandum that I received from Ms. Morales is attached at Exhibit 2.

16.     Another employee, Karen Alper, who was a sales person hired by Chromatek after being recommended by Mr. Tanis, complained to me on June 7, 2005, concerning the lack of support and direction provided by Mr. Tanis.

17.     On February 22, 2005, I formally offered Randy Schneider, my business partner with Full Spectrum Media, to assume all responsibilities for Chromatek Imaging and Full Spectrum Media's sales activities.  A true and correct copy of the February 22, 2005 letter I sent to Mr. Schneider is attached at Exhibit 3.

18.     I also decided that Mr. Schneider, as the new Vice President of Sales, should make the decisions on all things sales related, including Mr. Tanis' future with the company in light of my growing dissatisfaction with Mr. Tanis' continued failure to achieve his sales goals and the employee complaints that had been raised against Mr. Tanis.

19.     On March 10, 2005, I received Chromatek's monthly financial statement compilation for February 2005 from Chromatek's accountant, Rich Gruber.  Mr. Gruber pointed out that Chromatek had a dramatic increase in its Cost of Goods between January and February 2005 ("cost of goods problem").  A true and correct copy of the March 10, 2005 cover letter I received from Mr. Gruber is attached at Exhibit 4.

20.     On March 14, 2005, I met with Mr. Gruber concerning the cost of goods problem, and he explained to me the various things that could cause the disparity, as well as the steps to take to investigate.  The explanation that really stood out to me from the ones listed by Mr. Gruber was the possibility of employee theft.

21.     On March 30, 2005, I met with Karen Houlli concerning the cost of goods problem and various issues she had raised in a March 29, 2005 memorandum she had prepared.

22.     During that March 30, 2005 meeting, I decided that Ms. Houlli and I needed to conduct a thorough investigation into the cost of goods problem and into the possibility of employee theft, and we devised a number of steps to take to investigate.

23.     Ms. Houlli and I developed a list of four employees who we believed might have the capacity to steal from Chromatek, with Mr. Tanis being the most likely suspect for a variety of reasons, including his contacts in the industry, his ability to remove inventory from Chromatek, and his access to Chromatek's offices.

24.     Soon after Ms. Houlli and I began our investigation, I mentioned to Mr. Tanis that I was concerned that an employee may be stealing from Chromatek in order to gauge his reaction.

25.     On June 20, 2005, Mr. Schneider and I terminated Mr. Tanis from Chromatek, due to his blatant insubordination, his refusal to work as part of a team, the complaints brought against him by three female employees, and his continued failure to achieve his sales goals

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE STATEMENTS IN THIS DECLARATION, CONSTITUTING OF FIVE (5) PAGES ARE TRUE AND CORRECT.

Executed this ___7th___ day of April 2006.

ALLEN EVANS

| Driver | Name | DOB | License# | State | MVR Ordered? | MVR Status | |
|--------|------|-----|----------|-------|--------------|------------|---|
| 1 | EVANS, ALLEN | 4/11/1965 | E152761651310 | FL | Yes | Clear | Delete |
| 2 | DAVIS, TERRANCE | 7/13/1952 | 503890126 | NY | Yes | Clear | Delete |
| 3 | SOLLEY, MICHAEL | 3/21/1984 | S400541841010 | FL | Yes | Clear | Delete |
| 4 | TANIS, WILLIAM | 10/20/1963 | T520937633800 | FL | Yes | Clear | Delete |
| 5 | BLANDON, JAIRO | 5/10/1970 | B453421701700 | FL | Yes | Clear | Delete |

Click here to add another driver



EXHIBIT

tabbies

1

| BILL | POLICY NUMBER | TC | PRODUCER NUMBER | AC | ACCOUNT NUMBER | AUDIT |
|------|---------------|----|-----------------|----|--------------|-------|
| A | PAS 00086480 | | 13622329 | | MO15247689-001-00001 | NONE |

2147   BRANCH  SD  SOUTHEAST FLORI                                    ENDORSEMENT EFF 02/24/2005

**PRECISION PORTFOLIO POLICY**

**POLICY CHANGES**

**Z**

**ZURICH**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

| POLICY EFFECTIVE | | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|---|
| FROM | TO | | |
| 09/07/2004 | 09/07/2005 | 02/24/2005 | ASSURANCE COMPANY OF AMERICA |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| CHROMATEK IMAGING, INC.<br>3400 POWERLINE ROAD<br>FORT LAUDERDALE FL 33309 | TCC ASSOCIATES, INC.<br>PO BOX 11975<br>FORT LAUDERDALE FL 33339-1975 |

**COVERAGE PARTS AFFECTED**

COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART

**CHANGES**

ADDED AUTO TO THE POLICY
DELETED HIRED AND NON-OWNED AUTOMOBILE LIABILITY
DELETED HIRED AND NON-OWNED AUTOMOBILE LIABILITY
FULL TERM PREMIUM INCLUDING THIS TRANSACTION: $    8,698.00
PREMIUM EFFECT OF THIS TRANSACTION:         $    1,981.00

Countersigned by _____          05/07/05
                        Authorized Representative              Date

Copyright, Insurance Services Office, Inc., 1983.
Copyright, ISO Commercial Risk Services, Inc., 1983.

**INSURED'S COPY**

IL 12 01 06 01                                                        02/24/2005

Chrom 0042

To: Allen Evans

From: Laura Morales

Date: April 22nd, 2005

Re: Resignation

---

Allen,

On the morning of December 1st of 2004, after you announced that I will take the responsibility of Production Supervisor for Chromatek Imaging. I was really happy about the opportunity. An hour later Scott Tannis approached me and told me in the Digital Department, that he didn't know if I was capable to do the job. At that moment all the confidence that I had, was gone. He said, "will see what happen, but congratulations anyway". Since that moment I felt he was looking over my shoulder and I know he was pushing with deadlines in order to see if I was capable to do it. I felt I was constantly harassed. As a production supervisor I made sure that the employees meet the requirements.

On March 9th of 2005 Scott ask me to have a meeting in the morning in the kitchen and he ask me if I had something personal with him. Which I didn't. He told me I was insubordinate because I wasn't doing things that he would tell me to do. (He want me to call a friend of him, Angel to come and work for as for a day or two and as a productions supervisor I had that position cover all ready and I didn't see any necessity to hire nobody else). Also he said that because I am in salary I have to work more that 8 hours. Through out the meeting he kept stating the he was the number two and I had to report to him at all times. At that time I told him that I would have to talk to you about that. Then we called you in to the meeting.

I always felt pressure from him all the time. I was always carefully, making sure I wasn't making any mistakes. Today after a lot of pression coming from Scott I had a confrontation with him in the Digital Department (Justin Bordeaux and Fernando Cruz were present), he was pushing to have a work done in couple hours when it was physically and machinery impossible.

Due to this and his disrespect to me I am resigning as Production Supervisor effective immediately. The verbal harassment and constant stress is overwhelming. This prevents me from performing my job efficiently.

In the future I could resume the position only if Mr. Scott Tanis is not longer with the company.

Thank you, for the opportunity and for believing in me.

Laura Morales/

EXHIBIT

2

Chrom 0078

**chromatek**
IMAGING

T: 954-566-1082 · F: 954-563-6207 · 3400 POWERLINE RD · FORT LAUDERDALE · FLORIDA 33309

February 22, 2005

Mr. Randy Schneider
1705 Avenida del Sol
Boca Raton, FL  33432

Dear Randy,

I want to formalize our discussions from last week.

Effective immediately, I will assume responsibility for the daily financial operations of
Full Spectrum Media, as well as, Chromatek Imaging.

Likewise, you will assume responsibility for all sales activity for Chromatek Imaging, in
addition to Full Spectrum Media.  You will advise me as to the date you are prepared to
make the sales transition.  At such time, Scott Tanis and the rest of the Chromatek sales
team will report to you.

This will make both companies stronger by better utilizing our strengths.  I'm excited to
bring your professional sales experience to Chromatek.

Regards,

Allen Evans

EXHIBIT
3

 **GRUBER AND ASSOCIATES, P.A.**

CERTIFIED PUBLIC ACCOUNTANTS
6550 North Federal Highway, Suite 522
Fort Lauderdale, Florida 33308-1404
www.grubercpa.com

Accounting
Taxation
Consulting
Financial Planning

| | |
|---|---|
| Office | (954) 522-2222 |
| Fax | (954) 522-9999 |
| Mobile | (954) 647-7777 |
| Toll-Free | (800) 9-GRUBER |
| Email | rcg@grubercpa.com |

To the Shareholder of:
Chromatek Imaging, Inc.

We have compiled the accompanying statement of assets, liabilities, and equity - income tax basis of Chromatek Imaging, Inc. (an S corporation) as of February 28, 2005, and the related statement of revenues and expenses - income tax basis for the two months then ended in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. The financial statements have been prepared on the accounting basis used by the Company for income tax purposes, which is a comprehensive basis of accounting other than generally accepted accounting principles.

A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or any other form of assurance on them.

Management has elected to omit substantially all of the disclosures ordinarily included in financial statements prepared on the income tax basis of accounting. If the omitted disclosures and the statement of cash flows were included in the financial statements, they might influence the user's conclusions about the Company's assets, liabilities, equity, revenues, and expenses. Accordingly, these financial statements are not designed for those who are not informed about such matters.

The Company, with the consent of its shareholders, has elected under the Internal Revenue Code to be an S corporation. The shareholders of an S corporation are taxed on their proportionate share of the Company's taxable income in lieu of paying corporate income taxes. Therefore, no provision or liability for federal income taxes has been included in these financial statements.

GRUBER AND ASSOCIATES, P.A.

*Gruber and Associates P.A.*

March 10, 2005

*① Yukon depreciation can change if profitable*

*② Concerns with gross profit percentage*

*③ Employee Theft?*

*COGS*

*JAN 19.7%*

*FEB 44.7%*

**EXHIBIT
4**

American Institute of Certified Public Accountants
Florida Institute of Certified Public Accountants

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 05-61283-CIV-COHN/Magistrate Snow

WILLIAM SCOTT TANIS,        :
                            :

      Plaintiff,              :
                            :

vs.                            :
                            :

CHROMATEK IMAGING, INC., INC.,   :
a Florida corporation; ALLEN EVANS   :
an individual; and KAREN HOULLI,   :
an individual,               :
                            :

      Defendants.            :
                            :

_____

## DECLARATION OF RICHARD GRUBER

I, Richard Gruber, a resident of Broward County, Florida, under penalty of perjury and from personal knowledge make the following declaration:

1.      My name is Richard Gruber. I am currently the owner of Gruber & Associates, P.A., and we provide accounting and payroll services for Chromatek Imaging, Inc. ("Chromatek"). We have provided such services for Chromatek since that company's inception on September 14, 2004.

2.      On March 10, 2005, I signed off on Chromatek's monthly financial statement compilation for February 2005. Such statements were compiled by us, and neither audited or reviewed. Accordingly, we express no opinion or limited assurance thereon. That compilation indicated a cost of sales percentage of 19% for January 2005 and 44% for February 2005.

3.      On March 14, 2005, Allen Evans met with me in my office, as was his normal practice anytime he had any questions or concerns with a financial statement compilation.

Specifically, he wanted to discuss the possible explanations for the dramatic increase in Chromatek's cost of goods.

4.      I explained to Mr. Evans that there were a number of different possible causes for the cost of goods problem, including poor inventory controls, paperwork issues such as improper invoicing or month-end cutoff, and employee theft.

5.      I explained to Mr. Evans possible steps he could take to determine the reasons for cost of sales increasing, including employee training in properly determining month-end cutoff, conducting a hard inventory count regularly, and attempting to determine cost for particular jobs on an individual basis.

6.      I then informed Mr. Evans that if these steps did not lead Mr. Evans to the cause of the cost of sales problem, a possibility would be to investigate the possibility of employee theft.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE STATEMENTS IN THIS DECLARATION, CONSTITUTING OF TWO (2) PAGES ARE TRUE AND CORRECT.

Executed this **6** day of April 2006.

RICHARD GRUBER

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 05-61283-CIV-COHN/Magistrate Snow

WILLIAM SCOTT MR. TANIS,                    :
                                            :
        Plaintiff,                          :
                                            :
vs.                                         :
                                            :
CHROMATEK IMAGING, INC.,                    :
a Florida corporation; ALLEN EVANS          :
an individual; and KAREN HOULLI,            :
an individual,                              :
                                            :
        Defendants.                         :
                                            :
_____     :

## DECLARATION OF KAREN HOULLI

I, Karen Houlli, a resident of Broward County, Florida, under penalty of perjury and from personal knowledge make the following declaration:

1.      I am currently employed as the Accounting Manager for Chromatek Imaging, Inc. ("Chromatek"). I have held this position since September 23, 2004.

2.      As the Accounting Manager, I am in charge of the accounts payable, accounts receivable, and bank reconciliations. I also handle minor payroll issues and perform light Human Resources ("HR") duties.

3.      As part of my HR duties, I would have new employees complete a Form I-9, for employment verification, and would examine the identification documents provided by the employee as required pursuant to the Form I-9.

4.      Also as part of my HR duties, I ordered pre-employment background checks on applicants with whom Chromatek, or any employee at Chromatek, did not know personally.

5.    Federal Background Services ("FBS") was the company I would use to do these pre-employment background checks. I would utilize FBS' online order form whenever I ordered such a background check.

6.    On November 5, 2004, Scott Tanis completed a Form I-9 and submitted it to me, along with a copy of his drivers' license. Mr. Tanis included his full name, address, date of birth, social security number, and drivers' license number on the Form I-9.

7.    On January 18, 2005, I submitted a letter of resignation to Mr. Evans in light of Mr. Tanis' continual harassment and disrespect of me at Chromatek, including his berating me in front of other employees, despite our both being managers. A true and correct copy of my January 18, 2005 resignation letter is attached at Exhibit 1.

8.    Mr. Evans talked me out of resigning by assuring me that I was a very valuable member of Chromatek and that he felt we should be able to work out any issues between Mr. Tanis and myself in a professional manner. Based on Mr. Evans' assurances, I withdrew my resignation.

9.    On March 30, 2005, I met with Mr. Evans to discuss the steps we needed to take to determine the reason for a increase in the cost of goods, including possible employee theft, that Mr. Evans' accountant had raised. We also discussed the issues concerning cash register shortages, and problems with the closing procedures and alarm setting that I had brought to Mr. Evans' attention in a March 29, 2005 memorandum.

10.    During that meeting, we created an action plan for the investigation we would be conducting, which included a number of steps we would take to attempt to solve the cost of goods problem and the cash register shortages.

-2-

11.    The final step we decided upon was ordering a background report on Mr. Tanis. I only did this after the other steps in our investigation did not lead us to the cause of the cost of goods problem, and we therefore believed employee theft was the cause.

12.    Mr. Evans directed me to order a background report on Mr. Tanis, and get whatever background information I could that might show whether Mr. Tanis had any reason to steal from Chromatek, or whether he might have actually stolen from Chromatek.

13.    Mr. Evans did not, however, specify which background reports I should order, and I made the decision on which ones to order as part of our investigation into suspected employee theft.

14.    On April 18, 2005, Mr. Evans asked me if I had ordered the background check on Mr. Tanis, which I had not because I had been busy completing the other steps of our investigation.

15.    Later in the day on April 18, 2005, right before I left for the day to pick up my daughter at daycare, I went online to FBS' website to order the background reports. I clicked on the boxes next to the following reports that I felt would provide information on Mr. Tanis that would help sustain or dismiss the possibility that he was stealing from Chromatek: a Florida Criminal History, a 50 State Criminal Records History, an Individual Credit History, and a Florida Drivers License History.

16.    I ordered the Florida Criminal History and 50 State Criminal Records History as these would show whether Mr. Tanis had ever been convicted of a crime involving theft or dishonesty in the recent past.

17.    I ordered the Individual Credit History because it could indicate whether Mr. Tanis was having any financial difficulties that might lead him to steal from Chromatek, or

whether he had recently paid off large amounts of credit or other loans which could indicate that he had obtained significant income from a source other than his pay from Chromatek.

18.     I ordered the Florida Drivers License History because Mr. Tanis had been doing a lot of deliveries and any traffic infractions he may have had while on the clock for Chromatek could indicate whether he was making deliveries to actual Chromatek customers.

19.     In my rush to get out of work on time to pick up my daughter, I inadvertently checked the boxes for two reports that I did not mean to order: a National Sexual Offender/Predator record and a Florida Workers Compensation Report.

20.     At the bottom of the order form was a box for me to enter my initials authorizing FBS to run the requested reports, which I did.  I do not believe there was anything on the form requiring that I have written authorization from Mr. Tanis to order any of the background reports.

21.     Neither Chromatek, Mr. Evans, nor myself received any of the requested background reports from FBS until July 22, 2005.  To my knowledge, the reports were only sent after I disputed an invoice we received from FBS earlier in July 2005 for the background reports. I wrote a letter to FBS on July 20, 2005, contesting the invoice and explaining to FBS that we had never received the background reports, nor did we need them since Mr. Tanis was no longer with Chromatek.  A true and correct copy of my July 20, 2005 letter is attached at Exhibit 2.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE STATEMENTS IN THIS DECLARATION, CONSTITUTING OF FOUR (4) PAGES ARE TRUE AND CORRECT.

Executed this  7  day of April 2006.

KAREN HOULLI

Karen Houlli
4025 N. Nob Hill Road Unit 201
Sunrise, FL 33351

January 18th, 2005

Allen Evans
President
Chromatek Imaging
3400 Powerline Road
Ft. Lauderdale, FL 33309

Dear Mr. Evans:

The recent events that took place on January 6th, with Mr. William Tanis, and yourself demand that I resign from Chromatek Imaging, Inc. effective immediately.

My disagreement with the disorganization and the unprofesional manner of Mr. William Tanis, as well as his belittlements of me and other coworkers is and will prevent me from performing my job effectively.

My experience at Chromatek Imaging, has taught me much, and I am grateful for the experience.

I appreciate having had the opportunity to work with so many talented and terrific people. I wish all of you the best.

Sincerely,

Karen Houlli
Accounting Manager

EXHIBIT
1



**T:** 954-566-1082   **F:** 954-563-6207  •  3400 POWERLINE RD  •  FORT LAUDERDALE  •  FLORIDA  33309

July 20th, 2005

Chromatek Imaging, Inc
3400 Powerline Road
Ft. Lauderdale, FL 33309

Federal Background Services
Accounts Receivables Department
PO Box 6703
Lake Worth, FL 33466

To Whom It May Concern:

We received your invoice number 2628 for the amount of $67.00, but at this time, we are withholding delivery of payment, due to the fact that we have not received the report.

We will not be needing this service, since the employee; (William Scott Tanis) is no longer an employee of Chromatek Imaging, Inc.

Thank you for your prompt attention to this matter. If you have any questions please feel free to contact me at 954-566-1082

Sincerely,

Karen Houlli
Accounting Manager



EXHIBIT

2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 05-61283-CIV-COHN/Magistrate Snow

WILLIAM SCOTT MR. TANIS,

    Plaintiff,

vs.

CHROMATEK IMAGING, INC., INC.,
a Florida corporation; ALLEN EVANS
an individual; and KAREN HOULLI,
an individual,

    Defendants.

## DECLARATION OF RANDY SCHNEIDER

I, Randy Schneider, a resident of Palm Beach County, Florida, under penalty of perjury and from personal knowledge make the following declaration:

1.    I have been a business partner with Allen Evans since January 2004, and together we own Full Spectrum Media ("Full Spectrum"). Full Spectrum offers public relations services to individuals and companies.

2.    Besides being a co-owner of Full Spectrum, I also am employed as the Vice President of Sales for Chromatek Imaging, Inc. ("Chromatek"), as well as Full Spectrum Media. I have held the vice president position since June 1, 2005, and have been paid on a 100% commission basis the entire time that I have been employed with Chromatek.

3.    On February 15, 2005, in light of Chromatek's flagging sales, Mr. Evans met with me concerning my thoughts on a new direction to take Chromatek in order to improve sales.

4.    On February 22, 2005, Mr. Evans made a formal offer to me to assume all responsibilities for Chromatek Imaging and Full Spectrum Media's sales activities. Attached at Exhibit 1 is a true and correct copy of the February 22, 2005 letter I received from Mr. Evans.

5.    I accepted Mr. Evans' offer on March 3, 2005, and suggested that I start on June 1, 2005. Attached at Exhibit 2 is a true and correct of the March 3, 2005 note I sent to Mr. Evans.

6.    Mr. Evans informed me that as the Vice President of Sales, I would have the final decision on all things sales related, including personnel decisions. Out of respect for our business relationship and friendship, however, I would always run by Mr. Evans any major decision I was planning on making.

7.    Prior to my officially assuming the vice president position, I had numerous conversations with Mr. Evans concerning Chromatek and different ways to improve the sales numbers, and I made frequent appearances at Chromatek's office.

8.    On more than one occasion, Mr. Evans and I discussed Mr. Tanis' continual failure to meet his sales goals, and it was clear that Mr. Evans did not see a future for Mr. Tanis at Chromatek.

9.    On June 1, 2005, I went to lunch with Mr. Evans and Mr. Tanis, wherein Mr. Evans explained to Mr. Tanis that I was assuming the position of Vice President of Sales. We then explained to Mr. Tanis what my plans were for the sales department, as well as our new sales strategy, which was going to include the cross-selling of the public relations services offered by Full Spectrum Media.

10.    On June 3, 2005, Mr. Tanis approached me toward the end of the day and mentioned that his credit report had been pulled by Karen Houlli and Mr. Evans. I told Mr.

Tanis that it sounded like an issue he needed to take up with Mr. Evans and Ms. Houlli. I heard nothing more concerning Mr. Tanis' credit report being pulled until July 1, 2005, after Mr .Evans received a draft of Mr. Tanis' court complaint from Mr. Tanis' attorney.

11. On June 6, 2005, I was formally announced as the Vice President of Sales for Chromatek and Full Spectrum.

12. Mr. Tanis remained in his sales manager position, retaining all the same duties and responsibilities he had prior to my starting, with the exception that he now reported directly to me rather than to Mr. Evans.

13. Also in early June 2005, I decided to bring two new sales people on board at Chromatek, Jason Weeks and John Walker. Mr. Evans had no objections, and on June 8, 2005, Mr. Walker was hired as a full time sales person, with Mr. Weeks joining Chromatek as an independent contractor who was paid on a 100% commission basis.

14. It has long been my belief that sales people are more motivated, and hence produce more sales, when they are paid on a straight commission basis, rather than on a salary or draw against commission basis.

15. As a result, I decided that Chromatek should change its compensation structure for its sales people, from a salary/draw against commission structure, to a 100% commission basis.

16. Realizing that sales people need some time to develop a customer base, however, I decided that for new sales people, they would receive a draw against commission for 6 months before they would be switched to 100% commission.

17. Six months is the commonly accepted time frame in the sales industry to make these kind of changes to compensation structure.

-3-

18.     On June 15, 2005, Mr. Evans agreed with my proposed changes to the compensation structure for Chromatek's sales people.

19.     Right from the time we informed Mr. Tanis that I would be joining Chromatek as the Vice President of Sales, I felt a lot of resistance from Mr. Tanis with regard to my ideas on the direction in which to take Chromatek's sales.

20.     Despite this, I decided that I would take an active role in trying to turn Mr. Tanis' sales around. In order to accomplish this, I requested that Mr. Tanis begin setting up sales calls on which he could take me, so I could meet and become familiar with the customer base and give Mr. Tanis suggestions as to how to expand upon his existing customer base.

21.     Mr. Tanis continually failed to take me out on any sales calls, and to my knowledge, never planned to set any up for me.

22.     Moreover, Mr. Tanis began making sales calls specifically when he knew I would not be available, or would not wait even ten to fifteen minutes for me to get back to the office to go out on the sales calls about which he notified me at the last minute.

23.     On June 8, 2005, I received an email from Karen Alper, a sales person, relaying her complaints and concerns about Mr. Tanis and his performance as her sales manager. Specifically, Ms. Alper felt that she was not getting the necessary training or support from Mr. Tanis. A true and correct copy of the June 8, 2005 email from Ms. Alper is attached at Exhibit 3.

24.     Related to this, Mr. Tanis showed a distinct lack of interest in training Mr. Walker, despite Mr. Tanis being Chromatek's sales manager.

25.     Moreover, on or around June 17, 2005, when I spoke with Mr. Tanis on the telephone and explained to him Chromatek's new compensation structure that was going into

effect on July 1, Mr. Tanis told me that he was done speaking with me and proceeded to hang up on me.

26.     Mr. Tanis called me back approximately 30 minutes later, and proceeded to tell me that I knew nothing about the sales business and that I was merely a puppet for Allen Evans. Mr. Tanis proceeded to speed dial my telephone and hang up until 9:45 p.m.

27.     As a result of the June 17th incident, Mr. Tanis' continued blatant insubordination, his refusal to work as part of Chromatek's sales team, the June 7th complaint by Ms. Alper as well as the prior complaints that Mr. Evans informed me had been made by Ms. Morales and Houlli, and Mr. Tanis' continued failure to even come close to his sales goals, I realized that we would have no choice but to terminate Mr. Tanis' employment.

28.     I spoke with Mr. Evans regarding my thoughts on terminating Mr. Tanis' employment, and Mr. Evans concurred with my decision.

29.     On June 20, 2005, I prepared Mr. Tanis' termination letter, and handed it to him during his meeting with Mr. Evans and myself, telling Mr. Tanis that Chromatek was heading in a different direction.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE STATEMENTS IN THIS DECLARATION, CONSTITUTING OF FIVE (5) PAGES ARE TRUE AND CORRECT.

Executed this _6th_ day of April 2006.

RANDY SCHNEIDER



**T:** 954-566-1082  **F:** 954-563-6207 • 3400 POWERLINE RD • FORT LAUDERDALE • FLORIDA 33309

February 22, 2005

Mr. Randy Schneider
1705 Avenida del Sol
Boca Raton, FL 33432

Dear Randy,

I want to formalize our discussions from last week.

Effective immediately, I will assume responsibility for the daily financial operations of Full Spectrum Media, as well as, Chromatek Imaging.

Likewise, you will assume responsibility for all sales activity for Chromatek Imaging, in addition to Full Spectrum Media. You will advise me as to the date you are prepared to make the sales transition. At such time, Scott Tanis and the rest of the Chromatek sales team will report to you.

This will make both companies stronger by better utilizing our strengths. I'm excited to bring your professional sales experience to Chromatek.

Regards,

Allen Evans

EXHIBIT

1

Chrom 0081



**Chromatek**
I M A G I N G

T: 954-566-1082  •  F: 954-563-6207  •  3400 POWERLINE RD  •  FORT LAUDERDALE  •  FLORIDA 33309

*Allen,*                    *3/8/05*
*Everything looks good,*
*lets st ot for June 1st*
*for a solid Sales transition.*

*Cant Wait Lets*
*Rock & Roll*
*Randy*

February 22, 2005

Mr. Randy Schneider
1705 Avenida del Sol
Boca Raton, FL  33432

Dear Randy,

I want to formalize our discussions from last week.

Effective immediately, I will assume responsibility for the daily financial operations of
Full Spectrum Media, as well as, Chromatek Imaging.

Likewise, you will assume responsibility for all sales activity for Chromatek Imaging, in
addition to Full Spectrum Media.  You will advise me as to the date you are prepared to
make the sales transition.  At such time, Scott Tanis and the rest of the Chromatek sales
team will report to you.

This will make both companies stronger by better utilizing our strengths.  I'm excited to
bring your professional sales experience to Chromatek.

Regards,

Allen Evans

**EXHIBIT**
**2**
tabbies

Chrom 0081

Subj:    **environment-Chromatek**
Date:    6/8/2005 11:55:39 A.M. Eastern Daylight Time
From:    <u>kalper@chromatekimaging.com</u>
To:    <u>randy@randport.com</u>

Hi Randy,

I'm glad that we got to speak also - I hope I can give you an unbiased view of my impression of Chromatek so far. First, about myself, I have been in sales for approximately 15 years or more - and I'm the type of person who does not move from job to job. Chromatek does not at this time have a sales focus and I think that is due to management. I have no background in graphics so what I was really expecting was basic knowledge of what we do here so I could talk intelligently to clients. My training has been 2-3 sales calls with Scott and one lesson on pricing which is key. I have been here 3 months and didn't know till today they (clients) could upload on our web site. To me that's basic information. In my previous position in which I sold rental agreements for floor mats , I was with my manger for two weeks absorbing and getting a handle of what the position entailed. Here I was with Scott for maybe two hours tops the first week , then he was out sick for three weeks, so I had no guidance whatsoever - and when he came back I sat back in my office for two days before he came back to say hello. To cut to the chase ,and I've said it to him , I have had no support from him. It's one thing to want to be a sales manager and to actually being one if that makes any sense. I would've spoken to Alan about it but I was under the impression that it would've been a no win situation , which is not the case. I basically feel that I was thrown back here to make phone calls and good luck to me. from speaking with Alan and terry , that was basically what happened to terry when he was in sales. Right now I have a good idea of what I need to know and if I do have questions I tend to ask terry, who I might add as been very helpful. the gist of it is, right now I've brought in four orders, I've made lots of contacts, the potential is here to make money and bring business in, we just need focus and support. I personally cannot live on what I am making here and the quicker I start making commissions, the happier I'll be.
I'm going to wrap it up and we'll talk.

Regards

Karen



Chrom 0080

Thursday, June 09, 2005 America Online: RandPort